IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITADEL SECURITIES LLC,<br>830 Brickell Plaza<br>Miami, Florida 33131<br><br>         Plaintiff,<br><br>    v.<br><br>CONSOLIDATED AUDIT TRAIL, LLC,<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801<br><br>         Defendant. | Civil Action No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, Citadel Securities LLC, by and through its undersigned counsel, brings this Complaint for Declaratory and Injunctive Relief against Defendant Consolidated Audit Trail, LLC (CAT LLC or the Company), and in support alleges as follows:

**INTRODUCTION**

1.      In this case, Plaintiff Citadel Securities seeks temporary injunctive relief to prevent Defendant CAT LLC from spending tens of millions of dollars it unlawfully collected from broker-dealers in reliance on authority purportedly delegated to it by the U.S. Securities and Exchange Commission (SEC or Commission) before the SEC has any opportunity to review or weigh in on CAT LLC's planned expenditures.

2.    The Constitution includes mechanisms to ensure that those who wield government power remain accountable to the people. The Vesting Clauses, for example, prevent government officials from shielding themselves from political accountability by improperly delegating government power. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025). The Constitution thus forbids members of one branch of government from delegating their assigned functions to members of another. *Id.*

3.    The Constitution likewise forbids government officials from delegating federal power to private entities. *Id.* at 692. That is "delegation in its most obnoxious form," for rather than transfer one branch's power to the "presumptively disinterested" officials of another, it grants it "to private persons whose interests may be and often are adverse to the interests" of those they are regulating. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

4.    This bedrock constitutional principle—that the government cannot "allow[] non-governmental entities to govern"—is often called "the private nondelegation doctrine." *Consumers' Rsch.*, 606 U.S. at 697. Under this framework, the government may "enlist private parties to give it recommendations," so long as the appropriate government official "retains decision-making power." *Id.* at 692. But in those situations, "the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve, disapprove, or modify' the private entity's actions and decisions on delegated matters." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1325 (D.C. Cir. 2025) (alterations omitted). By contrast, if the private party's exercise of federal power can take "effect without an

agency's say-so," the delegation is unconstitutional. *Consumers' Rsch.*, 606 U.S. at
695.

5.    This case involves just such an unconstitutional delegation. Over a
decade ago, the SEC ordered CAT LLC—a nominally private entity made up of self-
regulatory organizations (SROs) in the financial industry—to create and administer
an unprecedented, multi-billion-dollar trading surveillance system for the SEC
known as the Consolidated Audit Trail (CAT). The CAT collects and stores the trading
history of all Americans who trade equities or options. It accumulates a staggering
500 billion records per day. According to CAT LLC, "no other comparable system or
database of this scale … and complexity exists anywhere in the world." Letter from
B. Becker to V. Countryman 8-9 (May 22, 2023), https://perma.cc/UW4U-T73J.

6.    To fund this massive exercise of federal power, the SEC eventually
issued an order in September 2023 authorizing the SROs tasked with running CAT
LLC to tax every share traded on any exchange in the United States—both to
reimburse the SROs for the skyrocketing costs of developing the CAT and to cover
CAT LLC's massive operating expenses going forward. 88 Fed. Reg. 62628 (2023)
(2023 Order). In July 2025, however, the Eleventh Circuit vacated the 2023 Order as
unlawful. *American Securities Association v. SEC*, 147 F.4th 1264 (11th Cir. 2025)
(*ASA*). Moreover, the new SEC Chairman announced that the Commission is now
conducting a "comprehensive review" of the CAT itself. P. Atkins, *Prepared Remarks
Before SEC Speaks* (May 19, 2025), https://tinyurl.com/4pez7he9. (Atkins Remarks).

7.      While *ASA* was pending, however, CAT LLC unlawfully collected over $300 million in fees from broker-dealers, including Citadel Securities, in reliance on the since-vacated 2023 Order. Perhaps even worse, CAT LLC overcharged broker-dealers, including Citadel Securities, by tens of millions when collecting those fees, amassing a "reserve" of funds that grossly exceeds the cap imposed by the SEC. As of the beginning of this year, CAT LLC still has over $119 million of those fees in its so-called budget "reserve." Worse still, CAT LLC is now spending that reserve to fund its own expenses, which is not permitted under the SEC plan governing the CAT.

8.      On January 15, 2026, Citadel Securities therefore filed a petition for rulemaking asking the SEC to step in and instruct CAT LLC that it cannot spend and must return the unlawfully collected reserve. But the SEC's consideration of that petition (as well as its ongoing comprehensive review of the CAT) will take time, and CAT LLC is already draining the disputed reserve at a rate of nearly $15 million per month. That money—all of which will be gone by August 2026—will be unrecoverable for Citadel Securities and the SEC once spent. Thus, if the spending continues, any later SEC oversight of CAT LLC's spending decisions will be review in name only.

9.      The D.C. Circuit recently confronted the problem of immediately effective and immediately irreparable exercises of delegated government power in *Alpine*, 121 F.4th 1314. There, the court explained that under the private nondelegation doctrine, injunctive relief is necessary where such exercises of government power by SROs would render later review by the SEC "a largely academic exercise." *Id.* at 1326. Applying that doctrine, the court ordered a preliminary

injunction preventing an SRO from expelling one of its members before the Commission would have a chance to review the decision. *Id.* at 1324-25.

10.     Citadel Securities asks this Court to apply *Alpine* here and enjoin CAT LLC from spending the funds in its reserve until the SEC has had the opportunity to exercise the oversight required by the Constitution, including resolution of Citadel Securities' pending petition for rulemaking. That modest step would protect Citadel Securities—and our constitutional structure—by preventing CAT LLC from spending the reserve it has unlawfully amassed before a responsible and politically accountable government agency has had a chance to conduct the review our Constitution requires.

## PARTIES

11.     **Plaintiff Citadel Securities LLC** is a broker-dealer registered with the SEC. It is a limited liability company incorporated under Delaware law that maintains its principal place of business in Miami, Florida. Citadel Securities is required by law to report data to the CAT, and it was compelled to pay tens of millions of dollars in fees to CAT LLC in 2024 and 2025 under the SEC's now-vacated 2023 Order. Those fees make up a substantial portion of the reserve that CAT LLC is now holding and spending down. Plaintiff Citadel Securities therefore has a concrete interest in whether the reserve is returned and how the reserve is used both now and in the future in the event that another funding order is issued.

12.     **Defendant CAT LLC** is a limited liability company incorporated under Delaware law that is jointly owned and operated by 27 SROs—26 for-profit national securities exchanges and FINRA, a nonprofit national securities association. CAT

LLC owns and operates the CAT. CAT LLC is controlled by an operating committee, which is composed of representatives from all 27 SROs. Relying on the 2023 Order, CAT LLC has collected hundreds of millions of dollars in fees from broker-dealers like Citadel Securities (often referred to in SEC rules as "Industry Members") and its constituent SROs (often referred to in SEC rules as "Participants") to pay for the CAT's development and operational costs.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this suit arises under the Constitution and laws of the United States.

14.     This Court may grant declaratory, injunctive, and other appropriate relief in this matter under 28 U.S.C. §§ 1651, 2201, and 2202 to enforce the Constitution's prohibition against improper delegations of government power. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2, 513 (2010); *Alpine*, 121 F.4th at 1323-24, 1337.

15.     This Court has personal jurisdiction over CAT LLC. Upon information and belief, Citadel Securities' claims arise from CAT LLC's transacting of business in the District of Columbia, including through in-person meetings where its senior leadership discussed and made decisions regarding the CAT's collection of fees, spending, budget, and reserve. CAT LLC has explained that it "has no physical headquarters" for purposes of establishing a principal place of business. Declaration of B. Becker ¶¶ 6-20, *Davidson v. Atkins*, No. 6:24-cv-197, ECF 38-3 (W.D. Tex. July 12, 2024). But CAT LLC has stated that it frequently "uses the address of a CAT NMS

Plan Participant"—including FINRA, which is headquartered in this District—"to receive regular mail," and CAT LLC's leadership team has held in-person meetings in this District as well as New York and Chicago. *Id.*; *see* Motion To Dismiss at 14 n.4, *Davidson v. Atkins*, No. 6:24-cv-197, ECF 38 (W.D. Tex. July 12, 2024) ("To the extent CAT LLC has ties to any State, they are New York, Illinois, and Washington, D.C., where the leadership team occasionally meets in person.").

16.     Venue is proper in this District under 28 U.S.C. § 1391(b). Upon information and belief, CAT LLC resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and this Court has personal jurisdiction over CAT LLC.

17.     Citadel Securities has standing to seek declaratory and injunctive relief stopping CAT LLC from spending the reserve until the SEC has resolved Citadel Securities' petition for rulemaking, which seeks (among other things) the application of the reserve to offset future fees Citadel Securities will pay if the new proposed funding model currently pending before the SEC is approved.[1] Citadel Securities' petition also seeks the return of the reserve funds to broker-dealers, including itself. Fees collected from Citadel Securities make up roughly $16 million of the remaining reserve, so Citadel Securities has a concrete and particularized interest in how the reserve is used—both now and in the future in the event that another funding order

_____

[1] On September 5, 2025, CAT LLC proposed a new funding model to replace the 2023 Order vacated in *ASA*.  90 Fed. Reg. 44910, 44910 (2025) (Proposed Funding Model); *see also infra* ¶ 37. The Proposed Funding Model remains pending before the SEC. *See* 90 Fed. Reg. 54438 (2025) (requesting comment on the Proposed Funding Model).

is issued—and whether the reserve is returned. The threat of harm to that interest is both actual and imminent, as CAT LLC is already spending the reserve and will likely exhaust the remaining funds by August 2026. A favorable decision by this Court would redress the injury by preventing CAT LLC from further diminishing the reserve until the SEC can act.

## FACTUAL ALLEGATIONS

### A. The CAT and the SEC's CAT NMS Plan

18.    In 2010, the SEC proposed an SRO-operated "consolidated audit trail" (CAT) to help the Commission police transactions on the U.S. securities markets. 75 Fed. Reg. 32556, 32556 (2010). Historically, each SRO had maintained an audit trail for purposes of regulating its own members. In creating the CAT, the SEC's goal was to consolidate the data from those streams into a "central repository" that it could use in real time for its own market surveillance and enforcement purposes. 77 Fed. Reg. 45722, 45775 (2012); *see ASA*, 147 F.4th at 1270-71. In a final rule issued in 2012, the SEC ordered the SROs to design, build, fund, and run the CAT, which would provide the Commission with data on all orders across all U.S. securities markets. *Id.*

19.    In 2015, the SROs, following the SEC's order, proposed a national market system (NMS) plan[2] that would create the CAT as the government-mandated

---

[2] Generally, NMS plans "facilitate the establishment of a national market system for securities." 15 U.S.C. § 78k-1(a)(2). Historically, SRO securities regulations varied from SRO to SRO, but NMS plans provide a mechanism for promulgating industry-wide regulations. Either the SROs or the SEC may propose an NMS plan, and the SEC must approve a plan through notice-and-comment rulemaking. 17 C.F.R. § 242.608(a), (b). Once approved, NMS plans carry the force of law. *Id.* § 242.608(c).

mechanism to gather, consolidate, and transmit trading information to the SEC. 81 Fed. Reg. 30614, 30614-16 (2016). In parallel, they proposed the creation of a jointly owned limited liability company, CAT NMS, LLC—now known as CAT LLC— through which the SROs would own and operate the CAT. *Id.* at 30616. Under this proposal, each SRO would own a share of the company and have a seat on its operating committee. *Id.* Broker-dealers and their investor customers, by contrast, would have no role in owning or governing the entity, nor would they have any meaningful input on the CAT's design, implementation, budget, costs, or funding. *See ASA*, 147 F.4th at 1270. Broker-dealers and their investor customers would, however, share in the cost of the CAT, although the proposal left the precise "allocation" of CAT costs between the SROs and broker-dealers to be worked out later. 81 Fed. Reg. at 84793, 84795; *see ASA*, 147 F.4th at 1271.

20.    At the time, the SROs and SEC estimated that the CAT would cost $37.5 to $65 million to build and another $36.5 to $55 million per year to operate. 81 Fed. Reg. at 84801. Since the proposal did not provide a mechanism for collecting fees, the SROs planned to pay for the CAT's startup and early operating costs through loans to CAT LLC. 88 Fed. Reg. 17086, 17112 (2023); *see ASA*, 147 F.4th at 1272.

21.    In 2016, the SEC approved the SROs' proposed NMS plan for the CAT (the CAT NMS Plan) and deputized CAT LLC to run the surveillance system. 81 Fed. Reg. 84696 (2016). As originally adopted in 2016, the CAT NMS Plan anticipated that CAT LLC would later collect fees from Industry Members and Participants to fund the CAT. *Id.* at 84793, 84795. It also required CAT LLC to establish a budget for the

CAT's operation and provided that "[a]ny surplus of the Company's revenues"—that is, any overcollection of fees from Industry Members and Participants—"shall be treated as an operational reserve *to offset future fees*." CAT NMS Plan, § 11.1(c) (Nov. 15, 2016), https://perma.cc/88EB-FAEU (emphasis added).

22.     It soon became clear, however, that the CAT's actual costs were far higher than the SROs' and SEC's initial projections. Among other issues, the company CAT LLC hired in 2017 to build the system failed to deliver after two years of work and $100 million in spending, leaving the SROs to essentially start over in 2019, when they hired FINRA as a replacement to build and operate the CAT. *See* Letter from Citadel Securities to V. Countryman 8 (July 14, 2023), http://tinyurl.com/297sj3s4 (July Letter). Even after FINRA took over, development costs continued to spiral and the CAT's annual budget increased by tens of millions of dollars each year from 2019 to 2023—at least in part because the SEC continued to add expensive requirements to the system as it developed. *Id.* at 8, 26-27.

23.     As they developed the CAT, CAT LLC and the SROs that control it tried to shift the cost of the CAT's development and operation to broker-dealers through a series of funding schemes they proposed as amendments to the CAT NMS Plan. The SEC rejected each one. In the meantime, CAT LLC spent nearly *$1 billion*—20 times the SEC's and SROs' original prediction—on the development of the CAT before it was even operational. July Letter 11. Since then, the CAT's operating expenses have consistently hovered around $200 million per year—nearly quintuple the amount the SROs and SEC initially projected in 2016. *Id.*

**B. The 2023 Order**

24.     In 2023, CAT LLC made its fifth attempt at proposing a plan for funding the CAT. The proposed plan asked the SEC to authorize the SROs to collect transaction taxes on every share traded in the U.S. equities and options markets. Separate taxes (referred to in the CAT NMS Plan as "fees") were to be applied (1) to reimburse CAT LLC for the nearly $1 billion spent to build the CAT (historical costs); and (2) to cover CAT LLC's operating budget each year in perpetuity (operational costs). 88 Fed. Reg. at 62628. After notice and comment, the SEC approved the proposal and amended the CAT NMS Plan in September 2023 via the 2023 Order. *Id.*

25.     Under the 2023 Order, CAT LLC was to calculate the "fee rate" for the tax to fund its operating expenses by dividing the CAT's projected operating budget for the upcoming year by the year's projected trade volume. 2023 Order § 11.3(a). The Order also authorized CAT LLC to "approve a reasonable operating budget" and to "reasonably determine the projected total" trade volume, leaving CAT LLC in total control of the fee-rate calculation. *Id.* §§ 11.1(a), 11.3(a)(i)(D). The 2023 Order also called for CAT LLC to make mid-year adjustments to the fee rate to account for fluctuations in expenses or revenues. *Id.* § 11.3(a)(i).

26.     The 2023 Order further required CAT LLC to determine a fee rate to recover historical costs—that is, to pay off the loans from the SROs. *Id.* § 11.3(b). For this process, CAT LLC would decide which historical costs (*i.e.*, which loans) to include in that cycle's "Historical CAT Assessment," decide how quickly to retire those

loans (*i.e.*, the recovery period), and divide the total of the Historical CAT Assessment by the projected trade volume over the recovery period.

27.    Once CAT LLC had established the fee rates, each SRO would submit to the SEC a proposed amendment to its internal rules that would establish the new CAT fees (or modify old ones). *Id.* § 11.3(a)(i)(A)(I). In theory, the fees were to be split into thirds: one third was to be borne by the broker-dealer (and investor) on each side of the transaction, while the remaining third was to be paid by the SRO on which a trade was executed. *Id.* For historical costs, the SROs would cancel loans on a *pro rata* basis rather than pay historical fees. *Id.* § 11.3(b)(ii). But the 2023 Order allowed the SROs to pass "their CAT fees onto their members in full," so in reality, broker-dealers (and the investors they represent) could—at the SROs' discretion—bear 100% of the costs (both historical and operational). 88 Fed. Reg. at 62684 n.1135.

28.    Typically, each SRO must obtain SEC approval to amend its internal rules, but in some circumstances, a proposed rule "establishing or changing a due, fee, or other charge"—that is, a "fee filing"—will "take effect upon filing with the Commission." 15 U.S.C. § 78s(b). If that provision were to apply, CAT LLC could therefore start collecting fees as soon as the SROs had submitted fee filings to the SEC and before the SEC took any action.

29.    The SEC may suspend immediately effective fee filings "if it appears to the Commission that such action is necessary or appropriate to the public interest, for the protection of investors, or otherwise in furtherance of the purposes of" the Exchange Act. *Id.* § 78s(b)(3)(C). A suspension triggers the traditional notice-and-

comment approval process, after which the SEC can approve, modify, or deny the proposed amendment. *Id.* The D.C. Circuit has held that the SEC's decision not to suspend a fee filing is immune from judicial review. *NetCoalition v. SEC*, 715 F.3d 342, 344 (D.C. Cir. 2013); *see ASA*, 147 F.4th at 1276 (agreeing on this point).

30.    Under the 2023 Order, the SROs' submission of CAT-related fee filings provided the SEC's only touchpoint with the CAT budget. The 2023 Order empowered CAT LLC to "approve a reasonable operating budget for the Company" but did not provide a way for the SEC to review the Company's estimated expenses. 2023 Order § 11.1(a). Likewise, the 2023 Order tasked CAT LLC with estimating trade volume for the upcoming year but provided no mechanism for SEC review of that figure. *Id.* § 11.3(a)(i)(D). CAT LLC's final determination of the operational fee rate was similarly insulated from SEC review, as was its determination of the historical fee rate. The SEC's only mechanism for reviewing the CAT's collection or expenditure of fees under the 2023 Order was through its limited review of fee filings from the SROs.

31.    SEC Commissioners Hester M. Peirce and Mark. T. Uyeda recognized these problems and dissented from the Commission's adoption of the 2023 Order. Commissioner Peirce observed that no meaningful limits exist on CAT LLC's budget and that the SEC's *post hoc* review of the SROs' filings was not an adequate check because "the critical analysis of CAT costs needs to happen before the budget is finalized." SEC, *Statement of Hester M. Peirce On the CAT's Funding Model* (Sept. 6, 2023), https://tinyurl.com/25zn9rb4 (Peirce Statement). Commissioner Uyeda similarly questioned whether the 2023 Order "sufficiently align[ed] incentives

regarding decision-making that may impact [CAT] costs." SEC, *Statement of Mark T. Uyeda On Consolidated Audit Trail Revised Funding Model* (Sept. 6, 2023), https://tinyurl.com/2ew75z4v (Uyeda Statement).

C. *American Securities Association v. SEC*

32.     In September 2023, Citadel Securities, along with the American Securities Association, sought review of the 2023 Order in the Eleventh Circuit, contending that the CAT itself exceeds the SEC's statutory authority and that the 2023 Order violated the Administrative Procedure Act (APA) in multiple respects. *ASA*, 147 F.4th at 1269. CAT LLC and many of its constituent SROs intervened to defend the Order. Motions to Intervene, *ASA v. SEC*, No. 23-13396, ECF 28, 29, 30, 31 (11th Cir. Nov. 16, 2023).

33.     Despite the Eleventh Circuit's ongoing review of the 2023 Order, CAT LLC and its constituent SROs pressed ahead with their attempt to collect fees under that Order. After CAT LLC calculated and issued its first historical fee rate, the SROs submitted their first round of fee filings in January 2024. Letter from Citadel Securities to V. Countryman 1 n.1 (Mar. 5, 2024), https://tinyurl.com/av6a8bbd. Before CAT LLC could collect fees, however, the SEC suspended the filings and initiated the notice-and-comment review process. *See, e.g.*, 89 Fed. Reg. 11153 (2024). The SEC's review of the fee filings and the Eleventh Circuit's review of the CAT itself therefore initially proceeded in parallel. Briefing in the Eleventh Circuit closed in May 2024, and in July 2024, the SEC extended its internal deadline for completing its review of the fee filings. 89 Fed. Reg. 73175 (2024).

34.     In late July 2024, however, CAT LLC issued a fee rate for operating costs. CAT Alert 2023-02 at 4, https://perma.cc/HK6KZKUM. Soon thereafter, the SROs withdrew their suspended fee filings—thereby terminating the SEC's pending review proceeding without an agency ruling—and filed new ones with materially identical terms. *See, e.g.*, SR-CboeBZX-2024-78, https://perma.cc/Y77X-2P2H. The SROs also submitted fee filings for operating costs using CAT LLC's newly issued fee rate. *See, e.g.*, SR-CboeBZX-2024-76, https://perma.cc/F6RM-267V. And FINRA, the largest SRO, submitted a fee filing that passed through *all* of its CAT costs to its members. *See* SR-FINRA-2024-12, https://perma.cc/SR72-QV36. This time, the SEC did not suspend the new filings, and CAT LLC started collecting fees in November 2024 in reliance on the 2023 Order. *See, e.g.*, SR-Box-2024-20 at 50, 68-69, https://perma.cc/5UTR-V93P; CAT Alert 2023-02 at 4, https://perma.cc/HK6KZKUM.

35.     In July 2025, however, the Eleventh Circuit vacated the 2023 Order that served as the basis for the SROs' collection of fees after finding that the CAT funding model was unlawful. *ASA*, 147 F.4th at 1269. Specifically, the court held that the 2023 Order was arbitrary and capricious under the APA in two respects. *Id.* at 1273-74. *First*, the court ruled that the SEC had failed to consider and justify its choice to allow SROs to pass through their own portion of CAT fees to their broker-dealer members—particularly given the broker-dealers' lack of meaningful input into the CAT's design, implementation, or budget. *Id.* at 1274-77. In doing so, the court found that the SEC's review of fee-filings for reasonableness on the back end was "insufficient" as a check on these SRO pass-throughs because those fees "take effect

immediately upon filing" and the SEC's refusal to suspend such filings is not judicially reviewable. *Id.* at 1276. *Second*, the court ruled that the SEC violated the APA by failing to update its analysis of the CAT's economic effects in light of the CAT's skyrocketing costs and the 2023 Order's new allocation of those costs to broker-dealer and their investor customers. *Id.* at 1277–78.

36.    The Eleventh Circuit sought to return the parties to the status quo as it existed before the 2023 amendments to the CAT NMS Plan, *id.* at 1279, but CAT LLC had been collecting fees under the unlawful order since November 2024. By the time the court's vacatur of the 2023 Order took effect, CAT LLC had unlawfully collected over $300 million in fees from broker-dealers—including $56.4 million from Citadel Securities. CAT LLC spent roughly $187 million of that money in 2025, and at last count, still had over $119 million in fees in its so-called budget reserve. The funds in that reserve are the subject of this Complaint.

37.    The SROs persisted in their efforts to collect CAT fees from broker-dealers even in the wake of the Eleventh Circuit's decision to vacate the funding model set forth in the 2023 Order and a prior announcement by the new SEC Chairman that the Commission would be undertaking "a comprehensive review of the CAT." Atkins Remarks. Despite the Eleventh Circuit's ruling, they began by requesting in September 2025 that the SEC approve a new funding model that they called nearly "identical" to the one set forth in the unlawful 2023 Order, save for a new paragraph providing that each SRO agrees not to establish "a new fee" for passing through its portion of CAT costs. 90 Fed. Reg. 44910, 44912 (2025). That

proposal remains pending before the SEC, where it is the subject of an ongoing notice-and-comment rulemaking process. In addition, the SEC's "comprehensive review" of the CAT—which presumably will include a review of how it is funded—also remains ongoing. Office of Information & Regulatory Affairs, *Evaluating the Continued Effectiveness of the Consolidated Audit Trail* (Spring 2025) (listing potential rulemaking on "comprehensive rethink" of the CAT as in "Prerule Stage"), https://tinyurl.com/2tnc42as.

**D. CAT LLC's Unlawful Inflation of its Budget Reserve**

38.    From its initial adoption in 2016, the CAT NMS Plan has provided that "[a]ny surplus of the Company's revenues"—that is, any overcollection of fees—"shall be treated as an operational reserve to offset future fees." CAT NMS Plan, § 11.1(c) (Nov. 15, 2016), https://perma.cc/88EB-FAEU. As amended by the 2023 Order—which CAT LLC treated as valid and relied on to collect fees until its vacatur—the CAT NMS Plan authorized CAT LLC "to maintain a reserve of not more than 25% of the annual budget," and likewise required the company to offset future fees with any surplus beyond the 25% cap. *Id.* § 11.1(a)(ii). However, the amended CAT NMS Plan contained no explicit mechanism for the SEC to review CAT LLC's build-up of its reserve, nor any enforcement mechanism for the SEC to prevent CAT LLC from exceeding the 25% limit on its reserve. It now appears that CAT LLC seized on this gap in the SEC's ability to oversee CAT's budget and spending to amass a grossly inflated reserve over the course of 2025, including while Citadel Securities' challenge to the 2023 Order was pending before the Eleventh Circuit.

39.     CAT LLC's original budget for 2025 anticipated roughly $248.8 million in expenses. CAT LLC, *2025 Financial & Operating Budget* (Nov. 20, 2024), https://perma.cc/CN2E-3X6Z (CAT 2025 Budget). Thus, CAT LLC was authorized to maintain a $62.2 million reserve (25% of $248.8 million). CAT LLC, however, consistently underestimated trade volume, so revenue exceeded expectations at every stage in the process. Revenue for the fourth quarter of 2024 was over $30 million higher than expected, so CAT LLC started 2025 with a reserve balance that exceeded the 25% cap by over $8 million. *Compare* CAT 2025 Budget *with* CAT LLC, *2025 Financial & Operating Budget* (May 19, 2025), https://perma.cc/FY5P-KM7M (CAT First Revised 2025 Budget). Similarly, revenue in the first two quarters of 2025 was roughly 50% higher than CAT LLC had anticipated, so the reserve surpassed $155 million by the middle of the year. CAT LLC, *2025 Financial & Operating Budget* (Nov. 7, 2025), https://perma.cc/X4S3-9K8U (CAT Second Revised 2025 Budget). Moreover, CAT LLC's original budget overestimated expenses by at least $60 million, so even if revenue had perfectly tracked CAT LLC's expectations, the reserve *still* would have exceeded the 25% cap based solely on the reduction in expenses. *Compare* CAT 2025 Budget ($248,846,076) *with* CAT Second Revised 2025 Budget ($187,527,979).

40.     In August 2025 (after the Eleventh Circuit held the 2023 Order unlawful), CAT LLC finally lowered the fee rate somewhat to account for reductions in its mid-year budget and in an attempt to "offset future fees" with excess reserve funds. But that was not nearly enough. CAT LLC's mid-year budget again overestimated actual expenses, and the Company still over-collected fees during the

second half of the year. *Compare* CAT First Revised 2025 Budget *with* CAT Second Revised 2025 Budget. Thus, through its manipulation of spending and fees, CAT LLC managed to end the year with roughly $119 million in its reserve (not accounting for any variance between anticipated and actual expenses or revenue in Q4 of 2025). CAT LLC, 2026 Financial & Operating Budget (Dec. 11, 2025), https://perma.cc/3TMK-7AQ2 (CAT 2026 Budget). Even based on CAT LLC's original budget of $248.8 million (with a reserve cap of roughly $62.2 million), that reserve is nearly double the amount allowed under the 25% cap. The true overage is even higher because CAT LLC's 2025 actual expenses are expected to be no more than $187.5 million. CAT Second Revised 2025 Budget.

41.     Under the CAT NMS Plan and 2023 Order CAT LLC relied on to collect fees, CAT LLC's reserve should have been no more than $62.2 million when using the CAT's original budget for 2025. CAT 2025 Budget. And that limit falls to $46.8 million based on the CAT's most recent 2025 budget. CAT Second Revised 2025 Budget. But CAT LLC has admitted that it ended 2025 with a reserve balance of a staggering $119,128,336, which amounts to 48% of the original budget and 64% of the most recent revised budget. CAT 2026 Budget. Whether the result of gross financial mismanagement or an intentional ploy to build up a war chest as insurance against an unfavorable decision in *ASA*, CAT LLC's reverse balance at the end of 2025 exceeded the SEC's 25% cap by tens of millions of dollars.

**E. CAT LLC's Plan To Spend The Reserve**

42.     After amassing a budget reserve that far exceeds the limits imposed by the SEC, CAT LLC now plans to spend the reserve to cover its 2026 operational costs, in contravention of the CAT NMS Plan, which requires that the reserve be spent only "to offset future fees."

43.     In December 2025, CAT LLC published its 2026 budget, which shows that the Company plans to spend roughly $40 million of the reserve each quarter in 2026. CAT 2026 Budget. On December 18, CAT LLC confirmed that plan in a comment letter submitted to the SEC, explaining that "the CAT's operations must be funded through its limited operational reserve, which is currently estimated to be exhausted in August 2026." Letter from CAT LLC to V. Countryman 13 (Dec. 18, 2025), https://tinyurl.com/4ucazm37. And on January 14, 2026, CAT LLC defended both the balance of the reserve and its plan to spend it—adopting a tenuous reading of "fees" as "CAT expenses." Letter from CAT LLC to V. Countryman (Jan. 14, 2026), https://tinyurl.com/pj4vz6e3 (January Letter).

44.     The CAT NMS Plan—both as it currently stands and under CAT LLC's pending proposed amendment—dictates that the reserve must be used only to "offset future fees" allocated pursuant to a Commission-approved funding model. CAT NMS Plan, § 11.1(c) (Mar. 24, 2023), https://perma.cc/QD85-RHDL; 90 Fed. Reg. at 44946 (proposed amendment). Thus, CAT LLC's use of the reserve to cover its own expenses violates the express terms of the CAT NMS Plan. To be sure, CAT LLC disputes this conclusion—asserting "that 'fees' as used in the phrase 'to offset future fees' is

synonymous with costs incurred to operate the CAT." January Letter 4. That CAT LLC has resorted to such interpretive gymnastics to justify its use of the reserve only underscores how critical it is for a disinterested, accountable SEC official to review the CAT's decisions regarding the reserve.

45.    As noted above, however, under the CAT NMS Plan, the SEC has only an indirect and attenuated ability to review CAT LLC's budget and spending of CAT fees via the SROs' fee filings. At this time, however, there is no operative funding order that authorizes CAT LLC to collect fees, so the SROs have no reason to submit new filings for the SEC's review. The SROs' decisions regarding the CAT's budget—including whether and how to spend surplus fees from 2025 that currently comprise the reserve—are therefore effectively unreviewable by the SEC.

## F. Citadel Securities' Petition for Rulemaking

46.    Because the CAT NMS Plan does not provide the SEC with direct oversight of CAT LLC's use of surplus fees, Citadel Securities on January 15, 2026, filed a petition for rulemaking with the SEC (the Petition) that asks the SEC to address the narrow question of how CAT LLC may use (or not use) the remaining funds. The Petition explains how the collection of the reserve was doubly impermissible—both because the 2023 Order the SROs used to build up that reserve was unlawful and because CAT LLC violated the terms of the CAT NMS Plan approved by the 2023 Order by running up the reserve well beyond the 25% cap. The Petition also explains why CAT LLC's plan to spend the reserve in the absence of any "fees" approved by the Commission to "offset" violates the CAT NMS Plan as it

currently stands, and why the spending of these unlawfully collected broker-dealer funds must await the SEC's comprehensive review of the CAT as a whole.

47.     In light of those legal defects, Citadel Securities has asked the SEC to direct CAT LLC to (1) not spend down the reserve in the absence of an operative funding model or without obtaining prior SEC approval; (2) return of the entirety of the unlawfully collected reserve to payors; and (3) if the entirety of the reserve is not returned, return at least the portion of the reserve exceeding 25% of CAT LLC's revised 2025 budget. Judicial relief is necessary here because the SEC needs time "to approve, disapprove, or modify" CAT LLC's plans regarding the reserve. *See Alpine*, 121 F.4th at 1328.

## CLAIM FOR RELIEF

### Count I—Violation of the Private Non-Delegation Doctrine

48.     Citadel Securities realleges and incorporates by reference all prior and subsequent paragraphs.

49.     The Constitution's Vesting Clauses allocate the powers of the federal government into three branches: the legislative power in Congress, the executive power in the President, and the judicial power in the federal courts. U.S. Const., art. I, § 1; art. II, § 1, art. III, §1. In doing so, "the Constitution bars further delegations of power between the branches." *Oklahoma v. United States*, 2025 WL 3653642, at *5 (6th Cir. Dec. 17, 2025) (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)).

50.    The Constitution likewise forbids reassignment of federal power to private entities under what is now known as the "private nondelegation doctrine." *Consumers' Rsch.*, 606 U.S. at 697. The private nondelegation doctrine allows the government to "enlist private parties to give it recommendations" only if the appropriate government official "retains decision-making power." *Id.* at 692. Thus, "the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority to 'approve, disapprove, or modify' the private entity's actions and decisions on delegated matters." *Alpine*, 121 F.4th at 1325 (alterations omitted). If the private party's exercise of federal power can take "effect without an agency's say-so," the delegation violates the Constitution. *Consumers' Rsch.*, 606 U.S. at 695.

51.    The SEC has assigned to CAT LLC—a nominally private entity owned and operated by the SROs, themselves nominally private entities—a significant role to play in the exercise of federal power. As relevant here, the SEC has given CAT LLC the power to decide how to spend money collected from regulated parties (CAT fees) under an SEC order to fund an SEC-mandated regulatory program that is used for government enforcement purposes (the CAT). Such spending decisions are an exercise of core government power and hence implicate the private nondelegation doctrine. *See, e.g.*, *Pittston Co. v. United States*, 368 F.3d 385, 393-98 (4th Cir. 2004); *United States v. Frame*, 885 F.2d 1119, 1128-29 (3d Cir. 1989); *see also Consumers' Rsch.*, 606 U.S. at 695.

52. "[T]he SEC does not exercise ultimate control over" CAT LLC's decision to spend down the reserve, however, because those spending decisions "take effect immediately, before the SEC can review them, and the severe consequences associated with [them] can make any later review by the SEC a largely academic exercise." *Alpine*, 121 F.4th at 1326.

53. The only way the SEC will be able to review CAT LLC's decision to spend down the reserve is through the petition-for-rulemaking process invoked by Citadel Securities. The SEC needs adequate time, however, to act on Citadel Securities' request. The requested amendments to the CAT NMS Plan to address this situation will most likely require the SEC to engage in notice-and-comment rulemaking, by which time CAT LLC will have already spent the money. 17 C.F.R. § 242.608(a)(2), (b). And even if the Commission were to put an amendment to the CAT NMS Plan into immediate effect under 17 C.F.R. § 242.608(b)(4), that process would "still take[] time." *Alpine*, 121 F.4th at 1327. CAT LLC's decisions to spend down the reserve will therefore "take effect immediately, before the SEC can review them." *Id.* at 1326.

54. Moreover, the "consequences" of those spending decisions by CAT LLC will "make any later review by the SEC a largely academic exercise." *Alpine*, 121 F.4th at 1326. Once the reserve is spent, the SEC cannot require CAT LLC to replenish the reserve from its own pockets, as CAT LLC does not have its own revenue stream beyond voluntary loans from its SRO members and (in theory) CAT fees allocated pursuant to a yet-to-be-approved funding model. *See* 88 Fed. Reg. at 17112.

Accordingly, "delayed SEC review of" these spending decisions will "be too little too late." *Alpine*, 121 F.4th at 1326.

55.    "The result of this regulatory scheme is that [CAT LLC] can, without any SEC review of its decision on [spending the reserve], effectively decide" how to spend money collected from regulated parties under the authority of a vacated SEC order to fund an SEC-mandated regulatory program. *Id.* at 1328. "That falls short of what the private nondelegation doctrine requires: an accountable government actor that 'retains the discretion to approve, disapprove, or modify'" CAT LLC's "decisions" in this area. *Id.*

## PRAYER FOR RELIEF

WHEREFORE, Citadel Securities respectfully request that the Court

a.    Declare that any decision by CAT LLC to spend any money from the reserve before the SEC resolves Citadel Securities' pending petition for rulemaking is an unconstitutional exercise of delegated government power;

b.    Preliminarily and permanently enjoin CAT LLC from spending any money from the reserve until the SEC has resolved Citadel Securities' pending petition for rulemaking;

c.    Enter judgment in favor of Citadel Securities;

d.    Award Citadel Securities its costs and attorney's fees incurred in bringing this action; and

e.    Grant such other and further relief as this Court deems just and appropriate.

Dated:        January 16, 2026                Respectfully Submitted

/s/ Noel J. Francisco
Noel J. Francisco
  (D.C. Bar No. 464752)
Brian C. Rabbitt
  (D.C. Bar No. 992692) (*pro hac vice
  application pending*)
Brinton Lucas
  (D.C. Bar No. 1015185)
Christopher S. Dinkel
  (N.Y. Bar No. 5927470) (*pro hac vice
  application pending*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
njfrancisco@jonesday.com

David Phillips
  (Cal. Bar No. 344034) (*pro hac vice
  application pending*)
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Plaintiff Citadel Securities
LLC*