IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITADEL SECURITIES LLC, | |
| Plaintiff, | Civil Action No. 1:26-cv-00134 |
| v. | |
| CONSOLIDATED AUDIT TRAIL, LLC, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

ARGUMENT ................................................................................................................ 13

    I.   CAT LLC's Expenditure Of The Reserve Without Government Supervision
        Violates The Private Nondelegation Doctrine. ................................................. 13

    II.  The Equitable Factors Warrant A Preliminary Injunction............................ 22

CONCLUSION................................................................................................................ 28

i

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Alabama Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ....................................................................... 24

*\*Alpine Secs. Corp. v. FINRA,*
    121 F.4th 1314 (D.C. Cir. 2024) ...................................................*passim*

*\*American Secs. Ass'n v. SEC,*
    147 F.4th 1264 (11th Cir. 2025).....................................................*passim*

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ....................................................................... 14

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) ....................................................................... 14

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ..................................................... 22, 25

*\*FCC v. Consumers' Rsch.,*
    606 U.S. 656 (2025) .....................................................................*passim*

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ....................................................................... 14

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ......................................................... 27

*In re Series 7 Broker Qualification Exam Scoring Litigation,*
    548 F.3d 110 (D.C. Cir. 2008) ......................................................... 24

*Karsner v. Lothian,*
    532 F.3d 876 (D.C. Cir. 2008) ........................................................... 3

*Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft
    Noise, Inc.,*
    501 U.S. 252 (1991) ....................................................................... 14

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ...................................................................................... 13

*Mistretta v. United States,*
    488 U.S. 361 (1989) ...................................................................................... 13

*NIH v. American Public Health Ass'n,*
    145 S. Ct. 2658 (2025) .................................................................................. 24

*Oklahoma v. United States,*
    2025 WL 3653642 (6th Cir. Dec. 17, 2025)............................................... 13

*Pittston Co. v. United States,*
    368 F.3d 385 (4th Cir. 2004) ...................................................................... 16

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ...................................................................................... 13

*United States v. Frame,*
    885 F.2d 1119 (3d Cir. 1989)....................................................................... 17

*Xiaomi Corp. v. Dept. of Def.,*
    2021 WL 950144 (D.D.C. Mar. 12, 2021)................................................... 23

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const., art. I, § 1 .................................................................................... 13

U.S. Const. art. II, § 1..................................................................................... 13

U.S. Const. art. III, § 1 ................................................................................... 13

15 U.S.C. § 78s ................................................................................................. 7

**REGULATORY AUTHORITIES**

17 C.F.R. § 240.19b-4........................................................................................ 7

17 C.F.R § 242.608........................................................................................... 20

77 Fed. Reg. 45722 (2012) ................................................................................ 4

81 Fed. Reg. 30614 (2016) ................................................................................ 4

81 Fed. Reg. 84696 (2016) ................................................................................ 4, 5

88 Fed. Reg. 17086 (2023) ....................................................................... 5, 20, 25

88 Fed. Reg. 62628 (2023) ......................................................................... 1, 5, 18

90 Fed. Reg. 44910 (2025) ............................................................................. 9, 23

CAT NMS Plan § 11.1(a)(ii) (Sept. 6, 2023) .................................................... 9

CAT NMS Plan § 11.1(c) (Mar. 24, 2023) ....................................................... 9

**OTHER AUTHORITIES**

P. Atkins, *Prepared Remarks Before SEC Speaks* (May 19, 2025) ............................ 8

CAT LLC, *2026 Financial & Operating Budget* (Dec. 11, 2025).............. 10, 11, 19, 23

CAT LLC, *2025 Financial & Operating Budget* (Nov. 20, 2024) .............................. 10

CAT LLC, *2025 Financial & Operating Budget* (Nov. 7, 2025) ................................ 10

CAT LLC, *CAT Fee Alert 2025-4* (Nov. 25, 2025) ....................................................... 19

Letter from CAT LLC to V. Countryman (May 22, 2023) .......................................... 17

Letter from CAT LLC to V. Countryman (Jan. 14, 2026) ........................ 11, 12, 19, 23

Letter from CAT LLC to V. Countryman (Dec. 18, 2025) ......................................... 11

Letter from Cboe Exchanges to V. Countryman (Oct. 31, 2025) .............................. 27

Letter from Citadel Securities to V. Countryman (Aug. 28, 2024)............................ 7

Letter from Citadel Securities to V. Countryman (July 14, 2023) ............................ 5

Letter from SIFMA to V. Countryman (Oct. 21, 2025) ............................................. 21

SEC, *Statement of Hester M. Peirce On the CAT's Funding Model*
    (Sept. 6, 2023) ...................................................................................................... 6

SEC, *Statement of Mark T. Uyeda On Consolidated Audit Trail
    Revised Funding Model* (Sept. 6, 2023) ................................................................ 6

USAspending, *Agency Profiles* ................................................................................ 17

## INTRODUCTION

This case involves a nominally private entity wielding delegated government power that unlawfully extracted hundreds of millions of dollars from its operators' competitors in reliance on a since-vacated government order. The question here is whether that entity may now unlawfully spend over $119 million of its remaining plunder to cover its own costs without any oversight from the federal officials that impermissibly deputized it to seize those funds in the first place. Binding D.C. Circuit precedent, not to mention bedrock constitutional principles, make clear that the answer is "No."

Defendant Consolidated Audit Trail, LLC (CAT LLC or Company) is a formally private entity owned and operated by financial-industry self-regulatory organizations (SROs) that the U.S. Securities and Exchange Commission (SEC or Commission) tasked with creating and administering a multibillion-dollar surveillance system known as the Consolidated Audit Trail (CAT). This unprecedented system, which collects and stores the trading history of all Americans who trade equities or options for the purposes of SEC enforcement, accumulates a staggering 500 billion records per day. To fund this massive exercise of government power, the SEC issued an order in September 2023 authorizing CAT LLC to tax every share traded on any exchange in the United States—both to reimburse the SROs for the billion dollars it cost to develop the CAT and to collect the billions more needed to cover CAT LLC's operating expenses going forward. 88 Fed. Reg. 62628 (2023) (2023 Order).

Relying on the 2023 Order, CAT LLC collected over $300 million in fees from broker-dealers, including Plaintiff Citadel Securities LLC (Citadel Securities), from 2024 through 2025 alone. In July 2025, however, the Eleventh Circuit vacated the 2023 Order as unlawful. *American Secs. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025) (*ASA*). Yet rather than return the funds seized under the now-vacated 2023 Order— or even save them to offset potential future CAT fees as required by its SEC-approved plan—CAT LLC has recently decided to immediately spend the $119 million-plus in its reserve to cover its own operating expenses without any Commission oversight or approval. Because that approach would contravene the SEC-approved plan governing the CAT, Citadel Securities has asked the SEC to weigh in and direct CAT LLC that it cannot spend the unlawfully collected reserve without prior Commission approval. Berger Decl. Ex. A. But the SEC's consideration of this request will take time, and CAT LLC is already draining the disputed reserve at a rate of nearly $15 million per month. That money—all of which will be gone by August 2026—will likely be unre-coverable for both Citadel Securities and the SEC once spent. If CAT LLC's runaway spending from the reserve continues, the SEC's oversight of those critical fiscal deci-sions will be review in name only.

The D.C. Circuit confronted the problem of immediately effective and immedi-ately irreparable exercises of delegated government power to the SROs in *Alpine Se-curities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024). There, the court explained that under the private nondelegation doctrine, a preliminary injunction is necessary

where unsupervised exercises of government power by SROs would render later review by the SEC "a largely academic exercise." *Id.* at 1326. Applying that doctrine, the D.C. Circuit ordered an injunction preventing an SRO from expelling one of its members before the SEC would have a chance to review the decision. *Id.* at 1324-25. The Court should take the same approach here—specifically, enter a limited preliminary injunction to stop CAT LLC from spending the funds in the reserve until the SEC has the opportunity to meaningfully review that decision. That modest step would protect Citadel Securities—and our constitutional structure—by ensuring that CAT LLC does not irrevocably spend the reserve it has unlawfully amassed without any oversight by accountable government officials.

## BACKGROUND

1.      The Exchange Act and its amendments provide "'a comprehensive system of federal regulation of the securities industry'" that relies on SROs to oversee U.S. stock markets. *Karsner v. Lothian*, 532 F.3d 876, 879-80 (D.C. Cir. 2008). Although the SROs—today, the 26 for-profit national securities exchanges and the non-profit FINRA—serve as the frontline regulators of the securities industry charged with enforcing the SEC's rules as well as their own, Congress tasked the Commission with watching the SRO watchmen. *Alpine*, 121 F.4th at 1320-21.

In 2012, the SEC directed the SROs to create a tool to help the Commission police the U.S. securities markets. Specifically, it ordered the SROs to construct a national trading surveillance system known as the "consolidated audit trail" (*i.e.*, the CAT) that would allow the Commission to audit each and every trade on the U.S.

securities markets. 77 Fed. Reg. 45722 (2012). The SEC's rule called for the SROs to create an unprecedented oversight apparatus that would provide the Commission with data on all orders across all U.S. securities markets—with the SROs directed to build, fund, and run it. *Id.* at 45775; *see ASA*, 147 F.4th at 1270.

In 2015, the SROs heeded the SEC's diktat and proposed the CAT as a mechanism to gather, consolidate, and transmit trading information to the SEC for surveillance and enforcement purposes. 81 Fed. Reg. 30614, 30614-16 (2016). In parallel, they proposed the creation of a jointly owned company, CAT NMS, LLC—now known as CAT LLC—through which the SROs would operate the CAT. *Id.* at 30616. Each SRO owns a share of the Company and is represented on its operating committee. *Id.* Broker-dealers and their investor customers, by contrast, have no role in owning or governing the Company, nor do they have any meaningful input on the CAT's design, implementation, budget, costs, or funding. *See ASA*, 147 F.4th at 1271.

In 2016, the SEC approved the SROs' plan for the CAT (CAT NMS Plan) and formally deputized the Company to run it. 81 Fed. Reg. 84696 (2016). The SEC's 2016 order, however, did not settle exactly how the Commission's new tool would be funded. Instead, the SEC and the SROs punted, explaining that the precise "allocation" of CAT costs between the "Participants" (the SROs) and the "Industry Members" (broker-dealers) would be worked out later. *Id.* at 84793, 84795; *see ASA*, 147 F.4th at 1271. The SEC thus would have to approve an amendment to the CAT NMS Plan setting forth a funding model before any allocation of CAT costs to broker-dealers and their investor customers could occur. *See* 81 Fed. Reg. at 84793, 84795.

**2.**      With no funding mechanism in place, CAT LLC covered the CAT's startup and operating costs exclusively through loans from its member SROs until 2024. 88 Fed. Reg. 17086, 17112 (2023); *see ASA*, 147 F.4th at 1272. In the meantime, the costs associated with the CAT's development and implementation spiraled beyond all expectations. When the SEC approved the CAT NMS Plan in 2016, it estimated that it would cost $37.5 to $65 million to build the CAT and another $36.5 to $55 million per year to operate it. 81 Fed. Reg. at 84801. But to date, the CAT has blown through over *$1 billion* dollars in development costs—20 times the SEC's prediction. Letter from Citadel Securities to V. Countryman 11 (July 14, 2023), http://tinyurl.com/297sj3s4. And the CAT's operating costs have consistently hovered around $200 million per year. *Id.*

In 2023, the SEC approved a funding model for the CAT as an amendment to the CAT NMS Plan. 88 Fed. Reg. at 62628. The SEC's 2023 Order approving this model purported to fund the CAT through a tax on every share traded in the U.S. equities and options markets. Separate taxes (in Commission-speak, "fees") were to be applied (1) to reimburse CAT LLC (the SROs) for the nearly $1 billion spent to build the CAT (historical costs); and (2) to cover CAT LLC's budget each year going forward in perpetuity. *Id.* at 62629-30.

In theory, the 2023 Order provided that the tax on each trade would be split into thirds: two-thirds were to be borne by broker-dealers (and investors) that handled a trade, while the remaining third was to be payable by the SRO on which a trade was executed. *Id.* But the 2023 Order also allowed the SROs to pass "their CAT

5

fees onto their members in full," meaning broker-dealers (and the investors they represent) might actually "bear 100%" of the costs. *Id.* at 62684 n.1135. In approving this funding scheme, the Commission claimed that it would review the SROs' biannual CAT fee filings setting the specific per-transaction fee rate to ensure they were based on "reasonably budgeted CAT costs." *Id.* at 62637.

Commissioners Peirce and Uyeda each dissented from the 2023 Order. Commissioner Peirce pointed out that no meaningful limits exist on CAT LLC's budget and that the SEC's *post hoc* review of the SROs' biannual fee filings setting the specific fee rate based on CAT's annual budget was not an adequate check because "the critical analysis of CAT costs needs to happen before the budget is finalized." SEC, *Statement of Hester M. Peirce On the CAT's Funding Model* (Sept. 6, 2023), https://tinyurl.com/25zn9rb4 (Peirce Statement). Commissioner Peirce also observed that broker-dealers would bear "most, if not all, of the CAT's costs" yet would have no say in the CAT's budget or implementation whatsoever. *Id.* Commissioner Uyeda similarly questioned whether the 2023 Order "sufficiently align[ed] incentives regarding decision-making that may impact [CAT] costs." SEC, *Statement of Mark T. Uyeda On Consolidated Audit Trail Revised Funding Model* (Sept. 6, 2023), https://tinyurl.com/2ew75z4v (Uyeda Statement).

3.    Citadel Securities, along with the American Securities Association, sought review of the 2023 Order in the Eleventh Circuit. *ASA*, 147 F.4th at 1273. They urged that the CAT itself exceeds the SEC's authority and that the 2023 Order violated the Administrative Procedure Act (APA) in multiple respects. *Id.* at 1269.

6

While that challenge was pending, the SROs began to collect hundreds of millions of dollars in CAT fees from broker-dealers by submitting fee filings premised on the 2023 Order approved by the SEC. Letter from Citadel Securities to V. Countryman 3 (Aug. 28, 2024), https://tinyurl.com/8m8d49dx (Citadel Comment Letter); *see* 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4. As Citadel Securities and others predicted, the largest SRO—FINRA—also submitted an additional fee filing to pass through to broker-dealers 100% of the CAT fees supposedly allocated to it under the 2023 Order. *See ASA*, 147 F.4th at 1279. The filings all purported to be immediately effective, and SEC-regulated broker-dealers were forced to begin paying CAT fees to CAT LLC in November 2024 as required by the Commission. *See id.* at 1278. To date, Citadel Securities alone has paid over $56.4 million in CAT fees. Berger Decl. ¶ 9.

In July 2025, however, the Eleventh Circuit vacated the 2023 Order establishing the CAT funding model. *ASA*, 147 F.4th at 1269. The court found it unnecessary to decide whether the CAT itself is authorized under the Exchange Act, holding instead that the 2023 Order was arbitrary and capricious under the APA in two respects. *Id.* at 1273-74. *First*, the SEC had failed to consider and justify its choice to allow SROs to pass through their own portion of CAT fees to their broker-dealer members, which would saddle broker-dealers and their investor customers with all the CAT's costs while giving them no meaningful role in its design, implementation, or budget. *Id.* at 1274-77. The SEC's review of fee filings on the back end was "insufficient" as a check on these SRO pass-throughs, the court explained, because those fees "take effect immediately upon filing," and the SEC's refusal to suspend such filings

7

is not judicially reviewable. *Id.* at 1276. *Second*, the SEC violated the APA by failing to update its analysis of the CAT's economic effects in light of the CAT's skyrocketing costs and the 2023 Order's new allocation of those costs to broker-dealers and their investor customers. *Id.* at 1277-78.

Turning to the appropriate remedy, the Eleventh Circuit rejected CAT LLC's request to just remand the unlawful 2023 Order without vacating it. *Id.* at 1278-79. Instead, after "'balanc[ing] the equities,'" the court concluded that vacating that order likely would "not trigger serious 'disruptive consequences.'" *Id.* As it explained, "[t]he CAT has operated without a funding order since 2016 and will presumably continue to do so," so "vacating the 2023 Funding Order will minimally affect the status quo." *Id.* at 1279. Allowing the 2023 Order to remain in effect, by contrast, could leave broker-dealers "without a remedy," as the SROs' quasi-governmental immunity would likely protect them from efforts to recover the funds that they had unlawfully collected from their broker-dealer members. *Id.* The court stayed its judgment for 60 days pending issuance of the mandate, however, to give "the Commission and the industry … some time to adjust and react." *Id.* at 1280.

4.      Faced with the Eleventh Circuit's decision to vacate the funding model—as well as a prior announcement by the new SEC Chairman that the Commission would be undertaking "a comprehensive review of the CAT"—the SROs embarked on a desperate attempt to continue collecting as many CAT fees as possible from broker-dealers. P. Atkins, *Prepared Remarks Before SEC Speaks* (May 19, 2025) https://ti-

nyurl.com/4pez7he9 (Atkins Remarks). They began by requesting that the SEC approve a new funding model that was nearly "identical" to the one in the unlawful 2023 Order that the Eleventh Circuit had just vacated. 90 Fed. Reg. 44910, 44912 (2025). That proposal remains pending before the SEC. CAT LLC then leveraged that new proposal to ask the Eleventh Circuit to extend its stay of the judgment. Pet. for Reh'g at iii, *ASA v. SEC*, No. 23-13396, ECF 158-1 (11th Cir. Sept. 8, 2025). Seeing CAT LLC's proposal for what it was—an attempt to extend its ability to collect CAT fees under the unlawful 2023 Order for as long as possible—the court denied the request. Order, *ASA v. SEC*, No. 23-13396, ECF 162-1 (11th Cir. Sept. 22, 2025).

5.     The SROs' latest strategy for compelling broker-dealers and their investor customers to continue paying for the CAT—notwithstanding the unlawful 2023 Order and the lack of any Commission-approved funding model—involves CAT LLC's "reserve," which consists of the over $119 million in fees it improperly collected under the 2023 Order. Before the SEC's adoption of the 2023 Order, the CAT NMS Plan provided that "[a]ny surplus of [CAT LLC's] revenues over its expenses shall be treated as an operational reserve to offset future fees" allocated pursuant to a lawful and SEC-approved funding model. CAT NMS Plan § 11.1(c) (Mar. 24, 2023), https://perma.cc/QD85-RHDL (March 2023 Plan). As amended by the 2023 Order, the CAT NMS Plan further specified that the reserve should be "not more than 25% of the annual budget," and reiterated that any surplus—"including the reserve"—"shall be used to offset future fees." CAT NMS Plan § 11.1(a)(ii) (Sept. 6, 2023) https://perma.cc/USU3-6QQ5 (September 2023 Plan).

It has recently become clear, however, that CAT LLC has badly mishandled the reserve in at least two key respects. *First*, while the challenge to the 2023 Order was pending, CAT LLC systematically over-collected fees from broker-dealers, allowing its reserve to balloon far beyond the 25% cap set by the SEC. At the start of 2025, CAT LLC's 2025 budget was estimated at $248.8 million, meaning the Company should have capped the reserve at roughly $62.2 million last year (25% of $248.8 million). Ex. 3, CAT LLC, 2025 *Financial & Operating Budget* (Nov. 20, 2024), https://perma.cc/CN2E-3X6Z. Yet CAT LLC's 2026 budget now estimates a reserve amount of over $119 million—a sum *nearly double* the amount allowed under the 2023 Order's 25% cap. Ex. 1, CAT LLC, *2026 Financial & Operating Budget* (Dec. 11, 2025), https://perma.cc/3TMK-7AQ2 (CAT 2026 Budget). And the true overage is even higher because CAT LLC's actual 2025 budget (and hence the reserve amount allowed under the 25% cap) materially decreased from the initial estimate. Ex. 2, CAT LLC, *2025 Financial & Operating Budget* (Nov. 7, 2025), https://perma.cc/X4S3-9K8U. Whether due to a serious oversight, financial mismanagement, or a deliberate strategy to hedge against a successful challenge to the 2023 Order, CAT LLC drastically overcharged Citadel Securities (and other broker-dealers) for CAT fees in 2025, thereby amassing a war chest of others' funds.

*Second*, CAT LLC is now spending down the reserve in 2026 rather than holding those amounts to offset future fees as required by the CAT NMS Plan and reverting to the pre-2023 Order approach of covering its operating expenses using loans from the SROs. That approach effectively continues to allocate the costs of the CAT

10

to broker-dealers and their investor customers, even without an SEC-approved funding model in place. Both CAT LLC's recent 2026 budget and recent letters to the SEC confirm this plan, with the Company asserting that the "reserve (currently estimated to be exhausted in August 2026)" will be used as "the only source of funding to support the CAT's ongoing operations." Ex. 4, Letter from CAT LLC to V. Countryman 2 (Jan. 14, 2026), https://tinyurl.com/pj4vz6e3 (January Letter); *see* Letter from CAT LLC to V. Countryman 13 (Dec. 18, 2025) (similar); Ex. 1, CAT 2026 Budget (similar). Contrary to the CAT NMS Plan, the SROs have decided to continue allocating CAT costs to broker-dealers without *any* Commission oversight or approval with money that was improperly collected in the first place.

6.      Due to the CAT's byzantine structure, the CAT NMS Plan does not provide any formal mechanism for the SEC to supervise either CAT LLC's improper inflation of its reserve or its plans to spend the reserve in contravention of the Plan. On January 15, 2026, Citadel Securities therefore petitioned the SEC for rulemaking to enforce the Plan and stop the SROs from continuing to misuse funds unlawfully collected from broker-dealers and their investor customers. Berger Decl. Ex. A. That petition explains how the collection of the reserve was doubly impermissible—both because the 2023 Order the SROs used to build up that reserve was unlawful, and because CAT LLC violated the terms of the unlawful 2023 Order by running up the reserve well beyond the 25% cap. *Id.* at 4-5, 7-9. The petition also explains why CAT LLC's plan to spend the reserve in the absence of any "fees" approved by the Commission to "offset" violates the CAT NMS Plan as it currently stands, and why the

11

spending of these unlawfully collected broker-dealer funds must await the SEC's comprehensive review of the CAT as a whole. *Id.* at 6, 9.[1]

For those reasons, Citadel Securities has asked the SEC to direct CAT LLC (1) not to spend down the reserve in the absence of an operative funding model without obtaining prior SEC approval; (2) to return the entirety of the unlawfully collected reserve to payors; and (3) if the entirety of the reserve is not returned, to return at least the portion of the reserve exceeding 25% of the Company's revised 2025 budget. *Id.* at 5-9. But the Commission's consideration of Citadel Securities' pending petition and any subsequent rulemaking proceeding will take time, during which CAT LLC plans to completely exhaust the reserve. Citadel Securities therefore seeks a preliminary injunction to stop CAT LLC from doing so in order to preserve the SEC's ability to meaningfully review the Company's planned use of the reserve funds it unlawfully collected under the now-vacated 2023 Order.

---

[1] The petition further addresses CAT LLC's desperate attempts to rewrite the CAT NMS Plan to justify its mishandling of the reserve. Berger Decl. Ex. A at 6. For example, CAT LLC contends that the Plan's requirement to offset "fees" refers to the Company's "expenses incurred in operating the CAT" rather than "fees imposed … under a funding model." Ex. 4, January Letter 4. But the same sentence already refers to the CAT's "expenses," and it then uses a different term—"fees"—for what the reserve must be used to "offset." March 2023 Plan § 11.1(c). The only other uses of "fees" in the provision are in the phrase "fees, costs and expenses," which plainly refer to what CAT LLC has "incurred" in creating and implementing the CAT. *Id.* § 11.1(b), (d). That CAT LLC has to resort to such interpretive gymnastics to justify its draining of the reserve only underscores how critical it is for a disinterested, accountable SEC official to be able to review this money-grab.

## ARGUMENT

This Court should enter a "limited preliminary injunction" that provides an "opportunity for SEC review" of Citadel Securities' rulemaking petition before CAT LLC can unilaterally spend the over $100 million it unlawfully extracted from competitors of its for-profit SRO operators. *Alpine*, 121 F.4th at 1319. That modest relief is warranted because Citadel Securities has shown "that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) the issuance of a preliminary injunction is in the public interest." *Id.* at 1324 (cleaned up).

## I.    CAT LLC's Expenditure Of The Reserve Without Government Supervision Violates The Private Nondelegation Doctrine.

A.    The Constitution's Vesting Clauses allocate the powers of the federal government into three branches: the legislative power in Congress, the executive power in the President, and the judicial power in the federal courts. U.S. Const., art. I, § 1; art. II, § 1, art. III, §1. In doing so, "the Constitution bars further delegations of power between the branches." *Oklahoma v. United States*, 2025 WL 3653642, at *5 (6th Cir. Dec. 17, 2025) (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). "Legislative power," for instance, "belongs to the legislative branch, and to no other," *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025), which is why "Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die*," *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J. dissenting). Similarly, because "the 'executive Power'—all of it—is 'vested in a President,'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020), he may not "delegat[e]" his "executive

13

powers" to "'an officer answerable only to Congress,'" *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 275 (1991) (discussing *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)); *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010).

The Constitution likewise forbids reassignment of federal power to private entities. *Consumers' Rsch.*, 606 U.S. at 692. If anything, that is "delegation in its most obnoxious form," for rather than transfer one branch's power to the "presumptively disinterested" officials of another, it cedes it "to private persons whose interests may be and often are adverse to the interests" of those they are regulating. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). The Supreme Court therefore had no trouble rejecting a regulatory scheme that gave private coal companies unilateral authority to dictate the permissible wages and hours of their "competitor[s]." *Id.*

Today, this venerable constitutional principle is often called "the private nondelegation doctrine." *Consumers' Rsch.*, 606 U.S. at 697. It sets forth a simple, but important rule: the government violates the Constitution "when it allows non-governmental entities to govern." *Id.* To be sure, so long as the appropriate official "retains decision-making power," the government remains free under the private nondelegation doctrine to "enlist private parties to give it recommendations." *Id.* at 692. That is because a private actor who is "merely giving advice" is "exercising no government power." *Id.* at 698. But for that to be true, "the private entity must act only 'as an aid' to an accountable government agency that retains the ultimate authority

to 'approve, disapprove, or modify' the private entity's actions and decisions on delegated matters." *Alpine*, 121 F.4th at 1325 (alterations omitted). By contrast, if the private party's exercise of federal power can take "effect without an agency's say-so," the delegation crosses a constitutional red line. *Consumers' Rsch.*, 606 U.S. at 695.

**B.**     Just two years ago, the D.C. Circuit applied the private nondelegation doctrine in *Alpine* to forbid an SRO (there, FINRA) from wielding federal power without federal supervision. Specifically, FINRA initiated proceedings to expel one of its members (Alpine) for alleged regulatory violations using an expedited procedure that would take effect immediately—before the SEC would have a chance to review the decision on the merits. 121 F.4th at 1323-24. Invoking the private nondelegation doctrine, the D.C. Circuit directed entry of a limited preliminary injunction barring the expedited expulsion. *Id.* at 1324-25, 1337.

As the D.C. Circuit observed, FINRA's expedited orders "take effect immediately, before the SEC can review them," with consequences that "can make any later review by the SEC a largely academic exercise." *Id.* at 1326. In light of those immediate, irreparable consequences, "delayed SEC review" would be "too little too late." *Id.* at 1326. That was true even though the SEC could stay the effectiveness of FINRA's expulsion order: seeking such a stay "still takes time," during which the consequences of FINRA's action would "already be taking its toll." *Id.* at 1327. For the period before the SEC could review FINRA's order, then, no "accountable government actor" had "the discretion to approve, disapprove, or modify FINRA's delegated decisions." *Id.* at 1328 (cleaned up).

15

As the D.C. Circuit explained, the "absence of SEC review" over a FINRA expulsion decision "before such a decision takes effect likely runs afoul of the private nondelegation doctrine, which requires that a private entity statutorily delegated a regulatory role be supervised by a government actor." *Id.* at 1324-25. Under the challenged framework, "FINRA can unilaterally expel a member and, in so doing, bar the expelled entity from engaging in stock trading"—as "federal securities law generally transforms FINRA's membership decision into a flat legal prohibition on trading securities"—"all without governmental superintendence or control." *Id.* at 1324. Because "SEC review is not available as a practical matter" before regulated parties are "forced to close," that arrangement violated "the private nondelegation doctrine." *Id.* at 1331. The remedy for that constitutional defect was to enjoin FINRA from giving effect to its expulsion order until the SEC could "review[] the order." *Id.* at 1337.

**C.**    *Alpine* squarely controls this case and makes clear that Citadel Securities is likely to prevail on the merits of its private-nondelegation-doctrine challenge.

**1.**    To start, here as in *Alpine*, the government has assigned a nominally private actor (CAT LLC) a significant role to play in the exercise of federal power. Specifically, the Commission has given CAT LLC substantial discretion over how to budget and spend money collected from regulated parties (CAT fees) under the authority of an SEC order to fund an SEC-mandated regulatory program used for government enforcement (the CAT). The role of budgeting and spending the funds for a federal surveillance database implicates the private nondelegation doctrine no less than any other regulatory responsibility. *See, e.g.*, *Pittston Co. v. United States*, 368

16

F.3d 385, 393-98 (4th Cir. 2004) (applying the private nondelegation doctrine to evaluate a private party's discretion "'to collect, manage, and spend federal revenues'" under the Coal Act); *United States v. Frame*, 885 F.2d 1119, 1128-29 (3d Cir. 1989) (applying the private nondelegation doctrine to evaluate a private party's discretion "to collect assessments and to take the initiative in planning how those funds will be spent" under the Beef Promotion Act); *see also Consumers' Rsch.*, 606 U.S. at 695 (applying private nondelegation challenge to evaluate private party's "accounting functions" with respect to regulatory fees). That is why no one reasonably thinks that the Commission could cede the *management of its own budget* to CAT LLC or any other formally private entity, for example.

Indeed, the $119 million reserve managed by CAT LLC dwarfs the annual budgets of many federal agencies, from the Federal Election Commission to the Merits System Protection Board. USAspending, *Agency Profiles*, https://www.usaspending.gov/agency. And that eight-figure sum is meant to defray the costs of the largest government surveillance database of all time by offsetting fees that would otherwise be paid by broker-dealers and their investor customers under a Commission-approved funding model. In CAT LLC's own words, "no other comparable system or database of this scale … and complexity exists anywhere in the world." Letter from CAT LLC to V. Countryman 8-9 (May 22, 2023), https://perma.cc/UW4U-T73J. It is therefore critical that an accountable government actor be able to weigh in before a nominally private actor spends almost $120 million as it—and it alone—sees fit.

17

2.    Unfortunately, here as in *Alpine*, the SEC does not exercise adequate supervisory authority over CAT LLC's decision to retain and immediately spend down the reserve in a way that violates the CAT NMS Plan. As an initial matter, the Commission retains little oversight of CAT LLC's budget in general. The SEC does not "approve [CAT LLC's] budget," *Consumers' Rsch.*, 606 U.S. at 660, which involves the expenditure of hundreds of millions of dollars every year on the CAT's operation. Instead, the most the CAT NMS Plan ever has required of CAT LLC in this area is that its budget be "reasonable." September 2023 Plan, § 11.1(a). And even that requirement no longer exists now that the Eleventh Circuit has vacated the 2023 Order and its addition of the "reasonable" language. Today, the Plan simply directs CAT LLC to "approve" the budget, and it does not require the Commission's approval before that budget takes effect. *Id.*

The only purported oversight the SEC has of CAT LLC's budget occurs *after* spending has begun—specifically, when the Commission reviews the SROs' biannual filings establishing the fees broker-dealers must pay to fund the CAT. *See* 88 Fed. Reg. at 62637. But as Commissioner Peirce has pointed out, reviewing biannual filings aimed at "recoup[ing] costs" is "a very indirect way to police CAT costs"; "the critical analysis of CAT costs needs to happen *before* the budget is finalized." Peirce Statement, *supra* (emphasis added). The Eleventh Circuit recognized as much in rejecting the SEC's "*post hoc* review of fee filings" as a reasonable way to address the free-rider problem posed by pass-throughs and CAT LLC's runaway budget. *ASA*, 147 F.4th at 1276. Such after-the-fact review is "insufficient," that court explained, in

18

part because fee filings purportedly take effect immediately upon filing, and because "review of any individual [SRO's] fee filing does not reach the issue of cost allocation as a whole because it is necessarily focused on specific costs rather than the market-wide allocation formula." *Id.* (quotation marks omitted).

In any case, whatever limited oversight the SEC may have of CAT LLC's budget in general, it has *no* ability to meaningfully review the Company's decision to spend down the reserve without any funding model in place in violation of the law. To the contrary, that decision is designed to circumvent the SEC's oversight of CAT LLC. Just as in *Alpine*, CAT LLC's decision "take[s] effect immediately, before the SEC can review [it]." 121 F.4th at 1326. CAT LLC admits it is currently spending down the reserve to pay for CAT costs in 2026, to the tune of almost $15 million per month. *See* Ex. 1, CAT 2026 Budget (listing $119 million reserve amount beginning in Q1); Ex. 4, January Letter 2 (stating reserve will be exhausted in August 2026).

The SEC will not be able to review that decision even indirectly at the fee-filing stage, as CAT LLC is doing all of this without any operative funding order or any fee filings. *See* CAT LLC, *CAT Fee Alert 2025-4* (Nov. 25, 2025) (CAT Fee Alert), https://perma.cc/KMR6-CN89 (stating that after December 2025, reporting entities "will not receive any further monthly invoices for CAT Fees until further notice"). To be sure, the SEC can always amend the CAT NMS Plan to put an end to CAT LLC's money-grab, and Citadel Securities has petitioned the Commission to do exactly that—namely, instruct CAT LLC what it may do (and may not do) with its unlawfully

19

collected reserve. Berger Decl. Ex. A. But the SEC normally must put those amendments into effect through the arduous process of notice-and-comment rulemaking—a process that cannot be realistically completed by August 2026, when CAT has said the reserve will be exhausted. 17 C.F.R § 242.608(a)(2), (b). Putting amendments into effect "summarily" under 17 C.F.R § 242.608(b)(4) is the exception, not the general rule. And even if the SEC does try to put an amendment into immediate effect, that process will "still take[] time," during which the draw-down of the reserve "will already be taking its toll." *Alpine*, 121 F.4th at 1327. In any event, that regulatory band-aid would only staunch the reserve's bleeding for "120 days" at the most. 17 C.F.R § 242.608(b)(4).

**3.**     Finally, just as in *Alpine*, CAT LLC's decision to spend down the reserve has "consequences" that will "make any later review by the SEC a largely academic exercise." 121 F.4th at 1326. Just as "expelled FINRA members could be forced out of business before they can obtain SEC review of the merits of FINRA's decision," *id.*, much or all of the reserve will be spent for purposes not permitted under the CAT NMS Plan—with no government oversight whatsoever—by the time the SEC can act through the routes identified above. Further, the SEC cannot simply require CAT LLC to replenish the reserve from its own pockets later on, as CAT LLC does not have its own revenue stream. *See* 88 Fed. Reg. at 17112. The money currently in the reserve will be gone forever once spent. CAT LLC's decision to immediately spend the reserve therefore creates the same private nondelegation problem that existed in *Alpine*, because later review by the SEC will be "too little too late." 121 F.4th at 1326.

That problem is especially acute in this case because there is a significant prospect that the SEC will ultimately decide that CAT LLC's reserves—and its funding as a whole—should be handled differently. The prior funding model was vacated as unlawful by the Eleventh Circuit, and it remains an open question whether the CAT itself even falls within the SEC's statutory authority. *See ASA*, 147 F.4th at 1273-74. Moreover, each of the three Commissioners currently on the SEC has recognized that CAT LLC's unchecked budget creates serious problems. *See* Atkins Remarks, *supra* (noting the "seemingly endless cost increases" associated with the CAT, which have risen "to nearly $250 million a year"); Peirce Statement, *supra*; Uyeda Statement, *supra*. The new SEC Chairman has therefore directed a "comprehensive review" of the CAT, and commenters have specifically proposed alternative funding models, such as including the CAT in the SEC's budget. Atkins Remarks, *supra*; *see, e.g.*, Citadel Comment Letter 13; Letter from SIFMA to V. Countryman 1, 3-5 (Oct. 21, 2025), https://tinyurl.com/w7jspbkt.

If the Commission gets the opportunity to weigh in, it is likely to take a dim view of CAT LLC's spending of the reserve without offsetting broker-dealers' fees, as the CAT NMS Plan has long required. And Citadel Securities' pending petition for rulemaking lays out a number of options for how the current reserve should be handled consistent with the Eleventh Circuit's decision and the CAT NMS Plan. Berger Decl. Ex. A, at 5-9. So CAT LLC's decision to drain the reserve undercuts not only the SEC's prerogative to have the final say over the reserve, but also what that final say *is likely to be.*

21

In sum, having unlawfully seized hundreds of millions of dollars from their competitors in purported reliance on the since-vacated 2023 Order, the SROs (operating through CAT LLC) now claim the prerogative to spend that money as they see fit and for purposes not allowed by law—all before any government official or agency has any opportunity to consider the issue. The Constitution does not give them that choice. Citadel Securities therefore is likely to succeed on the merits of its claim that—as with FINRA's expulsion decision in *Alpine*—CAT LLC's spending of the reserve without any SEC oversight or input violates the private nondelegation doctrine.

## II.    The Equitable Factors Warrant A Preliminary Injunction.

The remaining preliminary-injunction factors likewise justify a limited pause to give the SEC enough time to review CAT LLC's plan to drain the reserve. Such relief would shield Citadel Securities from irreparable damage without visiting any cognizable harm on CAT LLC or others.

**A.**    Without a preliminary injunction, Citadel Securities faces a significant risk of irreparable injury. To demonstrate a likelihood of irreparable harm, a movant must show its prospective injury is both "imminen[t]" and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Citadel Securities readily meets each requirement.

**1.**    As to imminent injury, CAT LLC already has begun spending down the reserve and plans to deplete all $119 million of it by sometime in August 2026. *See* Ex. 1, CAT 2026 Budget; Ex. 4, January Letter 2. That ongoing spending will injure Citadel Securities in multiple ways.

22

*First*, every dollar of the reserve spent now is one less dollar CAT LLC can use to offset CAT fees imposed on Citadel Securities in the future. The CAT NMS Plan—both as it currently stands and under CAT LLC's proposed amendment—dictates that the reserve must be used to "offset future fees" allocated pursuant to a Commission-approved funding model. March 2023 Plan, § 11.1(c); 90 Fed. Reg. at 44946 (proposed amendment). Accordingly, if CAT LLC succeeds in persuading the Commission to approve a new funding model and restart the collection of CAT fees, fees imposed on Citadel Securities would be offset by the reserve at that time. And the reserve is currently so high that Citadel Securities would be required to pay far less in the new fee regime than it has paid in the past. *See* Berger Decl. ¶ 9 (explaining Citadel Securities paid over $56.4 million under 2023 Order). A loss of over ten million dollars is "significant" by any measure. *Xiaomi Corp. v. Dept. of Def.*, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021).

*Second*, immediately draining the reserve will undercut the various proposals currently before the SEC that would redirect those funds to benefit broker-dealers such as Citadel Securities. Citadel Securities' pending petition for rulemaking, which, in addition to requesting that CAT LLC be required to obtain prior SEC approval before spending the reserve, asks the Commission to return either (1) the entire reserve to fee payors on a percentage basis because it was collected pursuant to the unlawful 2023 Order (approximately $16 million of the reserve belongs to Citadel Securities); or (2) at least the inflated portion of the reserve on a percentage basis that should have been used to offset CAT fees in 2025 (approximately $9.7 million of

23

the overage belongs to Citadel Securities). *See* Berger Decl. Ex. A at 5-9; Berger Decl. ¶ 9 (stating Citadel Securities paid $39,990,907 in prospective CAT fees, which contributed to funding reserve under 2023 Order). Each of those solutions is realistic, as the SEC is comprehensively reviewing the CAT, and its three Commissioners (along with the Eleventh Circuit) have signaled a strong concern over exactly the kind of misaligned incentives and unchecked power that CAT LLC's spend-down decision illustrates. *See ASA*, 147 F.4th at 1275-76; Atkins Remarks, *supra*; Peirce Statement, *supra*; Uyeda Statement, *supra*. Draining the reserve in the interim will rob Citadel Securities of the financial benefits of each one of those options—and of any other option for the reserve the SEC may come up with as part of its comprehensive review.

    **2.**    As to remediation, once CAT LLC spends down the reserve, the funds likely "cannot be recouped and are thus irrevocably expended." *NIH v. American Public Health Ass'n*, 145 S. Ct. 2658, 2659 (2025); *see Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (holding applicants were at risk of irreparable harm by depriving them of payments "with no guarantee of eventual recovery"). Unlike an ordinary private party who can be sued for damages to remedy past financial harms, CAT LLC would surely respond to any such attempt for *post hoc* relief by asserting the quasi-governmental immunity that SROs enjoy "in performance of their regulatory, adjudicatory, or prosecutorial duties." *In re Series 7 Broker Qualification Exam Scoring Litigation*, 548 F.3d 110, 114-15 (D.C. Cir. 2008). Faced with that "'immunity,'" broker-dealers, including Citadel Securities, likely "would be left without a remedy." *ASA*, 147 F.4th at 1279.

The SEC could not simply direct CAT LLC to replenish the reserve from its own funds after the fact either, because CAT LLC does not have its own funds to begin with. The Company has no revenue streams beyond voluntary loans from its SRO members and (in theory) CAT fees allocated under a yet-to-be-approved funding model. *See* 88 Fed. Reg. at 17112. So once CAT LLC has spent the reserve, that money will be gone forever. Citadel Securites's financial injury here is therefore irreparable because "'no adequate compensatory or other corrective relief will be available at a later date.'" *Alpine*, 121 F.4th at 1329. It has therefore demonstrated "a clear and present need for equitable relief." *Chaplaincy*, 454 F.3d at 297 (cleaned up).

**B.**     On the other side of the ledger, granting Citadel Securities its requested preliminary injunction would produce no cognizable harm to CAT LLC, the SROs, or anyone else. As an initial matter, the effect of the requested injunction on CAT LLC will be "relatively limited" because it extends only until the SEC has a chance to address the Company's use of the reserve. *Alpine*, 121 F.4th at 1330.

More fundamentally, that relief would simply mark a return to a 10-year status quo. Since CAT LLC's inception, the SROs have funded the CAT's operations through voluntary loans. 88 Fed. Reg. at 17112. The collection of CAT fees from broker-dealers in 2024 and 2025 was the aberration, made possible only because the SEC approved (unlawfully) a funding model in the since-vacated 2023 Order. A temporary injunction against spending down the reserve would therefore prompt a return to the original approach—and the only lawful approach under the CAT NMS Plan in the absence of an SEC-approved funding model.

25

Under that longstanding framework, the SROs would be able to collect repayment for any loans in the future under a new funding regime, just as they did under the 2023 Order. Indeed, the SEC could approve the pending funding proposal at any time, which would then allow the SROs to attempt to recoup on any interim loans.

Denying an injunction, by contrast, would allow CAT LLC to place over $119 million in unlawfully collected money permanently beyond the reach of both the SEC and Citadel Securities. The equities here are not even close. *See Alpine*, 121 F.4th at 1330. Indeed, the Eleventh Circuit recognized as much in *ASA* when declining to remand the 2023 Order without vacatur. It "balance[d] the equities" and asked whether vacating the 2023 Order would produce "disruptive consequences." *ASA*, 147 F.4th at 1278. The answer was no: "The CAT has operated without a funding order since 2016 and will presumably continue to do so; vacating the 2023 [Order] will minimally affect the status quo." *Id.* at 1279. Enjoining CAT LLC from spending down the reserve will return the CAT's funding to that exact same status quo.

The conduct of CAT LLC and its operators (the SROs) confirms that the equities favor an injunction. CAT LLC's decision to immediately spend the reserve for purposes not permitted by the CAT NMS Plan is just the latest in a long line of SRO attempts to unlawfully extract money from broker-dealers like Citadel Securities to pay for the CAT. Those efforts began with ramming through fee filings based on the 2023 Order despite the pending challenge to that order in the Eleventh Circuit. *Supra* at 7. Once the 2023 Order was vacated as unlawful, CAT LLC quickly submitted a nearly identical funding proposal for the purpose of trying to convince the Eleventh

26

Circuit to extend the life of the 2023 Order. *See* Letter from Cboe Exchanges to V. Countryman 2 (Oct. 31, 2025), https://tinyurl.com/3f76x6cu (explaining that "the rationale and timing for the [new proposal] is now moot because the Eleventh Circuit did not grant the extension of the stay for which the Amendment was intended to support"). CAT LLC then continued to demand payment of CAT fees all the way through December 2025 even though the Eleventh Circuit vacated the 2023 Order as unlawful in July 2025. CAT Fee Alert 1. CAT LLC also ran up the amount of the reserve in 2025 well beyond the 25% cap by failing to reduce CAT fees as CAT expenses fell. *Supra* at 10; Berger Decl. Ex. A at 3-5. Thus, at every turn, CAT LLC has sought to insure itself against that 2023 Order's invalidation by extracting as many unlawful fees as possible, as quickly as possible, and for as long as possible. Forestalling its latest take-the-money-and-run strategy cannot be classified as an injury weighing against an injunction.

Finally, CAT LLC cannot claim the mantle of the public interest in spending the reserve for purposes not permitted by the CAT NMS Plan and without SEC oversight because the "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). A limited injunction, by contrast, will guarantee that Citadel Securities' "constitutional claim can be fully litigated" while preserving the power of the accountable government agency to decide what should happen to the reserve. *Alpine*, 121 F.4th at 1330. That injunction also will not threaten any purported benefits the public enjoys from an operational CAT. As the Eleventh Circuit recognized, this surveillance system can be

funded the way it was from the beginning, *ASA*, 147 F.4th at 1279—at least for the period until the SEC can weigh in on how CAT LLC can or cannot handle the reserve it has unlawfully collected.

## CONCLUSION

The Court should issue a preliminary injunction forbidding CAT LLC from spending or otherwise depleting any money in its reserve of funds until the SEC resolves Citadel Securities' pending petition for rulemaking.

Dated:  January 16, 2026

Respectfully Submitted

*/s/ Noel J. Francisco*
Noel J. Francisco
  (D.C. Bar No. 464752)
Brian C. Rabbitt*
  (D.C. Bar No. 992692)
Brinton Lucas
  (D.C. Bar No. 1015185)
Christopher S. Dinkel*
  (N.Y. Bar No. 5927470)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
njfrancisco@jonesday.com

David Phillips*
  (Cal. Bar No. 344034)
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Plaintiff Citadel Securities LLC*

* *pro hac vice application pending*

28