**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITADEL SECURITIES LLC,

        *Plaintiff,*

v.

CONSOLIDATED AUDIT TRAIL, LLC,

        *Defendant.*

Case No. 1:26-cv-00134

**DEFENDANT CONSOLIDATED AUDIT TRAIL, LLC'S OPPOSITION TO
PLAINTIFF CITADEL SECURITIES LLC'S MOTION FOR PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 4

      A.     The Consolidated Audit Trail Exists To Fulfill SROs' And The SEC's Statutory Market-Oversight Duties, Not For SRO Profit. ........................... 4

      B.     The SEC Oversees CAT LLC's Every Operation; The SEC Approved CAT LLC's Collection Of A Reserve And Use Of Excess Funds To Offset Future Fees ................................................................. 7

      C.     In The 2023 Funding Model, The SEC Approved Budgeting For A Reserve And A Specific Cost Allocation .................................................. 9

      D.     CAT LLC Collected Funds Consistent With An SEC-Approved Plan. ................................................................................................... 11

      E.     The Eleventh Circuit's Vacatur Left CAT LLC Without Fee-Based Funding Following The Expiration Of The Court's Sixty-Day Stay Of Its Judgment. .................................................................................... 14

      F.     A New Funding Model Has Been Proposed, And CAT LLC Has Continued To Publicly Notice Its Budget, Including The Use Of The Reserve. ............................................................................................... 15

      G.     The SEC Is Currently Engaging With The Issues Citadel Has Raised On Two Separate Regulatory Fronts ....................................................... 17

STANDARD OF REVIEW .............................................................................................. 18

ARGUMENT ............................................................................................................... 18

I.     This Is Not An Emergency. ............................................................................. 18

II.    Citadel Suffers No Irreparable Harm. .............................................................. 21

      A.     Spending Money Is Not Irreparable. .................................................... 22

      B.     Citadel's Supposed Harms Are Doubly Speculative. ............................ 24

      C.     *Citadel* Is The Party Undercutting The SEC's Review. ...................... 28

III.   Citadel Has No Likelihood Of Success On The Merits. ...................................... 29

      A.     This Suit Suffers From Numerous Threshold Defects. .......................... 29

1.    Citadel Lacks Standing. ............................................................ 29

2.    Citadel's Suit Circumvents Established Review Procedures. ................... 31

B.    There Is No Private Nondelegation Problem. ........................................ 34

1.    This Case Is Nothing Like *Alpine*. ............................................. 34

2.    Citadel's Theory Finds No Other Home In The Doctrine. ...................... 39

IV.    The Remaining Preliminary-Injunction Factors Favor CAT LLC. .................................. 41

A.    The Balance Of The Equities Weighs Decisively Against Relief. ....................... 41

B.    The Public Interest Weighs Against Granting Preliminary Injunctive
Relief. ............................................................................... 43

CONCLUSION ............................................................................... 44

## TABLE OF AUTHORITIES

**CASES**

*Air Transportation Ass'n of America, Inc. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327 (D.D.C. 2012) ..............................................2, 21, 23, 24

*Allina Health Services v. Sebelius*, 756 F. Supp. 2d 61 (D.D.C. 2010)........................................41

*Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025)..............................................................3, 4, 26, 34, 35, 37, 39

*American Foreign Service Ass'n v. Trump*, 768 F. Supp. 3d 6 (D.D.C. 2025) ............................25

*American Forest Resource Council v. Williams*, No. Civ. 21-601, 2021 WL 4819846 (D.D.C. Oct. 13, 2021)...........................................................................................21

*American Securities Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025) ................6, 14, 15, 22, 42, 43

*Arab v. Blinken*, 600 F. Supp. 3d 59 (D.D.C. 2022) .......................................................................33

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) ......................................................................32

*Black v. LaHood*, 882 F. Supp. 2d 98 (D.D.C. 2012) ...................................................................30

*Block v. Community Nutrition Institute*, 467 U.S. 340 (1984)........................................................33

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ..........................................................................40

*Center for Science in the Public Interest v. FDA*, 74 F. Supp. 3d 295 (D.D.C. 2014) .................................................................................................................................33

*Citadel Securities LLC v. SEC*, No. 24-12300 (11th Cir.).............................................................43

*Citizens for Responsibility & Ethics in Washington v. Federal Election Commission*, 904 F.3d 1014 (D.C. Cir. 2018) (per curiam) .....................................24

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)......................................... 25-26, 29

*Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230 (D.C. Cir. 2025)...........................18, 22, 23

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) .........................................................................18

*Coinbase, Inc. v. SEC*, 126 F.4th 175 (3d Cir. 2025) ..............................................................33, 34

*ConverDyn v. Moniz*, 68 F. Supp. 3d 34 (D.D.C. 2014)................................................................41

*Davidson v. Gensler*, No. 6:24-CV-00197, 2024 WL 4926665 (W.D. Tex. Oct. 24, 2024) .................................................................................................................................44

*Doremus v. Board of Education of Borough of Hawthorne*, 342 U.S. 429 (1952) .......................31

*Elgin v. Department of Treasury*, 567 U.S. 1 (2012)......................................................................32

*FCC v. ITT World Communications, Inc.*, 466 U.S. 463 (1984) .......................................................32

*FCC v. Consumers' Research*, 606 U.S. 656 (2025) ..............................................................39, 40

*Florida EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7 (D.D.C. 2020).............................19, 20

*Flyers Rights Education Fund, Inc. v. United States Department of Transportation*,
    957 F.3d 1359 (D.C. Cir. 2020)........................................................................................25

*Frederick Douglass Foundation, Inc. v. District of Columbia*, 531 F. Supp. 3d 316
    (D.D.C. 2021) ...............................................................................................................18, 29

*Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991).........................................................................30

*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975).......................................................20

*Gulf Oil Corp. v. Department of Energy*, 514 F. Supp. 1019 (D.D.C. 1981)................................22

*Hecate Energy LLC v. FERC*, 126 F.4th 660 (D.C. Cir. 2025) .....................................................30

*Hinck v. United States*, 550 U.S. 501 (2007)................................................................................32

*Kim v. FINRA*, 698 F. Supp. 3d 147 (D.D.C. 2023) ......................................................................44

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................................30

*Lukezic v. FINRA*, No. 25-cv-00623, 2025 WL 2305859 (D.C.C. Aug. 10, 2025)......................34

*Marine Power & Equipment Co. v. United States*, 594 F. Supp. 997 (D.D.C.
    1984) ...................................................................................................................................21

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ..............................21, 33

*Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000).................................20

*National Association of Letter Carriers, AFL-CIO v. United States Postal Service*,
    419 F. Supp. 3d 127 (D.D.C. 2019) ...................................................................................23

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) .................................................................20

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) .........................................................40

*Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) ...................................25

*Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26 (D.D.C. 2006), *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006) ............................................................... 23-24

*Smith v. FINRA*, No. Civ. 25-447, 2025 WL 985447 (D.D.C. Apr. 2, 2025) ................................ 34

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................................. 30

*Sunshine Anthracite Coal v. Adkins*, 310 U.S. 381 (1940) ............................................... 40

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ......................................................... 29

*Traudt v. Rubenstein*, No. 2:24-cv-782, 2025 WL 1795825 (D. Vt. June 30, 2025) .................... 34

*United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989) .................................................... 40

*United States v. Richardson*, 418 U.S. 166 (1974) ......................................................... 31

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................... 30

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ................................................................... 18

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ............................................... 22

*Woodstream Corp. v. Jackson*, No. Civ. A. 11-867, 2011 WL 8883395 (D.D.C. June 3, 2011) ............................................................................................. 23

*WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C. Cir. 1981) ....................................................... 25

**STATUTES**

15 U.S.C. § 78f(b)(1) ........................................................................................... 4

15 U.S.C. § 78f(b)(4) ........................................................................................... 9

15 U.S.C. § 78f(b)(5) ........................................................................................... 4

15 U.S.C. § 78k-1(a) ............................................................................................ 7

15 U.S.C. § 78mm(a)(1) ......................................................................................... 36

15 U.S.C. § 78o(b)(1) ........................................................................................... 35

15 U.S.C. § 78o-3(b)(2) ......................................................................................... 4

15 U.S.C. § 78o-3(b)(5) ......................................................................................... 9

15 U.S.C. § 78s(b) .......................................................................................... 10, 40

15 U.S.C. § 78s(b)(3) ........................................................................................... 20

15 U.S.C. § 78s(b)(3)(A) ...................................................................................................10

15 U.S.C. § 78s(b)(3)(C) ..........................................................................................10, 12, 37

15 U.S.C. § 78s(g) ...............................................................................................................4

15 U.S.C. § 78y(a) ......................................................................................................20, 33

15 U.S.C. § 78y(a)(1) .......................................................................................................33

15 U.S.C. § 78y(b)(1) .......................................................................................................32

**OTHER AUTHORITIES**

17 C.F.R. § 201.192 ..........................................................................................................33

17 C.F.R. § 201.700(b)(3)(i) ...............................................................................................9

17 C.F.R. § 240.19b-4(g) ..................................................................................................10

17 C.F.R. § 240.19b-4(h) ..................................................................................................10

17 C.F.R. § 242.608 .............................................................................................................5

17 C.F.R. § 242.608(a) ................................................................................................7, 40

17 C.F.R. § 242.608(a)(2) ................................................................................................32

17 C.F.R. § 242.608(b) .....................................................................................................40

17 C.F.R. § 242.608(b)(2) ...........................................................................................7, 16

17 C.F.R. § 242.608(b)(4) ................................................................................................36

17 C.F.R. § 242.608(d) .....................................................................................................36

17 C.F.R. § 242.608(d)(1) ..........................................................................................20, 33

17 C.F.R. § 242.608(d)(2) ..........................................................................................20, 33

17 C.F.R. § 242.608(e) .....................................................................................................36

17 C.F.R. § 242.613(a)(1)(ix) .......................................................................................6, 43

17 C.F.R. § 242.613(a)(5) ...................................................................................................5

17 C.F.R. § 242.613(f) .........................................................................................................6

*CAT Fee Alert 2025-4* (Nov. 25, 2025), https://catnmsplan.com/sites/default/
    files/2025-11/11.25.25-CAT-Fee-Alert-2025-4.pdf ...............................................16

*CAT Financial and Operating Budget*, CAT, https://www.catnmsplan.com/cat-financial-and-operating-budget (last visited Jan. 27, 2026)......................................................19

CAT LLC, *2025 Financial and Operating Budget* (Nov. 20, 2024), https://www.catnmsplan.com/sites/default/files/2024-11/11.20.24-CAT-LLC-2025-Financial_and_Operating-Budget.pdf ..........................................................38

CAT LLC, *2025 Financial and Operating Budget* (Nov. 7, 2025), https://www.catnmsplan.com/sites/default/files/2025-12/12.22.25_CAT-LLC-2025-Finacial_and_Operating-Budget.pdf ......................................................16, 38

CAT LLC, *2026 Financial and Operating Budget* (Dec. 8, 2025), https://catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf...........................................................16, 19, 38

Citadel Securities LLC, *2024 Financial Statement of Financial Condition* (Dec. 31, 2024), https://www.sec.gov/Archives/edgar/data/1146184/000114618425000 003/CDRG_BS_ONLY_FS_2024.pdf.....................................................................42

Consolidated Audit Trail, 75 Fed. Reg. 32,556 (June 8, 2010) ........................................5

Consolidated Audit Trail, 77 Fed. Reg. 45,722 (Aug. 1, 2012)...............................5, 6, 26

FINRA (SEC Form 19b-4) (Aug. 13, 2025) (withdrawing fee), https://www.finra.org/sites/default/files/2025-08/FINRA-2025-010-Notice-of-Withdrawal.pdf ............................................................................................15

*FINRA Eliminates the Order Audit Trail System (OATS) Rules*, Regul. Notice 21-21, FINRA (June 17, 2021), http://www.finra.org/rules-guidance/notices /21-21 ..................................................................................................6, 43

Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities LLC, to Vanessa Countryman, Secretary, SEC (Aug. 28, 2024), https://www.sec.gov/comments/sr-nysechx-2024-28/srnysechx202428-522375-1500282.pdf ............................................12, 20

Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, to Vanessa Countryman, SEC (Jan. 15, 2026), https://www.sec.gov/files/rules/petitions/2026/petn4-878.pdf........................17, 21, 32

Letter from Katie Kolchin, Managing Director, Head of Equity & Options Market Structure & Gerald O'Hara, Vice President & Assistant General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (Dec. 19, 2025), https://www.sec.gov/comments/4-698/4698-686527-2127374.pdf........................................17

Letter from Patrick Sexton, EVP, General Counsel & Corporate Secretary, Cboe, to Vanessa Countryman, Secretary, SEC (Oct. 31, 2025), https://www.sec.gov /comments/4-698/4698-672527-2038054.pdf ........................................................26

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional Corporation on behalf of FINRA, to Vanessa Countryman, Secretary, SEC (Oct. 17, 2025), https://www.finra.org/sites/default/files/2025-10/20251020-Comment-Letter-CAT-Amendment.pdf ...................................................................26

Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, SEC (Jan. 14, 2026), https://www.catnms plan.com/sites/default/files/2026-01/LLC_CAT-Response-to-Comments_Funding-Proposal-01.14.26.pdf.......................................................13, 17

Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, SEC (Dec. 18, 2025), https://www.sec.gov/comments/4-698/4698-685927-2125515.pdf...........................17, 19, 35

Tom C.W. Lin, *The New Investor*, 60 UCLA L. Rev. 678 (2013) .................................................5

Nasdaq Stock Market LLC (Form 19b-4) (Aug. 15, 2024), https://listing center.nasdaq.com/assets/rulebook/nasdaq/filings/SR-NASDAQ-2024-047.pdf ...............................................................................................11, 12, 19, 37

Nasdaq Stock Market LLC (Form 19b-4) (Jan. 2, 2025), https://listing center.nasdaq.com/assets/rulebook/nasdaq/filings/SR-NASDAQ-2025-002.pdf ...............................................................................................12, 13, 19, 37

Nasdaq Stock Market LLC (Form 19b-4) (June 30, 2025), https://listing center.nasdaq.com/assets/rulebook/nasdaq/filings/SR-NASDAQ-2025-049.pdf ...............................................................................................13, 14, 19, 37

Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail To Further Reduce the Costs of the Consolidated Audit Trail, 90 Fed. Reg. 61,506 (Dec. 31, 2025) ....................................................38

Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail Regarding CAT Funding Model, 90 Fed. Reg. 44,910 (Sept. 17, 2025)..............................................................................................................15

Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Establish Fees for Industry Members Related to Reasonably Budgeted Costs of the National Market System Plan Governing the Consolidated Audit Trail for the Period From July 1, 2025 through December 31, 2025, 90 Fed. Reg. 30,298 (July 9, 2025) ...........................................................................................................11

Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Establish Fees for Industry Members Related to Reasonably Budgeted Costs of the National Market System Plan Governing the Consolidated Audit Trail for the Period From July 1, 2025 through December 31, 2025, 90 Fed. Reg. 30,274 (July 9, 2025) ...........................................................................................................13

Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend FINRA Rule 6897 To Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail, 89 Fed. Reg. 76,626 (Sept. 18, 2024) ............................................11

Notice of Filing of a Proposed Rule Change to Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail; Suspension of and Order Instituting Proceedings to Determine Whether to Approve or Disapprove the Proposed Rule Change, 89 Fed. Reg. 10,582 (Feb. 13, 2024)....................................................10

Order, *American Securities Ass'n v. United States SEC*, No. 23-13396 (11th Cir. Nov. 27, 2024), ECF No. 134 .........................................................................22

Order Approving Amendments to the National Market System Plan Governing the Consolidated Audit Trail Designed to Implement Cost Savings Measures, Exchange Act Release No. 34-101901, 89 Fed. Reg. 103,033 (Dec. 18, 2024).......................38

Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62,628 (Sept. 12, 2023) ......................................................................6, 9, 10, 11, 19, 28, 37

Order Approving Proposed Rule Change and Amendment No. 1 Thereto, 63 Fed. Reg. 12,559 (Mar. 13, 1998)...........................................................................5

Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84,696 (Nov. 23, 2016).......5, 6, 8, 18, 22, 24, 26, 27, 31, 32, 35, 43

Order Granting Conditional Exemptive Relief, Pursuant to Section 36(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Thereunder, From Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail, Rule 613 of Regulation NMS, and Rule 17a–1 Under the Exchange Act, 90 Fed. Reg. 47,853 (Oct. 2, 2025) ....................................................................36, 38

Order Granting Temporary Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to Granularity of Timestamps Specified in Section 6.8(b) and Section 3 of Appendix D of the National Market System Plan Governing the Consolidated Audit Trail, 90 Fed. Reg. 19,334 (May 7, 2025) ..........................................................................................38

Order Granting Temporary Conditional Exemptive Relief Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail, 85 Fed. Reg. 83,634 (Dec. 22, 2020)....................................................................36

Press Release, SEC, *SEC Proposes Consolidated Audit Trail System to Better Track Market Trades* (May 26, 2010), https://www.sec.gov/news/press/2010/2010-86.htm ..............................................................................................................5, 43

Response Brief for Intervenor CAT LLC, *American Securities Ass'n v. United States SEC*, No. 23-13396 (11th Cir. Apr. 15, 2024), ECF No. 97 .........................................15

Kara McKenna Rollins, *Have the SEC's Delay Tactics Made Its Petition for Rulemaking Process Vulnerable to Challenge? A Look at* In re Coinbase Inc. *and SEC's Nullification of 5 U.S.C. § 553(e) by Inaction*, Yale J. on Reg. (May 3, 2023), https://www.yalejreg.com/nc/have-the-secs-delay-tactics-made-its-petition-for-rulemaking-process-vulnerable-to-challenge-a-look-at-in-re-coinbase-inc-and-secs-nullification-of-5-u-s-c ...........................................................25

SEC, *Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by Amendment Nos. 1 and 2 and by the Commission, Regarding the Customer and Account Information System*, Release No. 34-104586 (Jan. 13, 2026), https://public-inspection.federalregister.gov/2026-00762.pdf ..........................................38

SEC's Opposition to Petitioners' Motion for Stay and Injunctive Relief, *American Securities Ass'n v. United States SEC*, No. 23-13396 (11th Cir. Sept. 30, 2024), ECF No. 120 ...............................................................................................................14, 22

Paula Seligson & Katherine Doherty, *Citadel Securities on Track for Record Trading Revenue This Year*, Bloomberg (Dec. 1, 2025), https://www.bloomberg.com/news/articles/2025-12-01/citadel-securities-trading-revenue-jumps-9-amid-competition .............................................................24

David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L. Rev. 2379 (2021) .................................................................................................4

**INTRODUCTION**

This is not an emergency. Citadel Securities has asked this Court to take extraordinary and immediate action to stop Consolidated Audit Trail, LLC ("CAT LLC") from spending money. But the SEC approved CAT LLC to collect these funds and to use any operational reserve to cover the costs of the audit trail *nine years ago*. And the SEC approved CAT LLC to charge the fees it did in *2024* and *2025*. CAT LLC's specific reserve levels, budget, and spending plan for 2026 have been fully known *for over a month*. After waiting years to challenge the relevant regulations or fees and weeks to say anything about CAT LLC's current plans to use the reserve, Citadel attempts to generate an artificial emergency by claiming this Court must act *now* because otherwise the SEC will have no chance to grant Citadel's petition for rulemaking—filed the day before this suit and seeking to amend the 2016 regulations to bar CAT LLC from using the reserve—before the money is spent. There is no gap in SEC oversight. The SEC is fully aware of CAT LLC's use of the reserve and empowered to act—on Citadel's petition, in another pending rulemaking, or on the SEC's own initiative—at any point and with immediate effect. The SEC even provides a procedure for review and stay of alleged noncompliance with CAT LLC's rules—Citadel declined to use it. Citadel's true grievance is that the SEC has not acted as Citadel would like. But that policy disagreement does not warrant emergency relief against CAT LLC from this Court.

Little wonder, Citadel cannot meet any of the factors for a preliminary injunction. Spending money is the quintessential injury that can be later remedied. Going forward, the SEC can provide for fees that account for present expenditures. That means, even if the SEC were to change course and *disapprove* of CAT LLC's use of the reserve, the SEC could direct that future fees must credit broker-dealers for any interim expenditures later found inappropriate. As the SEC explained to the Eleventh Circuit when that Court denied Citadel's request to stay fees: "future fees could be

adjusted to account for any overpayments." Citadel's lack of irreparable harm is reason alone to deny relief.

In any event, Citadel's pocketbook injury is speculative twice over. Citadel's argument proceeds from the premise that the SEC will grant its long-odds petition for rulemaking and go back on the existing 2016 regulations. Those regulations authorize CAT LLC to treat "any surplus" as "an operational reserve to offset future fees"—exactly what CAT LLC is doing. And Citadel further assumes that the SEC will, in the future, relieve broker-dealers of their obligation to "fairly and reasonably share[]" contributions to the audit trail's costs alongside the self-regulatory organizations ("SROs") that operate CAT LLC. But the SEC has committed to the exact opposite position since CAT LLC's inception. Moreover, even if *both* of Citadel's wishes came true, the $16 million over which it seeks emergency relief—0.16% of Citadel's $9.7 billion net trading revenue in 2024—"hardly seems ruinous." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 338 (D.D.C. 2012) ("*ATA*") (Boasberg, J.) (finding potential unrecoverable monetary loss of 7% of Delta's annual revenue does not constitute irreparable injury). With no irreparable harm, this Court could stop there.

Citadel also has no likelihood of success on the merits. This suit stumbles out of the gate over a number of threshold issues. To begin, Citadel lacks standing. Its theory—that the SEC will grant its rulemaking petition and lower its fees in the future—is speculative and fails Article III's causation and redressability requirements. Plus, Citadel has attempted to bootstrap its way into district court by filing a longshot petition for rulemaking and simultaneously asking this Court to enjoin a private party from carrying out the 2016 regulations. That is not how this works. If Citadel wanted to stop the regulation from taking effect, it should have filed a petition in a federal court

of appeals nine years ago. If Citadel wanted to stop CAT LLC's supposed noncompliance with that regulation, it could appeal to and seek a stay from the SEC under Rule 608. Citadel did neither.

In any event, Citadel's private nondelegation theory is dead on arrival. Lacking any other supportive case law, Citadel pins all its hopes on the D.C. Circuit's recent decision in *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025). But this case is nothing like *Alpine*'s specific facts and "limited" ruling. *Id.* at 1319, 1324, 1330, 1332, 1337. Against the unbroken history of private self-regulation in the securities space, the D.C. Circuit found the combination of two "unique" attributes of the plaintiff broker-dealer's suit posed a constitutional problem: that the SEC likely had no opportunity to review FINRA's expedited expulsion order before it took effect; and that the expulsion would likely put the broker-dealer "out of business." *Id.* at 1325, 1326, 1329. Neither of those features is present here. Again, the SEC has already reviewed—and approved—CAT LLC's fees, expenditures, and general use of the reserve; has been fully apprised of the current reserve levels and spending plan for over a month; and is empowered at any point to act to ensure compliance with operative regulations. As for the real-world effect, Citadel sues over money it has already paid; clearly, Citadel did not go under.

Citadel fares no better on the remaining factors. As for the balance of equities, freezing the operational reserve would raise questions about how CAT LLC could continue to operate. CAT LLC presently has no alternative funding source. Meanwhile, Citadel stands to have some marginal amount of money it has already paid to CAT LLC spent on operational costs. Citadel intimates that the SROs are raiding CAT LLC's piggybank, but the reserve goes to the audit trail's operational costs, not to repay the SROs' prior loans to get the audit trail up and running. Citadel's further fearmongering about CAT LLC's fee collection is revisionist history. CAT LLC collected fees pursuant to SEC-approved methods and during the period of the Eleventh Circuit's stay of its

3

judgment. What Citadel really seeks is a return to the world where it and other broker-dealers paid $0 and the SROs bankrolled the audit trail alone, as they were forced to do for much of the last decade.

As for the public interest, the SEC required the SROs that run CAT LLC to maintain an audit trail to prevent fraud on the market. Legacy audit trails have been retired in reliance on this program. There is no backup to protect the industry and the American investing public.

For all these reasons, the Court should deny Citadel's motion for a preliminary injunction.

## BACKGROUND

### A.   The Consolidated Audit Trail Exists To Fulfill SROs' And The SEC's Statutory Market-Oversight Duties, Not For SRO Profit.

For more than two centuries, the U.S. securities markets have been the subject of a system of self-regulation—as overseen and regulated by the SEC since the 1934 passage of the Securities Exchange Act. *See Alpine*, 121 F.4th at 1319-21; *see* David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L. Rev. 2379, 2433-34 (2021). Today, financial self-regulatory organizations are required by statute, as a condition of their existence as exchanges and securities associations, to "enforce compliance by [their] members" with the Exchange Act, SEC rules and regulations, and each SRO's own rules, which, in turn, must be "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. §§ 78f(b)(1), (5), 78o-3(b)(2), 78s(g).

SROs historically relied on individual and joint audit-trail systems to fulfill these obligations and to keep the securities markets orderly and fair. For instance, beginning in the early 1990s, NYSE established the Intermarket Surveillance Information System, "a sequential reconstruction of trading in each stock, identifying the time of trade, the buying and selling member firms, the Floor brokers who represented the orders involved, and whether the trade was for a member firm proprietary account." Wishnick, *supra*, at 2433-34 (quotation marks omitted).

4

As another example, in 1998, as part of a settlement with the SEC to improve audit functions, the entities that would become FINRA established the Order Audit Trail System ("OATS"), an automated computer system, to record mandatory disclosures from FINRA members relating to orders, as well as other data from all equities markets. *See* Order Approving Proposed Rule Change and Amendment No. 1 Thereto, 63 Fed. Reg. 12,559, 12,560 (Mar. 13, 1998).

Following the "Flash Crash" of 2010, which "destroy[ed] nearly $1 trillion in market value" "in a matter of minutes," Tom C.W. Lin, *The New Investor*, 60 UCLA L. Rev. 678, 680, 682 (2013), it became clear that these analog audit trails were no longer sufficient. The SEC proposed the creation of a consolidated audit trail to "help regulators keep pace with new technology and trading patterns in the market" by allowing "more efficient access to data."[1]

The SEC thereafter promulgated a series of orders directing the creation of a consolidated system that would standardize data collection, processing, and management, and give the SROs and the SEC faster access to aggregated data. *See* Consolidated Audit Trail, 77 Fed. Reg. 45,722, 45,722-23 (Aug. 1, 2012). In 2016, the SEC approved a plan, proposed by the SROs, for the Consolidated Audit Trail (the "CAT") to be built and managed by CAT LLC. *See* Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84,696, 84,793-94 (Nov. 23, 2016) ("2016 CAT Order"). The CAT NMS Plan promulgated as part of the 2016 CAT Order is the CAT's governing document; it has been amended numerous times—with SEC approval—via the comprehensive regulatory process governing NMS Plan amendments. *See* 17 C.F.R. §§ 242.608, 242.613(a)(5). The CAT NMS Plan also serves as the limited liability company agreement of CAT LLC, in which the SROs are participants and through which they

---

[1] Press Release, SEC, *SEC Proposes Consolidated Audit Trail System to Better Track Market Trades* (May 26, 2010), https://www.sec.gov/news/press/2010/2010-86.htm ("SEC Press Release"); *see* Consolidated Audit Trail, 75 Fed. Reg. 32,556, 32,556-57 (June 8, 2010).

5

operate the CAT. 2016 CAT Order at 84,699; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62,628, 62,628 n.2 (Sept. 12, 2023) ("2023 Funding Order").

Consistent with the SEC's directive, the SROs constructed the CAT and brought it online. As the CAT became operational, the SEC required the SROs to retire their precursor audit trails. 17 C.F.R. § 242.613(a)(1)(ix) (requiring the SROs to make a "plan to eliminate existing rules and systems … that will be rendered duplicative by the consolidated audit trail"); *see also, e.g.*, *FINRA Eliminates the Order Audit Trail System (OATS) Rules*, Regul. Notice 21-21, FINRA (June 17, 2021), http://www.finra.org/rules-guidance/notices/21-21. Today, the SROs all rely on the CAT to fulfill their regulatory oversight obligations; so, too, the SEC relies on the CAT to do its work. *See* 17 C.F.R. § 242.613(f) (directing SROs to modify "existing surveillance systems[] … to make use of the consolidated information contained in the consolidated audit trail").

Since the SEC promulgated the regulation requiring the SROs to create the CAT back in 2012, the SEC made clear that the costs of building and operating the CAT would eventually be shared among "the SROs *and* their members," *i.e.*, broker-dealers such as Citadel. Consolidated Audit Trail, 77 Fed. Reg. at 45,794-95 (emphasis added). The SEC confirmed that approach when it adopted the CAT NMS Plan in 2016, which provided that, once a specific funding model was in place, costs would shift substantially to broker-dealers, who would reimburse the SROs for the costs of building the CAT and bringing it online and, via fees, contribute to the CAT's ongoing costs. *See* 2016 CAT Order at 84,710; *Am. Sec. Ass'n v. SEC*, 147 F.4th 1264, 1269 (11th Cir. 2025) ("*ASA*"). With that understanding, the SROs funded the entire construction of the CAT for over a decade—to the tune of more than $915 million—with interest-free loans. *See* Declaration

6

of Robert Walley in Support of Defendant CAT LLC's Opposition to Plaintiff Citadel Securities

LLC's Motion for Preliminary Injunction ¶ 7 ("Walley Decl.").

> **B.**     **The SEC Oversees CAT LLC's Every Operation; The SEC Approved CAT LLC's Collection Of A Reserve And Use Of Excess Funds To Offset Future Fees.**

When the SEC promulgated the CAT NMS Plan in 2016, it invoked its statutory authority

under the Exchange Act to "facilitate the establishment of a national market system for securities,"

including by "requir[ing] [SROs] to act jointly … in planning, developing, operating, or regulating

a national market system … or one or more facilities thereof." 15 U.S.C. § 78k-1(a). Under the

regulation the SEC has promulgated to implement that statutory directive—Rule 608—the SROs

must seek approval from the SEC for any National Market System ("NMS") Plan or amendment

thereto. 17 C.F.R. § 242.608(a). The SEC retains authority to make any "changes" to or impose

any "conditions" on such a proposal as it deems "necessary or appropriate." *Id.* § 242.608(b)(2).

Under this regulatory scheme, CAT LLC—an entity created by the SROs for the sole purpose of

satisfying the SEC's directive to run a consolidated audit trail—operates exclusively within the

comprehensive parameters set by the SEC.

Pursuant to its complete oversight, the SEC approved parameters around budgeting for

CAT LLC's reserve. The CAT NMS Plan, as promulgated in 2016, provides as follows:

Section 11.1 <u>Funding Authority</u>

> (a) On an annual basis the Operating Committee shall approve an operating budget for the Company. The budget shall include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, *as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company*.

7

2016 CAT Order at 84,967 (CAT NMS Plan § 11.1(a)) (emphasis added). The regulation thereby provides for the collection of "any reserve" that CAT LLC deems "appropriate for prudent operation." *Id.*

As relevant, the CAT NMS Plan continues:

> (c) To fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs. In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees and expenses) incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members. *Any surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees*.

*Id.* (CAT NMS Plan § 11.1(c)) (emphasis added). In short, the regulation provides for costs to be shared between the SROs that run CAT LLC (the "Participants" in CAT LLC parlance) and broker-dealers (or "Industry Members"). *Id.* It directs that CAT LLC should endeavor to collect those fees "in a manner reasonably related to the timing when the Company expects to incur" the relevant costs. *Id.* And it provides that "[a]ny surplus"—meaning "revenues over its expenses"—shall be treated as "operational reserve to offset future fees." *Id.*

In promulgating these provisions, the SEC sought to "clarif[y]" that "profits from fees will go toward *funding future costs instead of being redistributed among the SROs*." *Id.* at 84,881 (emphasis added). As a result, the SEC provided that any "reserve" cannot be split among the SROs, but rather "shall" be used to "offset future fees"—fees that would otherwise need to be collected from the SROs and broker-dealers to cover the CAT's operating costs. *Id.* at 84,967 (CAT NMS Plan § 11.1(c)). The SEC added these provisions to "formalize[] the representation

8

made by the [SROs]" that the CAT would "be operated on a 'break-even' basis" and that "any surpluses would be treated as an operational reserve." *Id.* at 84,792.

### C.    In The 2023 Funding Model, The SEC Approved Budgeting For A Reserve And A Specific Cost Allocation.

In September 2023, the SEC approved a funding model for the CAT following notice and comment. *See* 2023 Funding Order, 88 Fed. Reg. 62,628. The 2023 Funding Order implemented the 2016 CAT Order's requirement that costs be split among SROs and broker-dealers. It provided that certain historical and all prospective CAT costs would be divided into even shares among the three primary participants to a trade: one-third to the SROs; one-third to the buy-side executing broker-dealers; and one-third to the sell-side executing broker-dealers. *Id.* at 62,629. For recoverable historical costs, broker-dealers would be invoiced to cover their thirds of the amount the SROs had fronted with interest-free loans; the SROs' third would be "paid by the cancellation of [their] loans … on a pro rata basis." *Id.* at 62,666. For prospective costs, each party—the SRO, the executing buy-side broker-dealer, and the executing sell-side broker-dealer—would be charged a third of the fee for each executed equivalent share. *Id.* at 62,629. CAT LLC was to calculate the applicable fee rate twice per year based on reasonably projected CAT costs and reasonably projected executed equivalent share volumes. *Id.* at 62,637. The SROs, on behalf of CAT LLC, would then submit fee filings to the SEC implementing the fee rate to be charged to their broker-dealer members by CAT LLC pursuant to the process in SEC Rule 19b-4. *See id.*

Under Rule 19b-4—which applies to all SRO rule changes—any time an SRO proposes a new fee or fee change, it bears "[t]he burden to demonstrate that [the] proposed [fee] is consistent with the Exchange Act and the rules and regulations issued thereunder," including that the proposed fees are "reasonable" and "equitable." 17 C.F.R. § 201.700(b)(3)(i); 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5). The proposed fee is subject to public comment and SEC scrutiny. *See*

9

15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4(g), (h). While fee filings take effect automatically by default, 15 U.S.C. § 78s(b)(3)(A), if the SEC disagrees with any proposal, it can suspend any fee filing within sixty days and substantively review the proposed fee. *Id.* § 78s(b)(3)(C). The SEC exercised this suspension power as to the SROs' initial effort to implement CAT fees in early 2024.[2] Once suspended, where a proposed SRO fee is based on past and projected costs, the SEC can reject the fee if it appears, for instance, that the SRO has engaged in frivolous or undue spending that undermined the purposes of the Exchange Act. *See* 2023 Funding Order at 62,636.

The 2023 Funding Order also amended the reserve provisions already in place in the 2016 CAT Order by authorizing CAT LLC to include in its budget "an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget." *Id.* at 62,657-58. Put otherwise, the 2023 Funding Order specifically allowed CAT LLC to budget for a 25% surplus—and to charge fees necessary to generate that surplus. The SEC also recognized that, because fees would be calculated based on projected costs and anticipated trading volume and only adjustable twice per year, CAT LLC could end up with an unanticipated additional "budget surplus" or a "shortfall" even while faithfully applying the 2023 Funding Order. *Id.* at 62,657. Accounting for an unexpected surplus scenario, the SEC directed that any budget surplus collected *over* the 25% budgeted reserve amount was to be "used to offset future fees." *Id.* This requirement was designed to "obviate the need for a refund mechanism" by ensuring that all fees paid would ultimately go toward funding CAT LLC's operation. *Id.* at 62,658. The SEC made clear that "the reserve [was] meant to fund CAT LLC to pay its bills if necessary," as in the case of a shortfall or

---

[2] *See, e.g.*, Notice of Filing of a Proposed Rule Change to Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail; Suspension of and Order Instituting Proceedings to Determine Whether to Approve or Disapprove the Proposed Rule Change, 89 Fed. Reg. 10,582 (Feb. 13, 2024).

delays in fee collection, and to "ensure that future funding is secured from all intended parties, rather than relying on [the SROs] alone." *Id.*

Under the terms of the 2023 Funding Order and the fee filings submitted by the SROs on CAT LLC's behalf, CAT LLC collected—and the reserve thus reflects—an even share of fees from the SROs, buy-side broker-dealers, and sell-side broker-dealers.[3]

### D.    CAT LLC Collected Funds Consistent With An SEC-Approved Plan.

With the 2023 Funding Order in place, CAT LLC began moving toward collecting CAT fees from SROs and broker-dealers. CAT fee filings for prospective CAT costs (CAT Fee 2024-1) were submitted on or around August 15, 2024, with collection set to begin in November of that year.[4] The fee filings included a detailed breakdown of CAT LLC's anticipated costs for the time period covered by the fee and a discussion of its trade-volume projection.[5] The filings also included a discussion of the reserve, in which CAT LLC explained that "CAT fees are charged based on the budget" and "anticipated volume," which are "variable" and can be "difficult[]" to predict, and that the reserve thus "help[ed] to assure that the CAT has sufficient resources to cover costs should there be unanticipated costs."[6] Citadel submitted a comment letter asking the SEC to

---

[3] *See* 2023 Funding Order at 62,629; *e.g.*, Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Establish Fees for Industry Members Related to Reasonably Budgeted Costs of the National Market System Plan Governing the Consolidated Audit Trail for the Period From July 1, 2025 through December 31, 2025, 90 Fed. Reg. 30,298, 30,299 (July 9, 2025).

[4] Each SRO filed fees separately. *See, e.g.*, Nasdaq Stock Market LLC (Form 19b-4) (Aug. 15, 2024), https://listingcenter.nasdaq.com/assets/rulebook/nasdaq/filings/SR-NASDAQ-2024-047.pdf ("CAT Fee 2024-1 Fee Filings"). Fee filings for historical CAT costs are submitted separately from fee filings for prospective CAT costs. *See, e.g.*, Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend FINRA Rule 6897 To Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail, 89 Fed. Reg. 76,626 (Sept. 18, 2024) (creating Historical CAT Assessment 1).

[5] CAT Fee 2024-1 Fee Filings at 8-31.

[6] *Id.* at 52-53.

suspend the fees, but Citadel did not mention anything about the reserve.[7] *See* 15 U.S.C. § 78s(b)(3)(C). With or without a specific request from Citadel, if the SEC thought any aspect of the fee filings was problematic or beyond the scope of the 2016 CAT Order or the 2023 Funding Order, it could have suspended the fees. *Id.* The SEC did not do so.

The next fee filings for prospective CAT costs (CAT Fee 2025-1), submitted on or around January 2, 2025, likewise included an explanation of projected trade volume CAT LLC factored into the fee, an exhaustive breakdown of CAT's projected expenditures for the fee period, and the same discussion of the purposes and requirements of the reserve as the previous fee filings.[8] CAT LLC had approved a 2025 operating budget of approximately $249 million; based on that budget, CAT LLC set a fee rate of $0.000022 per executed equivalent share (down from $0.000035 under CAT Fee 2024-1[9]) for transactions starting in January 2025.[10] The filings acknowledged that the funding model required fee filings to "discuss[] ... how the budget is reconciled to the collected fees," given the possibility of a surplus or shortfall based on the unpredictable nature of the key variables involved in calculating fees[11]—making clear that, as a general matter, CAT LLC would calibrate its new fee rate to account for any surplus or shortfall under the previous fee. In this instance, given that CAT LLC was still in the "early stages of the collection of" the first round of

---

[7] Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities LLC, to Vanessa Countryman, Secretary, SEC (Aug. 28, 2024), https://www.sec.gov/comments/sr-nysechx-2024-28/srnysechx202428-522375-1500282.pdf ("Citadel Aug. 2024 Letter"). The letter's focus was the timing of the fee filing. It also made a cursory reference to the reasonableness of CAT LLC's operating budget.

[8] *E.g.*, The Nasdaq Stock Market LLC (Form 19b-4) (Jan. 2, 2025), https://listingcenter.nasdaq.com/assets/rulebook/nasdaq/filings/SR-NASDAQ-2025-002.pdf ("CAT Fee 2025-1 Fee Filings").

[9] CAT Fee 2024-1 Fee Filings.

[10] CAT Fee 2025-1 Fee Filings at 8, 10.

[11] *Id.* at 48.

12

fees, "the extent to which … invoiced fees [would] be collected" was "not yet clear," so the budget assumed 100% collection of invoiced fees.[12] Citadel did not challenge the fees, and the SEC did not suspend them.

In May 2025, CAT LLC revised its 2025 operating budget. In the time since the prior budget—upon which CAT Fee 2025-1 was based—CAT LLC had achieved significant cost savings that allowed it to reduce its budget by $21 million.[13] These savings resulted from a cost-savings amendment to the CAT NMS Plan that the SROs proposed and the SEC approved,[14] as well as from other actions by CAT LLC, including extensive efforts to bring down data-storage costs, a primary driver of CAT costs.[15] At the same time, trading volume was significantly higher than predicted, with multiple days in 2025 seeing over a *trillion* trading events.[16] As the SEC contemplated might be the case in its 2023 Funding Order, the variance in these unpredictable factors resulted in a budget surplus of $54,526,412 over the 25% budgeted reserve.[17]

In order to reduce the amount of the reserve, CAT LLC's next fee filings on or around June 30, 2025 (CAT Fee 2025-2), reduced the fee rate from $0.000022 to $0.000009 per executed

---

[12] *Id.*

[13] Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, SEC at 5 (Jan. 14, 2026), https://www.catnmsplan.com/sites/default/files/2026-01/LLC_CAT-Response-to-Comments_Funding-Proposal-01.14.26.pdf ("CAT LLC Response to SIFMA Letter").

[14] Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Establish Fees for Industry Members Related to Reasonably Budgeted Costs of the National Market System Plan Governing the Consolidated Audit Trail for the Period From July 1, 2025 through December 31, 2025, 90 Fed. Reg. 30,274, 30,288 (July 9, 2025) (citing 89 Fed. Reg. 103,033 (Dec. 18, 2024)).

[15] CAT LLC Response to SIFMA Letter at 5; *see also* Walley Decl. ¶ 41.

[16] Walley Decl. ¶¶ 18, 40; *e.g.*, Nasdaq Stock Market LLC (Form 19b-4) at 15 (June 30, 2025), https://listingcenter.nasdaq.com/assets/rulebook/nasdaq/filings/SR-NASDAQ-2025-049.pdf ("CAT Fee 2025-2 Fee Filings").

[17] *See, e.g.*, CAT Fee 2025-2 Fee Filings at 118.

equivalent share for transactions beginning in July 2025—a 59% reduction. The fee filings explained the drivers of the surplus reserve at length.[18] They also explained that the "surplus reserve balance … would be used to offset a portion of CAT costs" for the remainder of 2025, "reducing the fee rate for CAT Fee 2025-2 … as compared to CAT Fee 2025-1."[19] Again, Citadel did not challenge the fees, and the SEC did not suspend them.

If CAT LLC had continued collecting fees under the funding model, the CAT fees for 2026 would have maintained this downward trajectory based on further cost-saving initiatives, unprecedented trading volume, and the spending down of CAT LLC's reserves. Walley Decl. ¶ 43.

### E.    The Eleventh Circuit's Vacatur Left CAT LLC Without Fee-Based Funding Following The Expiration Of The Court's Sixty-Day Stay Of Its Judgment.

In July 2025, the Eleventh Circuit vacated the 2023 Funding Order following litigation by Citadel and a broker-dealer trade association. *See ASA*, 147 F.4th 1264. The Court of Appeals had previously declined to stay the 2023 Funding Order during the pendency of litigation, following the SEC's representation that "future fees could be adjusted to account for any overpayments." SEC's Opposition to Petitioners' Motion for Stay and Injunctive Relief at 18, *ASA*, No. 23-13396 (11th Cir. Sept. 30, 2024), ECF No. 120 ("SEC's Opp'n to Stay, *ASA*").

On the merits, the Eleventh Circuit ruled on narrow grounds that, in certain respects, the 2023 Funding Order was arbitrary and capricious. As relevant, it did not doubt the funding model's allocation of one-third of CAT costs to SROs, buy-side broker-dealers, and sell-side broker-dealers (nor did the American Securities Association and Citadel question that allocation in their briefing). And the Eleventh Circuit also did not address provisions of the CAT NMS Plan predating the 2023 Funding Order relating to CAT LLC's operational reserve. The panel disapproved the funding

---

[18] *Id.* at 69-101.

[19] *Id.* at 118.

model because the SEC failed to "explain or justify" its decision not to prohibit SROs from, in the future, seeking to pass through their one-third share of CAT costs to broker-dealers in the form of additional fees. *ASA*, 147 F.4th at 1274. The panel also directed the SEC to update its economic analysis. *Id.* at 1277-78. During the period when the 2023 Funding Order was in place, no SRO other than FINRA collected any pass-through fees.[20]

Recognizing that vacating the 2023 Funding Order would "leave[] the CAT without a mechanism for the equitable allocation of costs between self-regulatory organizations and broker dealers" (because CAT LLC has no meaningful revenue source other than fees) and that "the Commission and the industry need some time to adjust and react to this reality," on CAT LLC's request, the Eleventh Circuit stayed its judgment for sixty days following the issuance of its mandate to allow CAT LLC to continue to collect fees for that period. *Id.* at 1280; *see* Response Brief for Intervenor CAT LLC at 50-51, *ASA*, No. 23-13396 (11th Cir. Apr. 15, 2024), ECF No. 97 (requesting that the Court fashion relief that would not "give [the petitioner broker-dealers] a continued reprieve from paying for any of CAT's costs").

**F.    A New Funding Model Has Been Proposed, And CAT LLC Has Continued To Publicly Notice Its Budget, Including The Use Of The Reserve.**

CAT LLC has since proposed a new funding model to the SEC that would retain the executed-share model and the one-third, one-third, one-third allocation of CAT fees that the Eleventh Circuit did not question (and Citadel did not challenge). *See* Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail Regarding CAT Funding Model, 90 Fed. Reg. 44,910, 44,912 (Sept. 17, 2025). That proposal has

---

[20] FINRA voluntarily withdrew its most recent passthrough fee filing. *See* FINRA (SEC Form 19b-4) (Aug. 13, 2025) (withdrawing fee), https://www.finra.org/sites/default/files/2025-08/ FINRA-2025-010-Notice-of-Withdrawal.pdf.

been the subject of notice and comment and is pending before the SEC. The SEC may rule on the proposal at any time; it is currently scheduled to do so by March 16, 2026, under applicable regulatory deadlines. *See* 17 C.F.R. § 242.608(b)(2).

In early November 2025, CAT LLC published a revised 2025 budget reflecting an estimated $187,575,979 in expenses.[21] It also showed a liquidity reserve balance projected to decrease precipitously in the fourth quarter as revenue from fees steeply dropped—due to the expiration of the Eleventh Circuit's stay, the resulting cessation of fee collection under the 2023 Funding Order, and the fact that CAT LLC has no revenue other than fees (besides interest income from bank-account balances). *See* Walley Decl. ¶ 44.[22] The budget showed an ending estimated liquidity reserve balance of $125,128,336.[23] Later that month, CAT LLC published a fee alert stating that it would not be invoicing fees "until further notice" in light of the Eleventh Circuit's judgment's taking effect.[24] On December 11, 2025, CAT LLC published its 2026 financial and operating budget, which showed a starting reserve balance of $119,128,336, and the depletion of that reserve each quarter of 2026 as expenses would continue to accumulate and no fees would be collected.[25]

---

[21] CAT LLC, *2025 Financial and Operating Budget* (Nov. 7, 2025), https://www.catnmsplan.com/sites/default/files/2025-12/12.22.25_CAT-LLC-2025-Finacial_and_Operating-Budget.pdf ("CAT LLC Nov. 7 Operating Budget").

[22] *Id.*

[23] *Id.*

[24] *CAT Fee Alert 2025-4* (Nov. 25, 2025), https://catnmsplan.com/sites/default/files/2025-11/11.25.25-CAT-Fee-Alert-2025-4.pdf.

[25] CAT LLC, *2026 Financial and Operating Budget* (Dec. 8, 2025), https://catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf ("CAT LLC Dec. 11 Operating Budget").

Finally, on December 18, 2025, CAT LLC sent the SEC a public letter in response to comments on the pending funding proposal stating that "[a]s a result of the Eleventh Circuit's decision, following the expiration of the Court's stay of its judgment, the CAT's operations must be funded through its limited operational reserve."[26]

## G.    The SEC Is Currently Engaging With The Issues Citadel Has Raised On Two Separate Regulatory Fronts.

The day after CAT LLC submitted its letter explaining that the CAT's operation would be funded via the operational reserve until a new funding model is approved, an industry group, the Securities Industry and Financial Markets Association ("SIFMA"), filed a comment letter on the pending funding model docket arguing that CAT LLC's anticipated use of the reserve supplied a basis for the SEC to decline to adopt the proposed funding model.[27] CAT LLC has responded to that letter.[28] The SEC is empowered, as SIFMA urges, to reject the SROs' proposed amendment and new funding model for the reasons SIFMA raises or any other. It has not done so.

Nearly a month after SIFMA submitted its letter, on January 15, 2026, Citadel filed a petition for rulemaking before the SEC asking the agency to amend the 2016 CAT Order to bar the expenditure of reserve funds to keep the CAT running.[29] Once again, the SEC has authority to act on the petition, as Citadel urges.

---

[26] Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, SEC at 13 (Dec. 18, 2025), https://www.sec.gov/comments/4-698/4698-685927-2125515.pdf ("CAT LLC Dec. 18 Letter").

[27] Letter from Katie Kolchin, Managing Director, Head of Equity & Options Market Structure & Gerald O'Hara, Vice President & Assistant General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (Dec. 19, 2025), https://www.sec.gov/comments/4-698/4698-686527-212 7374.pdf ("SIFMA Letter").

[28] CAT LLC Response to SIFMA Letter.

[29] Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, to Vanessa Countryman, Secretary, SEC (Jan. 15, 2026), https://www.sec.gov/files/rules/petitions/2026/petn4-878.pdf ("Citadel Petition for Rulemaking").

17

Rather than give the SEC any time to act on Citadel's petition, the very next day—at 7 p.m. on the Friday before a holiday weekend—Citadel filed this case, together with a preliminary-injunction motion asking the Court to prevent CAT LLC from using reserve funds. *See generally* Complaint, ECF No. 1.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). The movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "A movant's failure to show any irreparable harm is … grounds for refusing to issue a preliminary injunction," standing alone. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (quotation marks omitted); *id.* at 1234 (noting "financial injuries are rarely irreparable"). So, too, "a failure to demonstrate a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion." *Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316, 326 (D.D.C. 2021) (Boasberg, J.).

## ARGUMENT

### I.     This Is Not An Emergency.

This case does not present an emergency: It is a collateral attack on a nine-year-old regulation and several fee filings from 2024 and 2025, based on specific facts known for more than a month.

Citadel seeks to stop CAT LLC's spending of revenue surpluses that the 2016 CAT Order authorizes CAT LLC to use "as an operational reserve," "go[ing] toward funding future costs instead of being redistributed among the SROs." 2016 CAT Order at 84,792, 84,881. The 2023

Funding Order confirmed that authority.[30] Fee filings on or around August 15, 2024,[31] January 3, 2025,[32] and June 30, 2025,[33] each detailed CAT LLC's anticipated costs and trade volume when establishing the fees for the relevant period. The fee filings explained that the fee-calculation methodology, combined with CAT LLC's actual expenses, could result in a revenue surplus or shortfall, which would be addressed via the reserve.[34] CAT LLC also made the budgets underlying its fee calculations available.[35] On December 11, 2025, CAT LLC published its 2026 financial and operating budget, showing a starting reserve balance of $119,128,336 and the depletion of that reserve each quarter as expenses would continue to accumulate and no fees would be collected.[36] Were that somehow not enough, on December 18, 2025, CAT LLC submitted a public comment letter to the SEC on the docket of its pending proposal for a new funding model stating "the CAT's operations must be funded through its limited operational reserve."[37]

After all that time, Citadel claims the situation is urgent. Courts routinely deny emergency relief in cases of less egregious delay. *See, e.g.*, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020) (finding that "plaintiff waited until five days after the Rule went into effect" to

---

[30] As discussed above, *see supra* at 10-11, the 2023 Funding Order authorized CAT LLC to budget for a reserve of 25% of anticipated costs and provided that "[any] reserve" over that 25% had to be "used to offset future fees." 2023 Funding Order at 62,657. The SEC made clear that "the reserve [was] meant to fund CAT LLC to pay its bills if necessary," to "ensure that future funding is secured from all intended parties, rather than relying on [the SROs] alone." *Id.* at 62,658.

[31] CAT Fee 2024-1 Fee Filings.

[32] CAT Fee 2025-1 Fee Filings.

[33] CAT Fee 2025-2 Fee Filings.

[34] *E.g.*, CAT Fee 2024-1 Fee Filings at 8-31, 52-53.

[35] *See CAT Financial and Operating Budget*, CAT, https://www.catnmsplan.com/cat-financial-and-operating-budget (last visited Jan. 27, 2026).

[36] CAT LLC Dec. 11 Operating Budget.

[37] CAT LLC Dec. 18 Letter at 13.

19

challenge it, and that "delay directly undercuts plaintiff's argument that its economic harm" warrants equitable relief); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (explaining delay of two months "militates against a finding of irreparable harm"); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding "delay to be inexcusable" where plaintiffs waited 44 days after issuance of regulation to bring challenge). Put simply: "Plaintiff's delay in seeking a preliminary injunction … undercuts its asserted harms." *Fla. EB5 Invs*., 443 F. Supp. 3d at 13; *see Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (in the context of delay of "more than a month," holding that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.").

Worse, all the way along, Citadel has declined to avail itself of numerous opportunities to object or seek review. Citadel did not challenge the 2016 CAT Order in a federal court of appeals under the Exchange Act. *See* 15 U.S.C. § 78y(a). Citadel did not file comments seeking suspension of CAT fees in 2024 or 2025 based on CAT LLC's treatment of the reserve, or any of the details of its cost and trade-volume projections.[38] *See* 15 U.S.C. § 78s(b)(3). Nor, after the December 11, 2025, publication of CAT LLC's budget or the December 18, 2025, letter stating CAT LLC would use its reserves, did Citadel seek review before—or a stay from—the SEC alleging noncompliance with the 2016 CAT Order by CAT LLC. *See* 17 C.F.R. § 242.608(d)(1)-(2) (providing "[a]ny action taken or failure to act by any person in connection with an effective national market system plan … shall be subject to review by the Commission, on its own motion or upon application by any person aggrieved thereby" and providing the SEC may enter a "stay").

---

[38] Citadel filed one comment seeking suspension of CAT Fee 2024-1, primarily focused on the timing of the fee filing and making cursory reference to CAT LLC's budget. Citadel Aug. 2024 Letter.

20

Having waited all this time to act and waived all those opportunities to object, Citadel has attempted to manufacture an emergency. The day before it filed suit, Citadel sent a petition for rulemaking to the SEC, asking it, with "immediate effect," to amend the operative 2016 CAT Order to prevent CAT LLC from spending its reserve. *See* Citadel Petition for Rulemaking at 9. Citadel now claims that this Court must rule immediately because the SEC will otherwise not have adequate opportunity to rule on the petition. Citadel Br. at 3.

Courts do not—and this Court should not—countenance such gamesmanship. Such a "procedural ploy" seeking an "end-run" around typical review procedures to get review of claims "more expeditiously" does not merit relief. *Am. Forest Res. Council v. Williams*, No. Civ. 21-601, 2021 WL 4819846, at *4 (D.D.C. Oct. 13, 2021); *see Marine Power & Equip. Co. v. United States*, 594 F. Supp. 997, 1002 (D.D.C. 1984) (rejecting preliminary-injunction motion where plaintiff had "slept on its rights" and engaged in dubious "litigation tactics" by sitting out other opportunities to adjudicate its claim (citation omitted)). This Court should not credit Citadel's fake emergency.

## II.     Citadel Suffers No Irreparable Harm.

As Citadel's "delay in seeking relief" shows, it suffers no irreparable harm. *ATA*, 840 F. Supp. 2d at 338 (Boasberg, J.). This Circuit "erects a very high bar" to establish irreparable injury. *Id.* at 334 (quoting *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008)). The "alleged injury must be certain, great, actual, and imminent." *Id.* (quoting *Hi–Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008)). And it must be "beyond remediation." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation marks omitted). Citadel's alleged injury is none of the above.

21

#### A.       Spending Money Is Not Irreparable.

Citadel's primary asserted injury—CAT LLC's expenditure of already-collected funds—does not constitute irreparable harm. It is hornbook law that spending money is generally not irreparable. *See, e.g.*, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Clevinger*, 134 F.4th at 1234. This is the quintessential case where that is true.

SEC regulation requires—and the Eleventh Circuit acknowledged—that the costs of the audit trail must be shared between broker-dealers and the SROs that run CAT LLC. *See* 2016 CAT Order at 84,967; *ASA*, 147 F.4th at 1269 ("[T]he [2016 CAT Order] anticipated that the costs would be shared by the self-regulatory organizations and their members."). And all agree that the SEC remains able to calibrate fees to address any period of disproportionate contribution by any party. *See* Citadel Br. at 26 (conceding that the pending funding proposal would allow recoupment of present expenditures). As the SEC put it before the Eleventh Circuit, Citadel does not face irreparable harm from CAT LLC's collection of fees because, "if the funding model were modified on remand, future fees could be adjusted to account for any overpayments." SEC's Opp'n for Stay, *ASA* at 18. (The Eleventh Circuit declined to stay the fees. *See* Order, *ASA*, No. 23-13396 (11th Cir. Nov. 27, 2024), ECF No. 134.) Thus, even if the SEC were ultimately to agree with Citadel, change course, and implement changes to the existing regulations to prohibit CAT LLC from spending the reserve, any funds spent in the interim could be put right via lower fees in the future.

In such situations, even where future regulations have not yet been promulgated, courts in this Circuit recognize that a plaintiff cannot establish an irreparable injury based on economic harm. Interim monetary losses "would be correctable" under possible future regulation, if adopted. *See Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1027 (D.D.C. 1981) ("[W]ithout deciding whether any final clean-up regulations will be valid (because that question is not properly presented here) the court concludes that there is a strong likelihood that any injury Gulf may suffer

from the March 6 Order and the March Entitlements Notice, will not be irretrievable, because of the likelihood that effective, valid clean-up regulations will be promulgated."); *cf. Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 419 F. Supp. 3d 127, 135-36 (D.D.C. 2019) (Boasberg, J.) (explaining that future arbitration "could award backpay and damages," thus remedying plaintiffs' asserted injury).

For that reason, Citadel's references to regulatory immunity, Citadel Br. at 8, 24, are a red herring; Citadel can recover any losses irrespective of immunity because the SEC can adjust for any imbalances in contributions to the CAT.

Were there lingering doubt on Citadel's ability to be made whole (there is not), the possibility that money may not be recoverable does not alone result in irreparable harm justifying injunctive relief. *See ATA*, 840 F. Supp. 2d at 336, 338. Even where an immunity doctrine would prevent recovery in a future suit, a plaintiff *still* must make "a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits." *Id.* at 336 (quoting *Mylan Pharms.*, 81 F. Supp. 2d at 43); *see id.* at 335-36, 338 (explaining that operation of sovereign immunity to prevent future damages alone did not render economic loss an irreparable injury and finding that the "magnitude" of plaintiffs' economic harm was not "significant enough to qualify as irreparable"); *see also Woodstream Corp. v. Jackson*, No. Civ. A. 11-867, 2011 WL 8883395, at *8 (D.D.C. June 3, 2011) (Boasberg, J.) (stating that plaintiff's "economic harm" must be "significant, even where it is irretrievable because a defendant has sovereign immunity"). This Court thus found that a prospective loss close to "7% of Delta's business[] … hardly seems ruinous." *ATA*, 840 F. Supp. 2d at 338; *see also Clevinger*, 134 F.4th at 1235 (noting "financial injury" was not "so great as to threaten [plaintiff's] continued existence"); *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) ("A loss of less than 1

percent total sales is not irreparable harm." (internal quotation marks omitted)), *aff'd*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006). Even crediting Citadel's claim to $16 million in CAT LLC's reserve, *see* Citadel Br. at 23; *but see infra* at 31, that represents 0.16% of Citadel's approximately $9.7 billion in net trading revenue in 2024.[39] Citadel has already paid that money to CAT LLC, and Citadel is still standing.

### B.    Citadel's Supposed Harms Are Doubly Speculative.

To obtain a preliminary injunction, a movant must establish an injury that is "actual" and "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *ATA*, 840 F. Supp. 2d at 334 (quoting *Hi–Tech Pharmacal Co.*, 587 F. Supp. 2d at 11; and *Judicial Watch, Inc. v. Dep't of Homeland Security*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007) (internal quotation marks omitted)). Citadel's harms are wholly speculative. *See Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam) (irreparable injuries must "rise beyond the speculative level"). Specifically, Citadel's theory assumes that the SEC will go back on *two* longstanding regulations and misrepresents how CAT fees work.

**1.** The premise of Citadel's theory of injury—that money spent now and later disapproved by the SEC cannot be clawed back, *see* Citadel Br. at 2-3—assumes that the SEC will grant Citadel's petition for rulemaking and opt to change the operative regulations governing the use of reserves. After all, the present CAT NMS Plan authorizes CAT LLC's actions. CAT LLC may "fund[] … any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company." 2016 CAT Order at 84,967 (CAT NMS Plan § 11.1(a)). And "[a]ny

---

[39] Paula Seligson & Katherine Doherty, *Citadel Securities on Track for Record Trading Revenue This Year*, Bloomberg (Dec. 1, 2025), https://www.bloomberg.com/news/articles/2025-12-01/citadel-securities-trading-revenue-jumps-9-amid-competition.

surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees." *Id.* (CAT NMS Plan § 11.1(c)). CAT LLC is doing just that: using the reserve to "fund[] future costs," *id.* at 84,881, thus "offset[ting] future fees" that would otherwise be required to cover those costs. *Id.* at 84,793. Hence, Citadel needed to file a petition for rulemaking before the SEC to *change* the operative regulations to get the result it wants.

The notion that the SEC will grant a petition for rulemaking to alter these longstanding provisions is highly speculative. Citadel avoids saying it is likely by simply proceeding from the premise that it will occur. But agencies have "broad discretionary powers ... to promulgate (or not promulgate) rules[.]" *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981); *see Flyers Rts. Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1363 (D.C. Cir. 2020) ("[A]n agency's denial of a petition for rulemaking is akin to an exercise of prosecutorial discretion."). Between 2018 and 2022, the SEC granted only *one* petition for rulemaking.[40] This Court should not bet on that three-legged horse.

Even setting aside Citadel's especially long odds, courts routinely reject claims of irreparable harm that are contingent on the future discretionary acts of third parties, including agencies. *See, e.g.*, *Am. Foreign Service Ass'n v. Trump*, 768 F. Supp. 3d 6, 17 (D.D.C. 2025) (no irreparable harm where agency "ha[d] no plan or proposal" in place that would result in asserted harm) (citing authority omitted); *Power Mobility Coalition v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005) (no irreparable harm where plaintiff was "basically predicting" that the agency would deny its reimbursement claims under new regulation); *see also Clapper v. Amnesty Int'l*

---

[40] *See* Kara McKenna Rollins, *Have the SEC's Delay Tactics Made Its Petition for Rulemaking Process Vulnerable to Challenge? A Look at* In re Coinbase Inc. *and SEC's Nullification of 5 U.S.C. § 553(e) by Inaction*, Yale J. on Reg. (May 3, 2023), https://www.yalejreg.com/nc/have-the-secs-delay-tactics-made-its-petition-for-rulemaking-process-vulnerable-to-challenge-a-look-at-in-re-coinbase-inc-and-secs-nullification-of-5-u-s-c.

*USA*, 568 U.S. 398, 414 n.5 (2013) (harms premised on "speculation about the unfettered choices made by independent actors" cannot support injunctive relief (internal quotation marks omitted)). Indeed, in *Alpine* itself, the D.C. Circuit denied a preliminary injunction on plaintiff's Appointments-Clause theory because, "[w]ithout knowing how the SEC will rule," plaintiff's possible injury "after full SEC review is far too uncertain and unpredictable at this time to warrant the extraordinary relief of a preliminary injunction." 121 F.4th at 1332. Here, as discussed, the 2016 CAT Order allows CAT LLC's reserve expenditures (a point that Citadel's petition for rulemaking proposing amendments thereto only underscores). The notion that the SEC is substantially likely to pull a regulatory about-face on this issue—particularly when it has been aware of the present facts for more than a month and has taken no action—is farfetched.

**2.** Citadel's theory of harm adds a *second* layer of speculation: It assumes that the SEC will reverse course on its commitment that broker-dealers and the SROs must split the costs of running the CAT. *See* 77 Fed. Reg. at 45,794-95 (2012 regulations); 2016 CAT Order at 84,967; *supra* at 6. Specifically, Citadel posits that "every dollar of the reserve spent now is one less dollar CAT LLC can use to offset CAT fees imposed on Citadel Securities in the future." Citadel Br. at 23. The exact opposite is true. Every dollar of the reserve spent today will reduce future fees that would otherwise be charged to recoup present outlays. Conversely, any dollar of the reserve that CAT LLC may *not* spend today would likely result in relatively higher future fees to make up the difference—a point Citadel eventually admits. *See* Citadel Br. at 26 ("[T]he SROs would be able to collect repayment for any loans in the future under a new funding regime, just as they did under the 2023 Order. Indeed, the SEC could approve the pending funding proposal at any time, which would then allow the SROs to attempt to recoup on any interim loans."). It is beyond speculative that the SEC will, in the future, pivot and take an approach to fees that is contrary to the position

26

the SEC has taken and reaffirmed for over a decade, especially when the SROs relied on the SEC's

position when expending hundreds of millions of dollars to finance the CAT. *See supra* at 6-7.

**3.** Citadel's asserted harm goes beyond conjecture; it affirmatively misstates how CAT fees

work. Citadel derives its dollar-for-dollar discount from a cramped reading of the 2016 CAT

Order's statement that operational reserve must "offset future fees." 2016 CAT Order at 84,967.

According to Citadel, the only way to "offset future fees" is to knock money directly off broker-

dealers' invoices. But that is not how the 2016 CAT Order uses the phrase. Other than the loans

that the SROs extended to get the CAT up and running, CAT LLC has no meaningful revenue

besides fees. Walley Decl. ¶ 44. Those fees are collected from *both* broker-dealers *and* SROs

(indeed, the present operational reserve comprises fees from both, a fact Citadel neglects to

mention). *See* 2016 CAT Order at 84,967 (referring to "fees on Participants and Industry

Members"). Fees are structured to "fairly and reasonably share[]" financial responsibility for

running the CAT between the broker-dealers and the SROs. *See id.*

With those basics in mind, the SEC provided that operational reserve be used to "offset

future fees" to "clarif[y]" that "profits from fees will go toward *funding future costs* instead of

being redistributed among the SROs" to repay their loans (or as profit). *Id.* at 84,881 (emphasis

added). Put otherwise, given how CAT LLC is structured, spending the reserve on "funding future

costs"—as CAT LLC is doing—*is* "offset[ing] future fees." CAT LLC has no other revenue, so it

would otherwise charge future fees to cover present outlays. Those fees could be, say, $0.000001,

or $0.000003; the delta is what the reserve offsets.

It makes no difference to Citadel's argument that the 2023 Funding Order has been vacated

and a new funding model is pending before the SEC. The SEC requires that the CAT continue to

run and to incur operational costs. And, as Citadel acknowledges, a new funding model will allow

for collection of fees once more. *See* Citadel Br. at 26. Thus, present use of the reserve "offset[s]" those future fees.

Citadel makes much of the fact that CAT LLC's operational reserve is greater than the 25% of annual costs that CAT LLC budgeted for under the 2023 Funding Order. *See* Citadel Br. at 9-11, 27. But that surplus was caused by factors outside of CAT LLC's forecast or control—a confluence of unprecedented trading volume and cost savings achieved mid-year. *See* Walley Decl. ¶¶ 33-43.[41] The 2023 Funding Order contemplated this very scenario and provided the remedy: use any surplus "to offset future fees." 2023 Funding Order at 62,657. The SEC thus made clear that "the reserve [was] meant to fund CAT LLC to *pay its bills if necessary*," as in the case of a shortfall or delays in fee collection, and to "ensure that future funding is secured from *all* intended parties, rather than relying on [the SROs] alone." *Id.* at 62,658 (emphasis added). That is exactly what CAT LLC is doing. The alternative Citadel proposes—refunding the overage, *see* Citadel Petition for Rulemaking at 7-9—is contrary to the 2023 Funding Order, which allowed CAT LLC to spend reserve in order to "*obviate the need for a refund mechanism*." 2023 Funding Order at 62,658 (emphasis added). With that air cleared, Citadel's entire claim of harm collapses.

### C.    *Citadel* Is The Party Undercutting The SEC's Review.

Lacking any other irreparable harm, Citadel states, without case law, that spending the reserve will undercut proposals before the SEC. Citadel Br. at 23-24. But *Citadel* is the party seeking to frustrate SEC proceedings. It is collaterally attacking multiple past SEC actions while attempting to use this Court to short-circuit the SEC's available administrative remedies under Rule 608(d), its review of the pending funding model, and Citadel's own petition for rulemaking.

---

[41] While Citadel suggests that the projections were nefarious or incompetent, *see* Citadel Br. at 10, they were disclosed publicly without complaint from Citadel or anyone else. *See supra* at 11-13.

In short, Citadel's financial harm is pure speculation and, in any event, fully curable. Its tacked-on claim of regulatory short-circuiting misrepresents reality. This Court should stop there and deny Citadel's relief.[42]

### III.    Citadel Has No Likelihood Of Success On The Merits.

Citadel fares no better on its chances of success on the merits. A moving party's "failure to demonstrate a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion." *Frederick Douglass Found.*, 531 F. Supp. 3d at 326. Citadel has no likelihood of success. Its case suffers from numerous threshold defects, and Citadel's private nondelegation doctrine theory has no grounding in precedent.

### A.    This Suit Suffers From Numerous Threshold Defects.

#### 1.    Citadel Lacks Standing.

To invoke this Court's jurisdiction, Citadel must demonstrate an injury-in-fact that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged conduct; and (3) likely to be redressed by a favorable decision. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Citadel satisfies none of these requirements.

Citadel first fails to allege a qualifying injury-in-fact. An injury-in-fact—like irreparable harm—cannot "rest on speculation about the decisions of independent actors" such as federal agencies. *Clapper*, 568 U.S. at 414; *see supra* at 24-27. But Citadel's asserted harm turns entirely on theoretical (and unlikely) future regulatory action by the SEC. As discussed, Citadel's claim of injury assumes that the SEC will grant Citadel's petition for rulemaking, then structure future fees

---

[42] To the extent Citadel attempts to justify relief based on the mere fact that it pleads a structural constitutional violation, *Alpine* itself forecloses that possibility. The D.C. Circuit stressed that being subjected to an action by an allegedly unconstitutionally structured agency does not alone create an "irreparable harm." *Alpine*, 121 F.4th at 1332-37.

in a manner that radically departs from existing regulations, past practice, and the pending funding model. Citadel's asserted "injury" goes beyond hypothetical—it is fiction.

For similar reasons, Citadel cannot satisfy standing's causation or redressability requirements. To establish causation, the asserted injury must be "fairly traceable" to the challenged conduct and not depend on a speculative chain of third-party decisions. *Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991); *see also Warth v. Seldin*, 422 U.S. 490, 504-05 (1975). As discussed, Citadel identifies no plausible causal mechanism creating a direct inverse relationship between CAT LLC's present spending and Citadel's future fee obligations.

By the same token, Citadel cannot show redressability. Enjoining CAT LLC from spending reserve funds would not even make it likely that Citadel's total future fees would be lower as a result. Where, as here, the requested relief has no "substantial likelihood" to produce the asserted benefit, redressability is lacking. *Hecate Energy LLC v. FERC*, 126 F.4th 660, 666 (D.C. Cir. 2025) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976)); *see also id.* at 665 (It is "'substantially more difficult to establish' redressability" where relief depends on "future choices" by parties "'whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992))).[43]

Nor is Citadel's asserted injury particularized. A particularized injury is "personal," "individual," and "distinct"—not "generalized" or "undifferentiated." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 & n.7 (2016) (citations omitted). Citadel cannot meet that standard because its

---

[43] To the extent Citadel attempts to ground its standing on the simple fact that it alleges a constitutional violation, that does not solve the problem. As discussed below, spending money alone is not an unconstitutional delegation, so Citadel must attribute the constitutional problem to a host of CAT LLC's activities taken together. *See infra* at 39. But that creates redressability issues, since *stopping* CAT LLC from using the reserve funds would not cure Citadel's supposed constitutional injury. *See Black v. LaHood*, 882 F. Supp. 2d 98, 106-07 (D.D.C. 2012); *cf. Lujan*, 504 U.S. at 568.

claimed injury arises solely from the expenditure of a pooled reserve of fees to which it contributed alongside over a thousand other broker-dealers, as well as the SROs. Citadel thus cannot claim that every "dollar of the reserve spent now" is *its* dollar rather than another broker-dealer's or an SRO's. *Cf.* Citadel Br. at 23. Even a large contributor to a pooled fund does not automatically acquire a personal stake in each expenditure from the fund, any more than a large taxpayer acquires standing to challenge government spending decisions. *Cf. United States v. Richardson*, 418 U.S. 166, 174 (1974) ("[A] taxpayer may not employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System" (quotation marks omitted)); *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429, 433 (1952) (taxpayer interests "are too indeterminable, remote, uncertain and indirect" to support standing). That is the difference between collecting fees and accepting deposits—a distinction Citadel ignores.

### 2.    Citadel's Suit Circumvents Established Review Procedures.

Citadel's suit also circumvents every established review procedure.

At its core, Citadel's suit is a collateral attack on the 2016 CAT Order that authorized CAT LLC's collection and use of the reserves. Again, that order authorized CAT LLC to "fund[] … any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company." 2016 CAT Order at 84,967 (CAT NMS Plan § 11.1(a)). And it further provided that "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees." *Id.* (CAT NMS Plan § 11.1(c)). In so stating, the SEC "clarifie[d]" that "profits from fees will go toward funding future costs instead of being redistributed among the SROs." *Id.* at 84,881. Citadel's pending petition for rulemaking asks the SEC to change that policy and forbid the collection or use of the reserve in this manner. The mere fact that Citadel must seek an amendment demonstrates, however, that the CAT NMS Plan today authorizes CAT

31

LLC's collection and intended use of the reserve. *See* Citadel Petition for Rulemaking at 7-9 (proposing "new paragraph[s]" to amend the existing regulations). By seeking relief in this Court simultaneously, Citadel is effectively asking this Court to vacate parts of the 2016 CAT Order pending the SEC's consideration of the regulatory change Citadel desires.

Those procedural gymnastics are forbidden. Section 25 of the Exchange Act provides the exclusive path for challenging final SEC rules or orders: a petition for review in a federal court of appeals, filed within 60 days of the rule's promulgation. 15 U.S.C. § 78y(a)(1), (b)(1). This scheme displaces general federal question jurisdiction under 28 U.S.C. § 1331 and deprives district courts of authority to entertain challenges—constitutional or otherwise—to final SEC action. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 8-10 (2012); *Hinck v. United States*, 550 U.S. 501, 506 (2007).[44]

Citadel cannot circumvent Congress's limits on the review of SEC actions by filing a petition for rulemaking to change the regulations and using that petition to bootstrap a district-court suit seeking to enjoin a private entity from implementing the existing regulations in the meantime. As the Supreme Court has explained, when Congress expressly sets forth a scheme for judicial review of agency action, "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order." *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984). If review could be had by forgoing the petition-for-review process in litigation against the agency and years later suing a regulated entity in district

---

[44] That Citadel raises a structural constitutional claim is not enough to get into district court. As the Supreme Court made clear in *Axon Enterprises, Inc. v. FTC*, plaintiffs may, in narrow circumstances, bring collateral constitutional challenges to an agency's structure where the claim "is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." 598 U.S. 175, 191 (2023). Such situation gives rise to the "'here-and-now injury' of subjection to an unconstitutionally structured decision-making process," that, once the proceeding ends, cannot be remedied. *Id.* at 192. Nothing similar is going on here.

32

court, parties could "effectively nullify Congress' intent" in creating a carefully reticulated review scheme. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984).

To the extent Citadel claims it is not attempting to invoke this Court's equity power to rewrite the 2016 CAT Order, but rather seeking to ensure CAT LLC's conformance therewith, that does not explain Citadel's maneuver. As discussed, the SEC provides for review of complaints of noncompliance with any NMS Plan and offers a stay of the offending conduct during the pendency of SEC review. *See* 17 C.F.R. § 242.608(d)(1)-(2). A final order from the SEC on a Rule 608(d) petition would likewise be channeled to a federal court of appeals, not federal district court. *See* 15 U.S.C. § 78y(a)(1).

Citadel has instead opted to file a Hail-Mary petition for rulemaking in an attempt to get into district court today. But Citadel's strategic decision to file a petition for rulemaking rather than a Rule 608(d) appeal should only buy it yet another ticket to a federal court of appeals, and only down the road. Citadel can, if and when the SEC denies the petition, seek review in a circuit court under the Exchange Act. 17 C.F.R. § 201.192; 15 U.S.C. § 78y(a). Citadel may grow impatient with the delay that petitions for rulemaking may reasonably entail. *See Mexichem Specialty Resins, Inc.*, 787 F.3d at 555 (estimated four-year delay in reviewing petition for reconsideration of rule not unreasonable); *Arab v. Blinken*, 600 F. Supp. 3d 59, 68, 72 (D.D.C. 2022) (30-month delay in adjudicating visa application not unreasonable); *Ctr. for Sci. in the Pub. Int. v. FDA*, 74 F. Supp. 3d 295, 300-01 (D.D.C. 2014) (Boasberg, J.) (agency's three-year delay in reviewing petition for rulemaking not "'so egregious' as to warrant relief" (citation omitted)). If it does, Citadel can file a mandamus action to try to prompt the SEC to act. *See, e.g.*, *Coinbase, Inc. v. SEC*, 126 F.4th 175, 186 (3d Cir. 2025) (denying relief).

33

But it strains credulity to claim that Citadel requires urgent relief today from this Court because it has declined an available route to seek an immediate stay from the SEC and chosen instead a drawn-out and highly discretionary means of agency review. *See id.* at 187-88 (noting the SEC's "'broad discretionary powers to promulgate (or not [to] promulgate)' rules" (quoting *WWHT*, 656 F.2d at 816) (alteration in original)). This Court should not buy it.

### B.   There Is No Private Nondelegation Problem.

Even were this Court to proceed past the numerous gateway issues with this suit, Citadel's case fails on the merits. Citadel's efforts to put this case on all fours with *Alpine* founder, and its argument finds no other home in the doctrine.

### 1.   This Case Is Nothing Like *Alpine*.

Citadel spends the majority of its brief attempting to shoehorn this case into the facts of *Alpine*, but the two are nothing alike.

Against the acknowledged backdrop that "the securities industry in the United States has engaged in extensive self-regulation for more than two centuries," *Alpine* was a "narrow and limited" ruling. 121 F.4th at 1319, 1330.[45] The opinion emphasized no fewer than *seven* times that the scope of the ruling and the relief granted were "limited." *Id.* at 1319, 1324, 1330, 1332, 1337. Specifically, the panel found that plaintiff's allegations regarding FINRA's expedited expulsion proceedings established a likelihood of success on the merits because of the combination of two features "unique" to those proceedings: (1) the SEC likely did "not conduct *any* review" of expedited expulsion decisions before they took effect, and (2) expulsion carried "immediate" and

---

[45] Numerous other courts have recognized *Alpine*'s limited application. *Smith v. FINRA*, No. Civ. 25-447, 2025 WL 985447, at *2 (D.D.C. Apr. 2, 2025) (Boasberg, J.); *Lukezic v. FINRA*, No. 25-cv-00623, 2025 WL 2305859, at *2-3 (D.D.C. Aug. 10, 2025); *Traudt v. Rubenstein*, No. 2:24-cv-782, 2025 WL 1795825, at *6 (D. Vt. June 30, 2025).

"financially devastating consequences" for FINRA members—whose only business was transactions in securities—such that "delayed SEC review" would be "too little too late" for the fate of their business. *Id.* at 1326, 1331 (crediting plaintiff's counsel's declaration that expulsion from FINRA would "force Alpine to close its business"). Putting the two together, the fact "that SEC review is not available as a practical matter in expedited expulsion proceedings prior to businesses being forced to close" produced a "gap" that the D.C. Circuit concluded "likely runs afoul of the private nondelegation doctrine." *Id.* at 1331. Neither feature is present here.

For starters, CAT LLC's use of the reserve does not carry "immediate" or "financially devastating consequences" for Citadel. *Id*. As the D.C. Circuit emphasized, expulsion from FINRA is "unique." *Id.* Because federal law requires membership in an SRO like FINRA, 15 U.S.C. § 78o(b)(1), an expulsion forces members to shutter their securities-trading businesses. *Alpine*, 121 F.4th at 1331. CAT LLC's use of the reserve is nothing like this. CAT LLC has *already collected* the money from Citadel. *See* Declaration of Stephen John Berger in Support of Plaintiff's Motion for Preliminary Injunction. But Citadel is still here, no devastating consequences to report.

Moreover, far from *no* opportunity for review before effectiveness, the SEC, after notice-and-comment rulemaking, *already reviewed* and *blessed* CAT LLC's use of the reserve to "fund[] future costs" back in 2016. *See* 2016 CAT Order at 84,881.

The SEC remains fully apprised of CAT LLC's current budget and is empowered to act at any time. As mentioned, CAT LLC submitted a letter regarding the pending funding proposal stating that it intended to use the reserve during the pendency of the notice-and-comment process. *See* CAT LLC Dec. 18 Letter at 13 ("[T]he CAT's operations must be funded through its limited operational reserve."). And the day before filing this suit, Citadel filed with the SEC a petition for rulemaking seeking changes to the CAT NMS Plan to prevent the expenditure of the reserve.

35

Citadel Petition for Rulemaking at 9 ("The Commission should take immediate action to amend the CAT NMS Plan to stop CAT LLC from spending the reserve[.]"). The SEC can act if it believes CAT LLC's expenditures are improper on any one of its *many* alternatives: (1) the SEC could institute Rule 608(d) proceedings "on its own motion" and enter an immediate stay of CAT LLC's expenditures, 17 C.F.R. § 242.608(d); or (2) the SEC could approve (or not) the pending proposal for a funding model and there address the comments about the appropriate use of the reserve; or (3) the SEC could impose an interim funding model, an approach several commenters have suggested;[46] or (4) if it believed CAT LLC required authorization to spend the reserve, the SEC could order immediate exemptive relief from the requirements of the CAT NMS Plan (as it has done on multiple occasions in the past[47]); *see* 15 U.S.C. § 78mm(a)(1); 17 C.F.R. § 242.608(e); or (5) the SEC could act on Citadel's petition for rulemaking and alter the operative regulations; or (6) the SEC could, on its own initiative, amend the CAT NMS Plan in some other way to direct CAT LLC's use of the reserve, 17 C.F.R. § 242.608(a)(2). As Citadel acknowledges, Citadel Br. at 20, the SEC can have these amendments take "effect" immediately "upon publication of [the] notice of … amendment[.]" 17 C.F.R. § 242.608(b)(4). Thus, unlike in *Alpine*, where the SEC

---

[46] *See* Letter from Patrick Sexton, EVP, General Counsel & Corporate Secretary, Cboe, to Vanessa Countryman, Secretary, SEC at 2 (Oct. 31, 2025), https://www.sec.gov/comments/4-698/4698-672527-2038054.pdf; Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional Corporation on behalf of FINRA, to Vanessa Countryman, Secretary, SEC at 2-3, 13-16 (Oct. 17, 2025), https://www.finra.org/sites/default/files/2025-10/20251020-Comment-Letter-CAT-Amendment.pdf.

[47] *E.g.*, Order Granting Temporary Conditional Exemptive Relief Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail, 85 Fed. Reg. 83,634 (Dec. 22, 2020); Order Granting Conditional Exemptive Relief, Pursuant to Section 36(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Thereunder, From Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail, Rule 613 of Regulation NMS, and Rule 17a–1 Under the Exchange Act, 90 Fed. Reg. 47,853 (Oct. 2, 2025).

likely had no opportunity to review FINRA's expedited expulsion orders, the SEC has *already* reviewed CAT LLC's reserve and maintains multiple tools to change course if it so chooses.

That some of these administrative processes could take time does not change the analysis. For one, the *Alpine* Court found the SEC's discretionary stay process insufficient in the context of FINRA's expedited expulsion "[b]ecause expulsion from FINRA carries with it a moratorium on all securities trading, [so] even a few days or weeks may be too long for an expelled FINRA member to stay afloat." *Alpine*, 121 F.4th at 1327. As discussed above, there is no similar existential threat to Citadel. For another, in *Alpine*, a discretionary stay *after* expulsion likely did not represent "a decision on the merits" by the SEC reviewing FINRA's expedited action. *Id.* But here the SEC substantively approved CAT LLC's actions all along the way, *see supra* at 7-17, and the SEC can continue to substantively review those actions, for example by acting on the pending funding model or Citadel's petition for rulemaking.

Indeed, the SEC continuously exercises significant oversight over CAT LLC's operating budget and the fee rates that led to the collection of the current reserve. As to the fees (and the projected budgets on which they were based), each one crossed the SEC's desk. When CAT LLC set a new fee rate, the SROs were required to submit fee filings to the SEC pursuant to the process outlined in SEC Rule 19b-4, *see* 2023 Funding Order at 62,637; 17 C.F.R. § 240.19b-4; those fee filings all contained detailed information about CAT LLC's budget and its calculation of fees. *See* CAT Fee 2024-1 Fee Filings; CAT Fee 2025-1 Fee Filings; CAT Fee 2025-2 Fee Filings. As discussed, the SEC could have temporarily suspended, substantively reviewed, and rejected any of these fees. 15 U.S.C. § 78s(b)(3)(C); *see supra* at 10.

The SEC's scrutiny of CAT LLC's expenses and budget is comprehensive, not limited to "post hoc" review. *See* Citadel Br. at 18. For example, in December 2024, the SEC approved a

proposed cost-savings amendment to the CAT NMS Plan estimated to result in approximately $23 million in cost savings.[48] In May and September 2025, the SEC granted the SROs exemptive relief from certain CAT NMS Plan requirements that would reduce the annual costs of operating the CAT by more than $20 million.[49] As recently as January 13, 2026, the SEC approved an amendment to the CAT NMS Plan, proposed by the SROs, that was estimated to achieve $12 million in annual cost savings.[50] As a result of these and other cost-saving measures, the annual operating budget for the CAT has been reduced from an originally estimated $249 million for 2025 to $156 million for 2026.[51] Another set of proposed amendments may even further reduce CAT costs.[52] Each of these regulatory actions has entailed notice-and-comment proceedings, significant substantive engagement by the SEC, and review of CAT LLC's detailed financials.

[48] Order Approving Amendments to the National Market System Plan Governing the Consolidated Audit Trail Designed to Implement Cost Savings Measures, Exchange Act Release No. 34-101901, 89 Fed. Reg. 103,033 (Dec. 18, 2024).

[49] Order Granting Temporary Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to Granularity of Timestamps Specified in Section 6.8(b) and Section 3 of Appendix D of the National Market System Plan Governing the Consolidated Audit Trail, 90 Fed. Reg. 19,334 (May 7, 2025); 90 Fed. Reg. 47,853.

[50] SEC, Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by Amendment Nos. 1 and 2 and by the Commission, Regarding the Customer and Account Information System, Release No. 34-104586 (Jan. 13, 2026), https://public-inspection.federalregister.gov/2026-00762.pdf.

[51] *Compare* CAT LLC, *2025 Financial and Operating Budget* (Nov. 20, 2024), https://www.catnmsplan.com/sites/default/files/2024-11/11.20.24-CAT-LLC-2025-Financial_and_Operating-Budget.pdf; *with* CAT LLC Dec. 11 Operating Budget. Note that the original 2025 budget was subsequently reduced and, as of November 7, 2025, was estimated at $188 million. *See* CAT LLC Nov. 7 Operating Budget.

[52] *See* Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail To Further Reduce the Costs of the Consolidated Audit Trail, 90 Fed. Reg. 61,506 (Dec. 31, 2025).

The notion that the SEC does not or cannot exercise oversight of CAT LLC's expenditures or fees is flat wrong. Citadel's real grievance is that it wishes the SEC would have taken any of the opportunities before it to change course. That is not a remedy Citadel can get from this Court.

### 2. Citadel's Theory Finds No Other Home In The Doctrine.

Failing to fit this case into *Alpine*'s narrow parameters, Citadel has no other precedent on its side. Citadel's challenge purports to stem from CAT LLC's imminent expenditure of already-collected funds. It cites no case suggesting that merely sending funds out the door is the exclusive or traditional prerogative of the federal government. For good reason: Under Citadel's theory, federal contractors and grantees would suddenly find themselves in violation of the private nondelegation doctrine.

To get around this basic problem, Citadel performs a sleight-of-hand, locating the putative private nondelegation problem in the amalgamation of CAT LLC's collection, budgeting, and spending of funds. *See* Citadel Br. at 16, 18 (criticizing the SEC's "review[] [of] biannual [fee] filings" as "insufficient[,]" and arguing that the Commission "retains little oversight of CAT LLC's budget"). That maneuver only aggravates the problem that Citadel is bringing a time-barred collateral attack on earlier agency action, now a host of prior actions.

In any event, Citadel's reframing does not state a private nondelegation problem. The private nondelegation doctrine requires that an entity exercising governmental authority do so "subject to [a federal agency's] authority and surveillance[.]" *FCC v. Consumers' Rsch.*, 606 U.S. 656, 692 (2025) (internal quotation marks omitted). Private entities may exercise governmental authority; the agency just has to "retain[] the ultimate authority to 'approve[], disapprove[], or modif[y]' the private entity's actions and decisions on delegated matters." *Alpine*, 121 F.4th at 1325 (citation omitted) (first bracket added).

For the reasons discussed above, CAT LLC and its use of the reserve meets this standard. Beyond the litany of specific oversight by the SEC already cataloged, *see supra* at 7-17, *every single* incremental change to CAT LLC's National Market System Plan must be submitted to the SEC for notice-and-comment proceedings and approval. *See* 17 C.F.R. § 242.608(a), (b) (providing that any "amendment to an effective national market system plan" must go through notice and comment and be approved by the SEC). As to CAT fees, specifically, they must be submitted to the SEC and subject to notice and comment; the SEC has the opportunity to suspend them. *See* 15 U.S.C. § 78s(b).

All of Citadel's other cases are in accord—and none found an unconstitutional private delegation. *See* Citadel Br. at 16-17. In *FCC v. Consumers' Research*—the Supreme Court's most recent word on the subject—the Court found no unconstitutional delegation from the FCC to a private entity, even though the entity manages the day-to-day operations of an FCC subsidy program, bills and collects contributions to the program from telecommunications carriers, and distributes the resulting pot of money to beneficiaries. 606 U.S. at 669, 692-94. In *United States v. Frame*, the Third Circuit found no unconstitutional delegation to the Cattlemen's Board, which is authorized to collect assessments from cattle producers and plan how those funds are spent. 885 F.2d 1119, 1129 (3d Cir. 1989). Finally, in *Pittston Co. v. United States*, the Fourth Circuit found that the delegation of powers to trustees of a fund, which provided benefits to retired coal workers, did not violate the nondelegation doctrine. 368 F.3d 385, 396 (4th Cir. 2004).[53] These cases all

---

[53] Citadel's passing reference to *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), *see* Citadel Br. at 14, does not help. Once the statute at issue in *Carter Coal* was revised to ensure that a federal agency "approved, disapproved, or modified" the private entity's actions, the Court found no improper delegation. *Sunshine Anthracite Coal v. Adkins*, 310 U.S. 381, 388 (1940). As noted, the SEC must approve every meaningful action CAT LLC takes.

strike the same note: Where, as here, an agency approves the rates a private entity charges and sets requirements for how the entity can expend funds, there is no unconstitutional delegation.[54]

## IV.    The Remaining Preliminary-Injunction Factors Favor CAT LLC.

The remaining preliminary-injunction factors—the balance of the equities and the public interest—weigh in favor of CAT LLC and against granting Citadel's extraordinary request for relief.

### A.    The Balance Of The Equities Weighs Decisively Against Relief.

In evaluating the balance of the equities, the Court must "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014) (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.* at 53; *see also Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 69 (D.D.C. 2010) (collecting cases) (finding that the balance of the equities weighed against issuing injunction because the alleged economic injury to the movant would be outweighed by economic injury to the defendants). Here, CAT LLC would face far greater injury from Citadel's requested relief than Citadel will suffer without it.

As Citadel acknowledges, CAT LLC presently "has no revenue streams" without fees. Citadel Br. at 25. Citadel handwaves that the SROs can simply loan CAT LLC the additional funds it needs to operate the CAT. *Id.* But the SROs have already loaned CAT LLC nearly a billion

---

[54] That the Eleventh Circuit vacated the 2023 Funding Order does not alter the private nondelegation analysis. As discussed above, the SEC authorized CAT LLC to collect the fees it did under the 2023 Funding Order and in subsequent fee filings; the SEC also authorized CAT LLC to maintain and use its operational reserve in the 2016 CAT Order; and the SEC can at any point change course on the reserve issue if it so chooses. There is no gap in the SEC's oversight.

dollars to get this critical market-oversight tool off the ground at the SEC's direction, to fulfill the SROs' regulatory obligations, *and* to serve the SEC's surveillance functions. *See ASA*, 147 F.4th at 1272. Without a clear path forward, freezing CAT LLC's use of the reserve would raise questions about how CAT LLC would function.

On the other side of the ledger, Citadel has, at most, a *de minimis* interest in the already-collected funds in the reserve. *See supra* at 29-31. Even crediting that Citadel has a specific claim to $16 million of its already-paid fees, *see* Citadel Br. at 23—which CAT LLC contests, *see supra* at 30-31—that dollar figure is a drop in Citadel's $58.6-billion ocean of assets.[55]

Perhaps sensing its cause is less than compelling, Citadel repeatedly suggests that CAT LLC has engaged in an unauthorized money grab and argues that this "conduct" weighs in favor of an injunction. *E.g.*, Citadel Br. at 12 n.1, 19, 26. In terms of the lawfulness of its revenue, CAT LLC has always complied with federal law. It collected fees as authorized by the SEC (in the 2023 Funding Model and via the SROs' fee filings on behalf of CAT LLC) and consistent with the Eleventh Circuit's sixty-day stay of its judgment. *See ASA*, 147 F.4th at 1280; Walley Decl. ¶¶ 8-17, 23-43. As to Citadel's intimations that CAT LLC inflated its fees to pad its reserves, the 2024 and 2025 fee filings setting rates all predated the Eleventh Circuit's decision, and all critical assumptions underlying those rates were publicly disclosed. *See supra* at 11-14; Walley Decl. ¶¶ 22, 24-26, 21, 40-41. Nor are SROs skimming off the top. The reserve is going and will continue to go directly toward operational costs of the CAT. *See supra* at 7-11, 15-17; Walley Decl. ¶ 51.

The SROs have committed hundreds of millions of dollars to CAT LLC, an enterprise that, all along, was supposed to be jointly funded by broker-dealers like Citadel. Neither the SROs nor

---

[55] Citadel Securities LLC, *2024 Financial Statement of Financial Condition*, at 1 (Dec. 31, 2024), https://www.sec.gov/Archives/edgar/data/1146184/000114618425000003/CDRG_BS_ONLY_F S_2024.pdf.

CAT LLC have acted—indeed, they cannot act—to generate a windfall for themselves. *See* 2016 CAT Order at 84,881 (prohibiting SROs from "redistribut[ing]" any budget surplus "among" themselves). That description better befits Citadel, which is fighting tooth and nail—across multiple parallel fronts, *see ASA*, 147 F.4th 1264; *Citadel Securities LLC v. SEC*, No. 24-12300 (11th Cir.)—to saddle the SROs with all the costs of running a system from which Citadel benefits. What Citadel really seeks in this case is a return to the world where it pays $0 of CAT costs, and the SROs foot the bill forever. That is not equitable.

### B.    The Public Interest Weighs Against Granting Preliminary Injunctive Relief.

For many of the same reasons, an injunction would jeopardize the public interest. The SEC directed the SROs to establish and operate a consolidated audit trail to "help regulators keep pace with new technology and trading patterns in the market" and thus more effectively oversee the securities markets and keep them secure and fair.[56]

Without access to the reserve—CAT LLC's only current source of funding—there would be uncertainty about how CAT LLC would continue to operate. *See supra* at 41-42. As discussed, the SROs have retired legacy audit-trail systems in reliance on the CAT, at the direction of the SEC. *See* 17 C.F.R. § 242.613(a)(1)(ix) (requiring the SROs to make a "plan to eliminate existing rules and systems … that will be rendered duplicative by the consolidated audit trail"); *see FINRA Eliminates the Order Audit Trail System (OATS) Rules*, Regul. Notice 21-21, FINRA (June 17, 2021), http://www.finra.org/rules-guidance/notices/21-21 (eliminating OATS system); *supra* at 6. That means there is no backup. If the CAT were to go offline, the markets would be essentially unmonitored, by the SROs or the SEC. It should go without saying (though Citadel apparently contests it, *see* Citadel Br. at 25-27), "[i]nvestors could be harmed" by the SROs' "even temporary

---

[56] SEC Press Release.

inability to self-regulate securities markets" via the CAT. *Kim v. FINRA*, 698 F. Supp. 3d 147, 171 (D.D.C. 2023) (explaining that SROs, in the exercise of their self-regulatory functions, "provide essential first-line level protection in real time," such that suspending an SRO's "enforcement ability would likely interfere with the 'efficiency, reliability, and safety' of U.S. capital markets").

Yet again assuming the merits of its claims, Citadel argues there is no public interest in "enforcement of an unconstitutional law." Citadel Br. at 27 (quotation marks omitted). But as discussed, there are *many* reasons to doubt that Citadel will win its uphill battle to make CAT LLC's reserve use unlawful. Far clearer are the real harms Citadel's requested relief will pose to the U.S. markets and traders. Indeed, another court reached that very conclusion, denying a preliminary injunction that would have had the "chaotic and disruptive" effect of halting the CAT's operation based in part on "the lack of a replacement system for CAT and the public's dependency on [the] program." *Davidson v. Gensler*, No. 6:24-CV-00197, 2024 WL 4926665, at *4 (W.D. Tex. Oct. 24, 2024). This Court should do the same.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for a preliminary injunction.

45

Dated: January 30, 2026.                    Respectfully submitted,

                                            */s/ Ian Heath Gershengorn*
Gregory M. Boyle                            Ian Heath Gershengorn
JENNER & BLOCK LLP                              *Counsel of Record*
353 N. Clark Street                             (DC Bar No. 448475)
Chicago, IL 60654                           Elizabeth B. Deutsch
(312) 527-0484                                  (DC Bar No. 1719602)
(*pro hac vice*)                            Sophia W. Montgomery
                                                (DC Bar No. 1753637)
                                                (*D.D.C. admission pending*)
                                            JENNER & BLOCK LLP
                                            1099 New York Avenue, NW
                                                Suite 900
                                            Washington, DC 20001
                                            (202) 639-6000
                                            igershengorn@jenner.com

                                            *Counsel for Defendant Consolidated
                                            Audit Trail, LLC*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the formatting and typeface requirements of LCvR 5.1(d) and the page-volume requirements of LCvR 7(e). The document is formatted in standard 8 ½ by 11-inch word processing format, with all text double-spaced (excluding block quotations and footnotes) and in 12-pt font; and the memorandum of points and authorities in opposition does not exceed 45 pages in length.

Dated: January 30, 2026

Respectfully submitted,

*/s/ Ian Heath Gershengorn*
Ian Heath Gershengorn
  (DC Bar No. 448475)
JENNER & BLOCK LLP
1099 New York Avenue, NW
  Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Counsel of Record for Defendant*
*Consolidated Audit Trail, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2026, I filed the foregoing document with the Clerk of Court for the U.S. District Court for the District of Columbia using the court's CM/ECF system. I further certify that a copy of the foregoing and accompanying documents will be sent via email to the below:

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com
brabbitt@jonesday.com
blucas@jonesday.com
cdinkel@jonesday.com

David Phillips
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92129
(858) 314-1200
davidphillips@jonesday.com

Dated: January 30, 2026

Respectfully submitted,

 /s/ Ian Heath Gershengorn
Ian Heath Gershengorn
   (DC Bar No. 448475)
JENNER & BLOCK LLP
1099 New York Avenue, NW
   Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Counsel of Record for Defendant*
*Consolidated Audit Trail, LLC*