IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITADEL SECURITIES LLC, | |
| Plaintiff, | Civil Action No. 1:26-cv-00134-JEB |
| v. | |
| CONSOLIDATED AUDIT TRAIL, LLC, | |
| Defendant. | |

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

   I.   CAT LLC's Expenditure Of The Reserve Without Government Supervision Violates The Private Nondelegation Doctrine. ................................................... 3

       A.    This case is indistinguishable from *Alpine.* ............................................. 3

       B.    Congress did not strip this Court of jurisdiction .................................... 8

  II.   The Equitable Factors Warrant A Preliminary Injunction ............................. 12

       A.    Citadel Securities faces a significant risk of irreparable injury. ......... 12

           1.    Citadel Securities' injuries are beyond remediation. .................. 12

           2.    Citadel Securities' injuries are imminent .................................... 15

       B.    The remaining equitable factors favor a preliminary injunction. ........ 22

CONCLUSION ................................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................................... 27

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ................................................................................ 7

*Alabama Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021) .............................................................................. 15

*\*Alpine Securities Corp. v. FINRA,*
121 F.4th 1314 (D.C. Cir. 2024) ........................................................*passim*

*\*ASA v. SEC,*
147 F.4th 1264 (11th Cir. 2025)................................................. 23, 24, 25

*Associated Press v. Budowich,*
780 F. Supp. 3d 32 (D.D.C. 2025) ........................................................ 15

*Baird v. Bonta,*
81 F.4th 1036 (9th Cir. 2023).............................................................. 19

*Biden v. Nebraska,*
600 U.S. 477 (2023) ................................................................................ 6

*Bond v. United States,*
564 U.S. 211 (2011) .............................................................................. 19

*Boyce's Ex'rs v. Grundy,*
28 U.S. 210 (1830) ................................................................................ 12

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936) ................................................................................ 4

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .............................................................. 18

*Ctr. for Biological Diversity v. EPA,*
861 F.3d 174 (D.C. Cir. 2017) ........................................................ 17, 18

*Consumers Research v. FCC,*
109 F.4th 743 (5th Cir. 2024) (en banc) .................................................................. 16

*Davidson v. Gensler,*
2024 WL 4926665 (W.D. Tex. Oct. 24, 2024) .......................................................... 22

*FCC v. Consumers' Research,*
606 U.S. 656 (2025) .................................................................................................. 16

*FEC v. Cruz,*
596 U.S. 289 (2022) .................................................................................................. 17

*Florida EB5 Investments, LLC v. Wolf,*
443 F. Supp. 3d 7 (D.D.C. 2020) .............................................................................. 21

*Friends of Earth US v. Exp.-Imp. Bank of United States,*
2025 WL 3516161 (D.D.C. Oct. 10, 2025) ......................................................... 18, 19

*Fund for Animals v. Frizzell,*
530 F.2d 982 (D.C. Cir. 1975) .................................................................................. 21

*Gordon v. Holder,*
721 F.3d 638 (D.C. Cir. 2013) .................................................................................. 19

*Gulf Oil Corp. v. Dep't of Energy,*
514 F. Supp. 1019 (D.D.C. 1981) .............................................................................. 13

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.,*
501 F. Supp. 2d 34 (D.D.C. 2007) ............................................................................ 16

*In re NTE Conn., LLC,*
26 F.4th 980 (D.C. Cir. 2022) .................................................................................. 15

*John Doe Co. v. CFPB,*
849 F.3d 1129 (D.C. Cir. 2017) ................................................................................ 19

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) .................................................................................................. 17

*Mylan Pharmaceuticals, Inc. v. Shalala,*
81 F. Supp. 2d 30 (D.D.C. 2000) .............................................................................. 21

iii

*N.J. Dep't of Env't Prot. v. EPA,*
626 F.2d 1038 (D.C. Cir. 1980)......................................................................... 19

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. USPS,*
419 F. Supp. 3d 127 (D.D.C. 2019) ................................................................... 13

*Newdow v. Bush,*
355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................... 21

*NIH v. American Public Health Ass'n,*
145 S. Ct. 2658 (2025) ...................................................................................... 15

*Northern Mariana Islands v. United States,*
686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................. 18, 19

*Ohio Oil Co. v. Conway,*
279 U.S. 813 (1929) .......................................................................................... 15

*Ohio v. EPA,*
603 U.S. 279 (2024) .......................................................................................... 15

*PhRMA v. Williams,*
64 F.4th 932 (8th Cir. 2023)............................................................................. 12

*Pittston Co. v. United States,*
368 F.3d 385 (4th Cir. 2004) .............................................................................. 6

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ............................................................................................ 19

*Tri-Cnty. Tele. Ass'n, Inc. v. FCC,*
999 F.3d 714 (D.C. Cir. 2021) .......................................................................... 16

*United States v. Frame,*
885 F.2d 1119 (3d Cir. 1989).............................................................................. 6

*Whitman-Walker Clinic, Inc. v. HHS,*
485 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) .......................................................................................... 15

**CONSTITUTIONAL AUTHORITIES**

U.S. Const. Amendment I ................................................................................. 25

**REGULATORY AUTHORITIES**

17 C.F.R. § 242.608 ....................................................................................... 11

81 Fed. Reg. 84696 (2016) ........................................................... 3, 9, 23, 24

90 Fed. Reg. 44910 (2025) ............................................................................ 14

CAT NMS Plan § 11.1(c) (Mar. 24, 2023) ................................................. 10

**OTHER AUTHORITIES**

Letter from CAT LLC to V. Countryman (Dec. 18, 2025) ......................................... 20

Letter from Citadel Securities to V. Countryman (Aug. 28, 2024) ...................... 13, 20

Letter from SIFMA to V. Countryman (Dec. 19, 2025) .............................................. 20

Letter from SIFMA to V. Countryman (Oct. 21, 2025) ............................................. 13

## INTRODUCTION

While CAT LLC tries to make this case seem complex, the problem here is simple. The Company unlawfully seized hundreds of millions in fees under a since-vacated SEC order, including over $56 million from Citadel Securities alone. CAT LLC raced to collect those funds despite an ongoing (and ultimately successful) challenge to the 2023 Order, took more than even that unlawful order allowed, and is now rushing to spend nearly $120 million of its spoils by August 2026 as if the Eleventh Circuit's vacatur of the 2023 Order never happened—all in contravention of its SEC-approved plan and all before the SEC has a chance to act. And once those funds are gone, they are not coming back, even if the Commission later steps in.

The solution to this problem is equally simple: a brief pause to allow the SEC time to do its job under the Constitution. Indeed, in every relevant respect, this case is the same as *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024), where the D.C. Circuit stopped an SRO from engaging in an unreviewable and irreparable exercise of delegated government power. CAT LLC struggles mightily to get around this binding precedent, but its distinctions invariably crumble. The Company's revisionist history notwithstanding, the SEC has never blessed its decision to spend unlawfully collected funds to cover CAT costs without an SEC-approved funding model in place. To the contrary, the governing 2016 CAT NMS Plan makes clear that CAT LLC cannot do so. And while the Company dutifully notes that this case addresses a different set of facts than *Alpine*, it never can articulate why those factual distinctions make a whit of constitutional difference.

1

With no plausible path around *Alpine*, CAT LLC launches a barrage of distractions. It insists Citadel Securities is attacking the 2016 Plan, when all Plaintiff is doing is asking for time to allow the SEC to enforce that Plan. It contends Citadel Securities lacks an irreparable injury—and even Article III standing—on the premise that the SEC "could" someday, somehow make Citadel Securities whole whenever it completes its comprehensive review of the CAT and settles on a new funding model. Such speculation cannot close the doors to equitable relief, let alone to a federal courthouse. In any event, CAT LLC's wishcasting about some future refund mechanism is belied by its refusal to give the SEC time to consider its draw down of the reserve. If the SEC really can work this all out later, then why is the Company fighting so hard against giving the Commission time to do so now? The answer is that CAT LLC knows draining the reserve before the SEC can act will render its scheme a *fait accompli*.

On the other side of the ledger, CAT LLC identifies no meaningful harm from simply giving the SEC some time to consider what to do with nearly $120 million in unlawfully collected regulatory fees, most of which came from broker-dealers and their investor customers—big and small. Remarkably, the Company threatens that its SRO operators will cut off the CAT's funding if this Court dares to give the SEC time to blow the whistle on its plan. But the SROs are required by law to run the CAT even in the absence of any funding from broker-dealers, and they have done so for a decade. Preserving the status quo until the SEC can address what to do with the unlawfully collected reserve will in no way jeopardize the CAT itself. Instead, the only thing it will threaten is CAT LLC's latest scheme to circumvent meaningful review.

2

## ARGUMENT

### I.  CAT LLC's Expenditure Of The Reserve Without Government Supervision Violates The Private Nondelegation Doctrine.

#### A.  This case is indistinguishable from *Alpine.*

*Alpine* controls this case. ECF 5-1 (Mem.) at 13-22. Here as in *Alpine*, (1) the SEC does not wield ultimate control over CAT LLC's "decisions" because they "take effect immediately, before the SEC can review them"; and (2) their "consequences" will make "any later review by the SEC a largely academic exercise." 121 F.4th at 1326. While CAT LLC tries to distinguish *Alpine* on each front, neither effort works.

**1.**  On the first prong, CAT LLC cannot deny its plundering of the reserve (to the tune of nearly $15 million a month) is occurring before the SEC can review those acts. Mem. 19. Instead, it says that does not matter for two reasons. Each fails.

*First*, CAT LLC insists that "in 2016," the SEC "*reviewed and blessed*" the Company's decision to spend nearly $120 million in fees unlawfully collected under the 2023 Order. ECF 21 (Opp.) at 34. But the 2016 Order could not have approved of CAT LLC's expenditure of fees *unlawfully* collected under the vacated 2023 Order. To the contrary, the 2016 Order (and the Plan it adopts) discusses only a reserve comprised of "surpluses" of "fees imposed and collected," contemplating *lawful* fee collection under an approved funding model that the Commission promised to finalize at "a later date." 81 Fed. Reg. 84696, 84795, 84880 (2016) (2016 Order). The SEC's attempt to do so "later" in the since-vacated 2023 Order failed, and it has yet to approve a new funding model. The 2016 Order thus did not, and could not, "bless" CAT LLC's current spending of a reserve *unlawfully* collected under a *vacated* order from 2023.

*Second*, CAT LLC contends that if the Commission wanted to act, it could put a stop to the Company's withdrawals "at any time" through various administrative "tools." Opp. 34-35. But the same was true in *Alpine*, and that was not enough to cure the unconstitutional delegation. As the D.C. Circuit explained, the fact that "the SEC can stay the effectiveness of an expulsion order" was "insufficient" to satisfy the Constitution, as such relief "is not automatic" and "the process" for obtaining a stay "takes time, during which" the expulsion "will already be taking its toll." 121 F.4th at 1326-27. As CAT LLC eventually admits, all that is true here: "The SEC *can* act if it believes CAT LLC's expenditures are improper"—*i.e.*, there is no automatic stay of the draining of the reserve—and these "administrative processes" will "take time." Opp. 35-36 (emphasis added). That time is all that Citadel Securities seeks here.

The Company nevertheless says this case is different because its spending of the reserve—as opposed to expulsion from FINRA—does not pose an "existential threat" to Citadel Securities. Opp. 36. But nothing about *Alpine*'s merits analysis of the unconstitutional delegation turned on the *severity* of the consequences from an SRO's unsupervised exercise of government power. Rather, what matters is the *permanence* of those consequences, such that later review by the SEC will be "too little too late." 121 F.4th at 1326. After all, delegations of government power to private entities are unconstitutional even if they fall short of wiping out a company in its entirety. The problem in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), for instance, was that Congress had given certain coal companies the power to "regulate" their competitors, not put them out of business. *Id.* at 311.

4

CAT LLC therefore tries to distinguish *Alpine* on the premise that while the available SEC stay process there did not provide "'a decision on the merits,'" the Commission "can … substantively review" the Company's draining of the reserve by acting later on Citadel Securities' "petition for rulemaking." Opp. 36. But in *Alpine*, the SEC likewise could engage in "plenary" review of a FINRA expulsion decision "*if a stay is granted*," yet the D.C. Circuit found "that 'if'—and the time it takes to get there—means that *no* SEC review takes place until after the effects of any expulsion have been felt." 121 F.4th at 1327. The same is true here: CAT LLC is spending the reserve right now, and there is no guarantee that the SEC will act on the petition for rulemaking before the money is gone. To the contrary, as the Company emphasizes, the SEC can often take "year[s]" to resolve such petitions. Opp. 32. That is *why* Citadel Securities filed this lawsuit: It needs to give the SEC time to "substantively review" CAT LLC's decisions to draw down the reserve. Opp. 36.

That leaves CAT LLC to retreat to discussing the SEC's "oversight" of the Company and its expenditures more generally. Opp. 36-39. Even assuming CAT LLC's rosy account of the SEC's supervision is correct (*but see* Mem. 18-19), *general* government oversight of a private entity is not a solution for *specific* exercises of delegated government power that are effectively unreviewable. *See Alpine*, 141 F.4th at 1330-31 (noting private nondelegation doctrine would not apply to actions the SEC could later undo). That is doubly true here, where the private entity's actions were not contemplated, much less authorized, by the government in the first place.

**2.**    As to the second prong—whether the effects of CAT LLC's spending spree will make "any later review by the SEC a largely academic exercise," *id.* at 1326—the Company reprises its attempt to cabin *Alpine* to business-"shutter[ing]" consequences. Opp. 34. But again, the question is whether the harms "can be undone later," not whether they are financially ruinous now. *Alpine*, 121 F.4th at 1330.

Nor is there an "expenditure" exception to the private nondelegation doctrine, as CAT LLC suggests. Opp. 37. If there were, then the SEC could hand over its entire $1.8 billion annual budget to the Company to "send[] … out the door" as it alone sees fit. *Id.*; *see* Mem. 17. CAT LLC offers no response to this problem, nor does it cite any authority that spending is categorically exempt in this area of constitutional law. To the contrary, courts assess private entities' spending authority under the private non-delegation doctrine just as much as any other "governmental power[]." *Pittston Co. v. United States*, 368 F.3d 385, 396 (4th Cir. 2004); *see* Mem. 16-17 (collecting cases). Here as elsewhere, "separation of powers concerns" do not "evaporate simply because" the government function at issue is "'spending'" instead of "imposing obligations." *Biden v. Nebraska*, 600 U.S. 477, 505 (2023).

While CAT LLC protests that "none" of these decisions "found an unconstitutional private delegation," the *reason* for that was not an exception for disbursing money. Opp. 39. Rather, it was that the relevant government official was the one "who decide[d] how the funds [would] be spent." *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989); *see Pittston Co.*, 368 F.3d at 395 (private entity may only "pay … out" assets "in an amount *specified* by the statute").

6

Here, the opposite is true. The SEC made clear the reserve could be used only to "'offset future fees'" imposed under an approved funding model, not to *substitute* for a lack of current fees where no such model exists. Mem. 23. And the SEC never considered, let alone approved of, CAT LLC's spending of a reserve comprised entirely of *unlawfully* collected funds.

None of this means that "federal contractors and grantees" will regularly "find themselves in violation of the private nondelegation doctrine." Opp. 38. On the front end, the government typically provides guidance and "impose[s] limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). And on the back end, meaningful post-spending "review" and audits can take place, monies "can be returned," and unauthorized spending "can be undone later." *Alpine*, 121 F.4th at 1330-31. More generally, it is unlikely those entities could be spending fees they themselves unlawfully collected from their competitors, so it is unclear what private parties would even have standing to sue in the first place.

The highly unusual situation here is very different. On the front end, the SEC never lawfully approved any expenditure of the current reserve because every dollar in that account was unlawfully collected under the vacated 2023 Order. *See supra* at 3. And on the back end, that nearly $120 million will likely never return once it goes out the door. As a nominally private entity created "for the sole purpose of the SEC's directive to run a consolidated audit trail," CAT LLC "has no revenue streams" beyond "loan[s]" from its SRO members and the "fees" it unlawfully collected at the

7

point of regulatory bayonet. Opp. 7, 40. So once those fees are gone, there is no chance of a claw back by the SEC. Nor is a refund suit by broker-dealers any guarantee, as CAT LLC doubtless will try to invoke a "regulatory immunity" few other purportedly private entities can claim (and which it conspicuously does not disavow here). Opp. 22; *see* Mem. 24. When it comes to stopping the draining of the reserve, it is now or never.

> **B.     Congress did not strip this Court of jurisdiction.**

With *Alpine* squarely against it, CAT LLC insists that this Court cannot review this challenge at all on the premise that Citadel Securities is trying to "circumvent Congress's limits on the review of SEC actions." Opp. 31. Nonsense. Citadel Securities is not asking this Court to review any SEC action or resolve the meaning of the 2016 Plan. Rather, it is urging this Court to give the SEC *time* to decide whether CAT LLC's expenditure of the reserve is consistent with that Plan and, if it is not, to act. While Citadel Securities (or CAT LLC) may *later* seek review of an SEC decision on whether and how the reserve can be spent, the possibility of such review does not deprive this Court of authority to enjoin unreviewable exercises of government power *in the interim* to maintain the status quo. *Alpine* proves as much: Although the SEC could eventually review FINRA's expulsion decision (and any resulting order would be judicially reviewable), the D.C. Circuit ordered an injunction to ensure adequate time for meaningful Commission review. 121 F.4th at 1337. That is precisely what Citadel Securities seeks: The whole point of this request is to *preserve* the SEC's review, not *circumvent* it.

1.    To prop up its puzzling argument to the contrary, CAT LLC accuses Citadel Securities of launching a "collateral attack" on the 2016 Order on the premise that the Order already "authorizes" the draining of the reserve. Opp. 30-31. But as explained, the 2016 Order could not and did not approve of spending a reserve consisting solely of fees *unlawfully* collected under the vacated 2023 Order. CAT LLC has no right to have those funds in the first place, much less spend them free from any SEC input. *Supra* at 3. In fact, CAT LLC cannot point to *any* statement from the SEC blessing the expenditure of unlawfully collected funds to cover CAT costs without an approved funding model in place—a plan the Company admits it first disclosed only in December 2025. Opp. 16. And while CAT LLC waves around the fact that the petition for rulemaking "seek[s] an amendment" of the 2016 Plan as if it were some sort of smoking gun, it neglects to add that the amendments proposed are purely procedural changes intended to provide the SEC with a clear way of reining in the Company's unprecedented spending of unlawfully collected funds—which the petition *also* explains violates the Plan as it currently stands. *See* ECF 5-2 at 5-6.

In any event, CAT LLC's claim that the 2016 Order authorizes its spending fails on its own terms. Even assuming *arguendo* that the Order could be stretched to cover a reserve comprised of unlawfully collected fees (it cannot), it still would do the Company no good. CAT LLC seizes on (Opp. 30) a part of the 2016 Order that addressed the concern that the SROs might engineer a windfall from surplus fees, explaining that "profits from fees will go toward funding future costs instead of being redistributed among the SROs." 81 Fed. Reg. at 84881. But the question of *how* those

profits would "fund[] future costs" is answered by the rest of the Plan—they are to be treated "as an operational reserve *to offset future fees*." *Id.* at 84967 (emphasis added). And since the vacatur of the 2023 Order, there are *no* "fees" being collected that could be "offset" by the reserve, as there is no SEC-approved funding model in place.

CAT LLC therefore contends that "to offset future fees" refers to *any* "spending" on the CAT for *any* purpose, such as covering the system's "'*costs*,'" on the premise that the Plan contemplates that CAT costs will eventually be recouped through fees. Opp. 26. But if the SEC wanted CAT LLC to use the reserve to offset "fees, *costs and expenses*," it could have easily said so, as the relevant portion of the Plan (§ 11.1) uses that phase elsewhere in the paragraph discussing the reserve. CAT NMS Plan § 11.1(c) (Mar. 24, 2023) (emphasis added), https://perma.cc/QD85-RHDL. Instead, § 11.1 almost invariably uses the term "fees" to refer to CAT fees lawfully collected from broker-dealers under an extant funding model, not hypothetical fees imposed someday in the future under a not-yet-approved one, nor bills from third-parties. *Id.*; *see* Mem. 12 n.1; ECF 5-2 at 6. To adopt CAT LLC's reading would also produce the financial windfall for the SROs that the SEC was trying to avoid—using industry funds, instead of SRO loans, to pay for the CAT without any approved funding mechanism in place. The lack of an SEC-approved funding model is precisely why the CAT was funded by SRO loans for nearly a decade prior to the 2023 Order, and why it should be again until a new model is put in place. In short, the SEC neither contemplated nor approved CAT LLC's use of the reserve as a slush fund for covering the CAT's expenses with broker-dealers' money in the absence of any "fees" to "offset."

10

**2.**      In a last-ditch effort to distract from the issues at hand, CAT LLC faults Citadel Securities for seeking relief from the SEC through a petition for rulemaking rather than an administrative appeal under Rule 608(d). Opp. 32-33. But CAT LLC never explains why that has anything to do with *this Court's jurisdiction* over this case. It does not. *Alpine* makes clear that a party seeking a temporary pause to address an unconstitutional delegation need not put the underlying merits before the SEC through any particular procedural mechanism, as the D.C. Circuit granted relief where the party had yet to file *any* administrative appeal at all with the SEC. *See* 121 F.4th at 1337 (directing injunction to last until "either the SEC reviews the order on the merits *or the time for Alpine to seek SEC review lapses*" (emphasis added)).

Nor does Citadel Securities' choice of procedural vehicle make a difference for *the SEC's process*. Its petition for rulemaking argues that the draining of the reserve violates the 2016 Plan as it stands, and it offers a number of solutions the SEC could use to reverse these unlawful actions. ECF 5-2 at 5-9. And as CAT LLC admits (Opp. 35), the SEC can grant broad relief—including a stay—under Rule 608(d) *sua sponte*, as well as put amendments to the Plan into immediate effect. Opp. 35; *see* 17 C.F.R. § 242.608(b)(4), (d). The petition for rulemaking therefore provides the SEC with everything it needs to take action to remedy CAT LLC's unlawful spending of the reserve by whatever means necessary. This Court should preserve its ability to do so.[1]

---

[1] Nor does it matter that Rule 608(d) permits an "immediate stay," Opp. 33, as the SEC "stay" process in *Alpine* did not remedy the unlawful delegation, 121 F.4th at 1327. The same goes for the "discretionary" nature of the petition-for-review process, Opp. 33, as the SEC likewise has "discretion" to grant administrative appeals under Rule 608(d), 17 C.F.R § 242.608(d).

## II.    The Equitable Factors Warrant A Preliminary Injunction.

### A.    Citadel Securities faces a significant risk of irreparable injury.

The irrevocable nature of CAT LLC's decision to drain the unlawfully collected funds in the reserve before the SEC can act not only cements Citadel Securities' case on the merits, but also shows why an injunction is necessary to prevent irreparable harm—*i.e.*, an injury that is imminent and beyond remediation. Mem. 22-25. CAT LLC nevertheless takes the remarkable position that Citadel Securities lacks not only "irreparable harm," but Article III "standing" as well. Opp. 2. All its arguments fail.

#### 1.    Citadel Securities' injuries are beyond remediation.

**a.**    CAT LLC first contends (Opp. 21-23) that Citadel Securities faces no irremediable injuries, but its argument rests on pure conjecture. Specifically, the Company speculates that Citadel Securities "can recover any losses" later on the premise that "'future fees could be adjusted to account for'" the draining of the reserve now. Opp. 22. But it "is not enough that there is a remedy at law; it must be plain and adequate, or in other words, as practical and as efficient to the ends of justice and its prompt administration, as the remedy in equity." *Boyce's Ex'rs v. Grundy*, 28 U.S. 210, 215 (1830); *see, e.g.*, *PhRMA v. Williams*, 64 F.4th 932, 942 (8th Cir. 2023) (possibility of filing "repetitive lawsuits" inadequate substitute for injunction). And forcing Citadel Securities to bank on the possibility that the SEC will provide a measure of rough justice in the future through some form of hypothetical regulatory book-balancing is no substitute for the assurance of a preliminary injunction now, which would simply preserve the status quo until the SEC has time to act.

Indeed, if the law were otherwise, regulators could *always* evade an injunction merely by speculating about "possible future regulat[ory]" solutions, such as a waiver of sovereign immunity. Opp. 22. CAT LLC's own cases prove the point. In each case, the court noted the agency had already provided or was in the process of devising a way for the plaintiff to recoup its losses. *Nat'l Ass'n of Letter Carriers, AFL-CIO v. USPS*, 419 F. Supp. 3d 127, 135-36 (D.D.C. 2019); *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1027 (D.D.C. 1981). Here, by contrast, no such mechanism currently exists, which is why Citadel Securities has petitioned for rulemaking.

Nor did Citadel Securities "agree" that the SEC can provide it an effective remedy through "lower fees in the future." Opp. 21. Rather, it simply noted that if this Court issues an injunction protecting the reserve for the time being, and the SROs go back to funding the CAT through loans for an interim period, CAT LLC and its SRO operators "could attempt to recoup on any interim loans" in the future—possibly through appropriations from Congress, or via a variety of alternative funding mechanisms, which both Citadel and industry groups have proposed to the SEC. Mem. 26; *see, e.g.*, Letter from Citadel Securities to V. Countryman 13 (Aug. 28, 2024), https://tinyurl.com/8m8d49dx (Citadel Comment Letter); Letter from SIFMA to V. Countryman 1, 3-5 (Oct. 21, 2025), https://tinyurl.com/8m8d49dx. Nothing about those practical observations suggests that a hypothetical administrative solution at some indeterminate point in the future is an adequate substitute for a preliminary injunction that would do nothing more than preserve the status quo.

CAT LLC also tries to wave away Citadel Securities' harm on the theory that, even if its spending is paused now, the SEC will someday allow it to make up the difference by charging Plaintiff and others back-fees. Opp. 25-26. But that argument likewise ignores the "comprehensive review of the CAT" currently underway at the SEC, as well as the alternative funding proposals before the SEC right now. Mem. 8. Given the SROs' track record, and the flawed replacement for the vacated 2023 Order they rushed to propose last year, it is "beyond speculative," Opp. 25, that the SEC will just hand CAT LLC a blank check to start collecting fees from broker-dealers again in the future. All this only underscores why time is needed for the SEC to decide on a path forward. And time is all Citadel Securities seeks with this motion.

At any rate, if CAT LLC was serious about refunding Citadel Securities in the event the SEC finds the Company's raiding of the reserve unlawful after the funds have been spent, it could have included a refund mechanism in the latest funding model that it submitted for SEC approval. 90 Fed. Reg. 44910 (2025). Or it could clearly waive any "regulatory immunity" it might claim to possess now. Opp. 22. Its failure to do either speaks volumes, making clear that the whole point of this exercise is to drain the unlawfully collected reserve before the SEC has a chance to weigh in.

**b.**     With the facts against it, CAT LLC tries its luck with the law, contending that even if the nearly $120 million it is spending from the reserve "may not be recoverable," the permanent loss of that money is not "'significant enough to qualify as irreparable'" when measured against Citadel Securities' "net trading revenue." Opp. 22-23. But that argument relies on an outdated standard.

14

To be sure, courts in this District used to require companies seeking prelimi-

nary injunctive relief from economic harm to show that prospective economic losses

were both unrecoverable and effectively "'ruinous.'" Opp. 22-23 (collecting cases). But

they have more recently held that an "'unrecoverable … economic loss can be irrepa-

rable' even if it would not wipe the business out." *Whitman-Walker Clinic, Inc. v.*

*HHS*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (Boasberg, J.); *see also, e.g., Associated*

*Press v. Budowich*, 780 F. Supp. 3d 32, 58-59 (D.D.C. 2025). For good reason: The

Supreme Court treats *unrecoverable* economic injuries as irreparable. *See, e.g., NIH*

*v. American Public Health Ass'n*, 145 S. Ct. 2658, 2660 (2025); *Ohio v. EPA*, 603 U.S.

279, 292 (2024); *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021); *Youngs-*

*town Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584-85 (1952); *Ohio Oil Co. v. Con-*

*way*, 279 U.S. 813, 814 (1929). So does the D.C. Circuit, which has held that "financial

injury can be irreparable where no adequate compensatory or other corrective relief

will be available at a later date." *Alpine*, 121 F.4th at 1329 (quoting *In re NTE Conn.,*

*LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022)) (alteration omitted). After all, the question

is whether the injury is *irreparable*, not whether it is *ruinous*.

### 2.    Citadel Securities' injuries are imminent.

Having failed to show Citadel Securities has a meaningful remedy on the back

end, CAT LLC pivots to dismissing Plaintiff's harms on the front-end, insisting the

injuries it faces are not sufficiently "imminent" to satisfy even Article III. Opp. 28.

This strategy fares no better.

15

**a.**     To start, CAT LLC claims Citadel Securities flunks every element of Article III standing, but that aggressive assertion quickly falls apart upon inspection. Opp. 28-30. For instance, the Company contends Citadel Securities' injury is not sufficiently "particularized" based on an analogy to limits on "taxpayer" standing. Opp. 29-30. But even taxpayers have standing to sue for refunds, which is one of the forms of relief from the SEC this suit seeks to preserve. ECF 2-5 at 7-8; *see In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 501 F. Supp. 2d 34, 43 (D.D.C. 2007) (collecting cases). In any event, CAT LLC's analogy fails. Unlike taxpayers, parties who contribute to pooled regulatory funds can sue to stop the collection of those funds—in fact, that injury was the basis for *FCC v. Consumers' Research*, 606 U.S. 656 (2025). *See* 109 F.4th 743, 753 (5th Cir. 2024) (en banc); *see also, e.g.*, *Tri-Cnty. Tele. Ass'n, Inc. v. FCC*, 999 F.3d 714, 718-19 (D.C. Cir. 2021). And this suit would effectively stop the collection of future CAT fees from Citadel Securities that may be allocated under an approved funding model by enabling those fees to be offset by the reserve. Mem. 23. Nothing about that is a "'generalized grievance[].'" Opp. 30.

Misplaced analogies aside, CAT LLC also argues that Citadel Securities cannot establish an injury-in-fact, causation, or redressability on the premise that Plaintiff's entire case turns on the "speculative" possibility of the SEC granting its petition for rulemaking or other "regulatory" relief. Opp. 28-29. That assertion is doubly flawed.

*First,* even if the SEC *denies* the petition and approves CAT LLC's proposed new funding model, the reserve would *still* have to be used to "'offset future fees'" Citadel Securities would otherwise incur under the 2016 Plan and a new funding

16

model. Mem. 23. The loss of the reserve will therefore directly harm it no matter what happens with its petition. CAT LLC's only response is to rely on its (flawed) reading of the Plan, but "[f]or standing," this Court must "accept as valid" Plaintiff's position on "the merits." *FEC v. Cruz*, 596 U.S. 289, 298 (2022); *see* Opp. 26; *supra* at 9-10.

*Second*, CAT LLC's argument is a red herring in any event. The draining of the reserve deprives Citadel Securities of a *meaningful opportunity* to have its petition *considered* by the SEC in the first place, with the likelihood that it will never benefit from action taken following that review due to the loss of the funds. Mem. 23-24. This case therefore involves an "'archetypal procedural injury.'" *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017). Specifically, Plaintiff is "seeking to enforce a procedural requirement" (that any exercise of government power is overseen by an accountable public official) "the disregard of which *could* impair a separate concrete interest" (its loss of a financial benefit from the reserve). *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 (1992) (emphasis added). As such, Citadel Securities "has standing to challenge the … failure" to abide by the private nondelegation doctrine, even if it "cannot establish with any certainty that" correcting that constitutional violation "will cause" the SEC to grant substantive relief. *Id.* at 572 n.7.

**b.**     All this equally dooms CAT LLC's assertion that Citadel Securities' asserted harms are too "speculative" to establish the "'imminence'" requirement of irreparable injury. Opp. 23. *First*, whatever happens to the petition for rulemaking, the loss of the reserve will irreparably deny Citadel Securities an offset under the Plan as it currently exists. And CAT LLC's untenable interpretation of the Plan is equally

irrelevant here, for when it comes to "the irreparable harm analysis itself," this Court must "assume[], without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006); *see supra* at 16-17.

*Second*, a procedural injury that satisfies the "imminence" requirement for standing, *Ctr. for Biological Diversity*, 861 F.3d at 182, also meets the same imminence requirement for irreparable injury; the only question remaining is whether that injury is irremediable. *See, e.g.*, *Friends of Earth US v. Exp.-Imp. Bank of United States*, 2025 WL 3516161, at *13-16 (D.D.C. Oct. 10, 2025) (*EXIM*); *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17-19 (D.D.C. 2009); *supra* at 17. CAT LLC's reliance on several cases that reject "irreparable harm … contingent on the future discretionary acts of third parties, including agencies," proves nothing to the contrary. Opp. 24-25. In each of those cases, the alleged harm was not about to occur; instead, the plaintiffs sought to enjoin an agency's "future discretionary acts" that might cause the plaintiffs harm down the road. *Id.* Here, by contrast, CAT LLC (without the SEC's review or approval) is currently spending the reserve, which is the direct cause of Citadel Securities' injury.

Nor can CAT LLC dismiss this procedural injury by asserting that *Alpine* "forecloses" treating a "structural constitutional violation" as inherently "irreparable." Opp. 28; *see* Opp. 25. To be clear, Citadel Securities disagrees with that part of *Alpine*—which departs from prior circuit precedent and the decisions of other circuits holding that "a prospective violation of a constitutional right constitutes irreparable

18

injury"—and preserves this issue for further review. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1136 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *see, e.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). After all, "'[t]he loss of First Amendment freedoms … unquestionably constitutes irreparable injury,'" and the loss of separation-of-powers protections cannot be treated any less solicitously. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *see Bond v. United States*, 564 U.S. 211, 222-23 (2011).

But that disagreement is irrelevant at this stage. For present purposes, it is enough that CAT LLC's draining of the reserve "impair[s]" Citadel Securities' "ability to protect its interests" in that pot of money. *Northern Mariana Islands*, 686 F. Supp. 2d at 18. Once the reserve is gone, the "SEC is far less likely to be receptive to" Citadel Securities' requests for relief, meaning Plaintiff "will never have an equivalent opportunity to influence" the Commission's decision regarding the reserve if an injunction is denied. *Id.* at 18-19; *see EXIM*, 2025 WL 3516161, at *13-16 (applying this analysis as to a "draw[] down" of "funds"); *see also N.J. Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980) (*post hoc* review is "'no substitute'" for a chance "'to influence'" agency's decision "'in a meaningful way'"). In *Alpine*, by contrast, the D.C. Circuit declined to issue a preliminary injunction halting FINRA proceedings on the basis of an Appointments Clause violation because "the harm from expulsion" was "already redressed by the nondelegation preliminary injunction," thereby guaranteeing that "the SEC will have the final word." 121 F.4th at 1332, 1336. But letting the SEC have the final word is precisely what CAT LLC is trying to prevent here.

19

**c.**    Finally, CAT LLC claims Citadel Securities' "egregious delay" in seeking relief shows there is no imminent harm. Opp. 19. But the supposed delay exists only in the Company's imagination. As explained, this challenge is not "a collateral attack" on the 2016 Plan, but an attempt to preserve the SEC's ability to remedy CAT LLC's violations of that Plan that are happening *now*. Opp. 18; *see supra* at 8-9. Nor is it a challenge to the "several fee filings from 2024 and 2025" that CAT LLC made in reliance on the since-vacated 2023 Order, as those filings said nothing about spending the reserve without either an operative funding model or any "fees" to "offset." And for the record, Citadel Securities *did* object to those filings by asking the SEC "to suspend" them because the 2023 Order ostensibly authorizing them was unlawful. Opp. 11; *see, e.g.*, Citadel Comment Letter 3. At that time, Plaintiff could not possibly have anticipated that after the Eleventh Circuit vacated that Order in late July 2025, CAT LLC would then effectively defy the decision by draining the reserve consisting of those unlawfully collected fees before the SEC could step in to address their use.

When CAT LLC's plan finally became clear, Citadel Securities acted promptly. The Company first publicly disclosed to the SEC its intent to immediately spend the entirety of the reserve on December 18, 2025. Letter from CAT LLC to V. Countryman 13 (Dec. 18, 2025), https://tinyurl.com/4ucazm37. The *next day*, SIFMA, an industry trade association which counts Citadel Securities among its members, responded with a letter contesting CAT LLC's authority to spend the reserve and requesting further clarity as to the Company's basis for its plans. Letter from SIFMA to V. Countryman 3-5 (Dec. 19, 2025), https://tinyurl.com/5yjem848 (SIFMA Letter) (Ex. 1).

20

It was CAT LLC that did not respond until January 14, 2026, brushing aside broker-dealer concerns and confirming that it planned to spend the industry's reserve funds. ECF 5-6 at 2. Citadel Securities filed its petition for rulemaking the *next day*. ECF 5-3. It then filed its complaint and preliminary-injunction motion *the day after that*. ECF 1, 5. The record therefore reflects that Citadel Securities acted with lightning speed as soon as it became clear what CAT LLC was doing and that it would not change course—the opposite of "gamesmanship." Opp. 20.

CAT LLC's assertion that courts "routinely deny emergency relief" in cases like this is therefore dead wrong. Opp. 19. In *Florida EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7 (D.D.C. 2020), for instance, the agency had "published the final rule in July 2019"—where it made clear the rule would take "effect on November 21, 2019"— yet the "plaintiff waited until five days after" the effective date to sue. *Id.* at 13. The failure to challenge the rule in the *four months before* the rule took effect was obviously the problem—not the *five days after*. *Id.* Similarly, the plaintiff in *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000), waited to sue "over eight months after it believed" its drug was eligible for FDA approval (and "over two months" after it was actually eligible). *Id.* at 44. The plaintiff in *Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005), likewise secured an inauguration ticket in "mid-November," but waited "until December 21, 2004" to sue without any apparent excuse. *Id.* at 292. And in *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975), the D.C. Circuit held that the plaintiff's 44-day delay in filing made an injunction "futile" because the chance to comment was "pretty well over" by oral argument. *Id.* at 987.

Here, by contrast, Citadel Securities and its fellow broker-dealers had no advance notice of CAT LLC's plan to spend the unlawfully collected reserve, nor did they fail to take advantage of an earlier opportunity to object. Instead, at every step, they took appropriate actions within days of the Company's revelations, tried everything they could to resolve the issue without making this a federal case, and immediately went to court once it became clear CAT LLC would not back down.

**B.    The remaining equitable factors favor a preliminary injunction.**

As for the remaining factors, CAT LLC never articulates why an order preserving the status quo to give the SEC time to act would cause it—or anyone else—meaningful harm. While the Company suggests the requested injunction would wreak "'chao[s]'" on "the U.S. markets," this lawsuit—unlike the Texas case it cites—does not seek to "halt[] the CAT's operation" in any respect. Opp. 43; *see Davidson v. Gensler*, 2024 WL 4926665, at *2 (W.D. Tex. Oct. 24, 2024) (discussing requested relief). To the contrary, it simply asks this Court to give the SEC time to figure out what should be done with a reserve consisting of funds that were unlawfully collected and that can no longer be used for their lawful purpose of offsetting fees.

If anything, CAT LLC is the only one threatening to take the CAT "offline" here. Opp. 42. The Company intimates that if the reserve is frozen, the SROs who run CAT LLC may refuse to "loan" it the money "it needs to operate the CAT," such that the system may no longer "function." Opp. 40. As a threshold matter, treating the CAT as a hostage that will be executed if this Court grants an injunction is an odd path to claiming the equitable high ground.

22

In any event, CAT LLC's threats get it nowhere. For all its bluster, the Company cannot bring itself to say that its SRO operators *will* shutter the CAT in the event of an injunction. *See* Opp. 40 ("questions"); Opp. 42 ("uncertainty"). And that is because they *cannot*, as the 2016 Plan—which, unlike the 2023 Order, remains in place—legally obligates the SROs to continue running the CAT regardless of whether there is a funding regime in place. *See* 81 Fed. Reg. at 84693. That is why the Eleventh Circuit rejected the same arguments from CAT LLC when the Court vacated the 2023 Order (and then denied CAT LLC's rehearing petition seeking an extension of the 60-day stay): The CAT "will presumably continue" to "operate[] without" the reserve—as it has "since 2016"—meaning an injunction "will minimally affect the status quo." *ASA v. SEC*, 147 F.4th 1264, 1279 (11th Cir. 2025); *see* Mem. 26-27; 23-13396 Dkt. 158-1 at 11 (CAT LLC threatening that a stay of only 60 days "may result in a lack of funding of the CAT altogether").

CAT LLC is therefore left complaining that "a return to" that status quo would not be "equitable." Opp. 42. But no one is asking this Court to decree that "the SROs foot the bill forever." *Id.* All that Citadel Securities seeks here is a temporary pause to allow *the SEC* to decide what happens to nearly $120 million in regulatory fees unlawfully collected under a defunct funding model before they are gone for good. CAT LLC obviously does not want to wait for that decision, but there is nothing inequitable about requiring it to do so. *See* Mem. 25-26. All it would mean is a return to the longstanding status quo.

23

Nor is Citadel Securities seeking a "windfall" by pursuing that modest relief. Opp. 41. Far from having paid "$0 of CAT costs," Opp. 42, broker-dealers have forked over hundreds of millions in fees under the unlawful 2023 Order (including FINRA's pass-through of its entire share onto those entities and their customers). Mem. 7. And that is on top of the *billions* in internal costs they incurred in complying with CAT's data-reporting requirements. 81 Fed. Reg. at 84801, 84860. That cannot be described as free-riding, especially where many broker-dealers view the entire system as unlawful, inefficient, and unfair. *See* Opp. 41 (claiming Citadel Securities "benefits" from the CAT by being regulated). Instead, the only one seeking a windfall here is CAT LLC, who urges this Court to let it spend nearly $120 million it never should have collected before the SEC can weigh in, thereby "extend[ing] the life of the unlawful 2023 funding model well beyond the date of its vacatur." SIFMA Letter 3; *see* Mem. 22-25. That gain to CAT LLC will come at the expense not only of Citadel Securities and its fellow broker-dealers, but their investor customers as well.

At any rate, CAT LLC has only itself to blame for its current situation. Despite studiously refusing to defend the CAT as lawful in the Eleventh Circuit, neither the Company nor its SRO operators ever challenged the SEC's decision to create this unprecedent regime.[2] Instead, they chose to play along, running up a ten-figure bill on the assumption that they ultimately would be "free to pass along all of those costs to their broker-dealer members." *ASA*, 147 F.4th at 1275.

---

[2] After intervening to defend the 2023 Order in the Eleventh Circuit, CAT LLC expressly declined to address Citadel Securities' argument "that the SEC exceeded its authority in creating the CAT." 23-13396 Dkt. 97 at 19.

24

Once the SEC initially gave them the green light to do so, Citadel Securities called their bluff by petitioning for a redress of grievances in the Eleventh Circuit. *Compare* U.S. Const. amend. I *with* Opp. 41 (suggesting pursuit of this successful lawsuit was inequitable). Yet rather than exercise caution in the face of that challenge, CAT LLC and the SROs raced to seize as many fees from broker-dealers as they could, even beyond what the unlawful 2023 Order allowed. Mem. 26-27. And when the Eleventh Circuit vacated the 2023 Order, CAT LLC chose not to use the court's 60-day stay "to adjust and react to this reality"—such as by seeking loans from the SROs—but instead demanded as much money as possible from broker-dealers before the stay expired to build up a reserve it could attempt to spend without any SEC-approved funding model in place. *ASA*, 147 F.4th at 1280; *see* Mem. 27. Whatever the wisdom of that go-for-broke strategy, its fallout now is not Citadel Securities' fault.

## CONCLUSION

The Court should grant Citadel Securities' motion.

25

Dated: February 9, 2026     Respectfully Submitted,

             */s/ Noel J. Francisco*
             Noel J. Francisco
              (D.C. Bar No. 464752)
             Brian C. Rabbitt*
              (D.C. Bar No. 992692)
             Brinton Lucas
              (D.C. Bar No. 1015185)
             Christopher S. Dinkel*
              (N.Y. Bar No. 5927470)
             JONES DAY
             51 Louisiana Avenue, N.W.
             Washington, DC 20001.2113
             Telephone: (202) 879-3939
             Facsimile: (202) 626-1700
             njfrancisco@jonesday.com

             David Phillips*
              (Cal. Bar No. 344034)
             JONES DAY
             4655 Executive Dr., Ste. 1500
             San Diego, CA 92121

             *Counsel for Plaintiff Citadel Securities LLC*

             * admitted *pro hac vice*

26

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2026, I filed the foregoing document with the Clerk of Court for the U.S. District Court for the District of Columbia using the court's CM/ECF system, which will serve all participants in the case.

Dated: February 9, 2026

*/s/ Noel J. Francisco*
Noel J. Francisco
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001.2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
njfrancisco@jonesday.com

*Counsel for Plaintiff Citadel Securities LLC*

27